## UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF              )
THE EXTRADITION OF            )
IGOR POLIAKOV A/K/A           )            22-mj-291
IGOR RAMOS A/K/A IGOR ADRIAN  )
RAMOS A/K/A IGORIS POLIAKOVAS )

## COMPLAINT PURSUANT TO 18 U.S.C. § 3184,
## FUGITIVES FROM FOREIGN COUNTRY TO UNITED STATES

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.      In this matter, I represent the United States in fulfilling its treaty obligation to the Government of the Republic of Lithuania ("Lithuania").

2.      There is an extradition treaty in force between the United States and Lithuania. *See* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, U.S.-Lith., Oct. 23, 2001, S. Treaty Doc. No. 107-4 (2002) (the "2001 Treaty"), *and* the Protocol on the Application of the Agreement on Extradition Between the United States of America and the European Union to the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, U.S.-Lith., June 15, 2005, S. Treaty Doc. No. 109-14 (2006) (the "Protocol"; together with the 2001 Treaty, the "Treaty"). The Annex to the Protocol (the "Annex") reflects the integrated text of the provisions of the 2001 Treaty and the U.S.-EU Extradition Agreement.

3.      Pursuant to the Treaty, the Government of Lithuania has submitted a formal request through diplomatic channels for the extradition of Igor Poliakov ("POLIAKOV") a/k/a Igor Ramos a/k/a Igor Adrian Ramos a/k/a Igoris Poliakovas.

4.    According to the information the Government of Lithuania has provided:  On April 12, 2010, POLIAKOV was charged with fraud, in violation of Paragraph 1 of Article 182 of Lithuania's Criminal Code ("Charge 1").  On September 29, 2011, POLIAKOV was charged with fraud involving high value property in violation of Paragraph 2 of Article 182 of Lithuania's Criminal Code ("Charge 2").

5.    These offenses were committed within the jurisdiction of Lithuania.  On April 16, 2010, Alberta Baltušyte, Pre-trial Investigation Judge of Vilnius City 3rd District Court, Lithuania, issued a warrant for POLIAKOV's arrest on Charge 1.  On November 9, 2011, O. Šibkovas, Judge of Vilnius City 3rd District Court, Lithuania, issued a warrant for POLIAKOV's arrest on Charge 2.

6.    The warrants issued on the basis of the following facts:

a.    POLIAKOV is accused of intentionally making false representations about his ability to export cars from the United States to Lithuania, receiving payment for the subject cars from victims who relied on his fraudulent statements, and failing to deliver the cars or repay the victims.

### Charge 1

b.    Charge 1 concerns an alleged fraud that POLIAKOV perpetrated on Alvydas Milkevičius ("Milkevičius" or "Victim 1").  In May 2009, Victim 1's neighbor, Česlav Pečul ("Pečul"), introduced Victim 1 to POLIAKOV.  Pečul understood that Victim 1 was interested in purchasing a Subaru Outback from the United States, and Pečul was under the impression that POLIAKOV was in the business of delivering vehicles from the United States to Lithuania.  POLIAKOV reported to Pečul that he had located a Subaru Outback in the United States and provided him with photographs of the vehicle to share with Victim 1.  After reviewing

the photographs, Victim 1 agreed to meet with Poliakov to discuss the purchase of the Subaru Outback.

      c.     POLIAKOV and Victim1 met on May 15, 2009.  At the meeting, Poliakov told Victim 1 that he would travel to the United States to procure the Subaru Outback and that the vehicle would be delivered within 30 to 40 days.  Poliakov requested that Victim 1 make a security deposit of 12,000 Lithuanian Litas for delivery of the vehicle.  Poliakov instructed Victim 1 to make the payment to a bank account belonging to an individual named Igor Judickij ("Judickij"), which Victim 1 did via an online transfer to the bank account POLIAKOV specified.

      d.     Judickij subsequently told investigators that POLIAKOV had requested to use his bank account to receive the 12,000 Lithuanian Litas from Victim 1 because POLIAKOV's passport had been seized and therefore POLIAKOV could not open a bank account in his own name.  POLIAKOV instructed Judickij to withdraw the money that Victim 1 had deposited into Judickij's account and provide POLIAKOV with the cash.  Judickij followed POLIAKOV's instructions and gave him the 12,000 Lithuanian Litas that Victim 1 had deposited.

      e.     The next month, in June 2009, Pečul contacted Victim 1 to inform him that he would be traveling with POLIAKOV to Lithuania's Port of Klaipėda to complete the customs check-out process, and that the car would be delivered the next day to Vilnius, the city where Victim 1 resides.  Victim 1 paid POLIAKOV an additional 4,000 Lithuanian Litas, through Pečul, which was purportedly necessary for the customs check-out process.

      f.     POLIAKOV failed to deliver the Subaru Outback to Victim 1 in June 2009 as promised.  Pečul informed Victim 1 that he and POLIAKOV had traveled to the Port of Klaipėda to handle the customs check-out process, but that certain documentation was missing and therefore the vehicle could not be delivered.  Victim 1 understood that POLIAKOV would contact him

regarding next steps.  However, POLIAKOV did not contact Victim 1.  Victim 1 then attempted to contact POLIAKOV directly by phone but received a message in Belorussian indicating that the number he had dialed could not be reached.  On June 17, 2009, Pečul received a text from POLIAKOV that he was in Belarus and would call Pečul when he returned.  However, POLIAKOV never called Pečul.

    g. POLIAKOV never delivered the Subaru Outback to Victim 1.  Investigators subsequently received notification that the company thought to have been engaged by POLIAKOV in connection with the shipment of the Subaru Outback from the United States to Lithuania had, in fact, never been contacted by POLIAKOV.

    h. In December 2009 and January 2010, POLIAKOV repaid a portion of the money he took from Victim 1.  However, POLIAKOV has not repaid the bulk of the money that he received from Victim 1, who is still owed more than 9,363 Lithuanian Litas.

### *Charge 2*

    i. Charge 2 concerns an alleged fraud that POLIAKOV perpetrated on Valdemar Savicki ("Savicki" or "Victim 2").  Savicki initially came across POLIAKOV's contact information in May 2008 when he searched a Lithuanian car website for a vehicle to purchase.

    j. Victim 2 first contacted POLIAKOV in connection with an advertised BMW X5.  POLIAKOV arranged a meeting with Victim 2, at which POLIAKOV represented himself as someone who transported cars from the United States to Lithuania.  POLIAKOV informed Victim 2 that the BMW X5 was still in the United States and would not be available in time for a trip that Victim 2 had planned with his wife.  However, POLIAKOV provided Victim 2 with credentials to access information on the internet about other vehicles that were being sold in the United States.  Following this initial meeting, POLIAKOV and his cohabiting partner

attempted to befriend Victim 2 and his wife by frequently contacting them by phone and meeting with them in-person.

      k.      Victim 2 subsequently found an advertisement on the internet for the sale of a Mercedes-Benz GL 450 that was being sold by a dealership in Roslyn, New York. POLIAKOV represented to Victim 2 that he could procure the vehicle and requested a $30,000 advance payment, which Victim 2 made on August 6, 2008.  POLIAKOV then left for the United States, purportedly to consummate the transaction.  While POLIAKOV was in New York, he communicated with Victim 2 by phone and emailed him pictures of the Mercedes-Benz GL 450.

      l.      Later in August 2008, POLIAKOV returned to Lithuania and met with Victim 2.  At the meeting, POLIAKOV represented to Victim 2 that the Mercedes-Benz GL 450 had been purchased and loaded onto a container and would be delivered to the Port of Klaipėda in Lithuania on September 10, 2008.  Also at the meeting, POLIAKOV requested that Victim 2 pay him the remaining amount owed on the vehicle, totaling approximately $26,560.  Victim 2 made the additional payment on August 20, 2008.

      m.      POLIAKOV did not deliver the Mercedes-Benz GL 450 to Victim 2 in September 2008 as promised.  Victim 2 demanded proof from POLIAKOV that his vehicle had, in fact, been shipped to Lithuania.  In the beginning of October 2008, POLIAKOV provided Victim 2 with a shipment container number, but the responsible customs company informed Victim 2 that the corresponding container did not contain a Mercedes-Benz GL 450.

      n.      Victim 2 then contacted the dealership in Roslyn, New York, which informed them that POLIAKOV had made only a small advance payment for the vehicle and that the sale was never consummated.  The dealership subsequently told investigators that, in early August 2008, POLIAKOV made a $5,000 security deposit for the Mercedes-Benz GL 450 and

told them that he would be traveling to Russia to obtain the rest of the money.  POLIAKOV promised to return to the dealership the following week.  However, POLIAKOV did not return to the dealership until three weeks after the initial meeting.  At that time, POLIAKOV told the dealership that his client no longer wanted to purchase the vehicle and demanded the return of the security deposit, which the dealership gave to him.

o.     From September 2008 until May 2011, POLIAKOV communicated with Victim 2 by phone and email.  In those communications, POLIAKOV made a number of excuses to Victim 2 for his failure to deliver the vehicle or repay the money owed to Victim 2.  To date, POLIAKOV has repaid only $500 of the $56,560 to Victim 2.

p.     The last contact between POLIAKOV and Victim 2 occurred in May 2011. On May 11, 2011, POLIAKOV told Victim 2 that he understood he was wanted by the Lithuanian authorities and was afraid to return to the country.  On May 17, 2011, POLIAKOV called Victim 2 and proposed paying off his debt in return for Victim 2 calling the police and asking them to stop the search for him.  Victim 2 told POLIAKOV that the first thing that needed to happen was for him to be repaid.  However, POLIAKOV never repaid Victim 2.

7.     On February 22, 2022, POLIAKOV was found by the U.S. Marshals and arrested at 2222 Napfle Street, Philadelphia, PA 19152.  POLIAKOV was previously believed to be located within the jurisdiction of the United States District Court for the Eastern District of New York.  A sealed arrest warrant issued in that district in 2017.

8.     An attorney in the Office of the Legal Adviser of the U.S. Department of State has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which Lithuania made its request for extradition and a copy of the Protocol (with the Annex).  The declaration states that the Annex covers the offenses for which Lithuania seeks

extradition and confirms that the documents supporting the request for extradition bear the certificate or seal of Lithuania's Ministry of Justice, in accordance with Article 9 of the Annex, so as to enable them to be received into evidence.

9.      The declaration from the U.S. Department of State with its attachments, including copies of the diplomatic note from Lithuania, the Protocol (with Annex), and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit #1) are filed with this complaint and incorporated by reference herein.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Lithuania, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered.

/s/ Alexandra M. Lastowski
ALEXANDRA M. LASTOWSKI
Assistant United States Attorney

Sworn to before me and subscribed in my presence this 23rd day of February , 2022, at 9:59 a.m.                    .

/s/ Hon. Scott W. Reid
HONORABLE SCOTT W. REID
United States Magistrate Judge



DISTRICT OF COLUMBIA, ss:

## DECLARATION OF ELIZABETH M. KIINGI

I, Elizabeth M. Kiingi, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Igor Poliakov, alias Igor Ramos, alias Igor Adrian Ramos. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Lithuania are found in the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Lithuania, signed on 23 October 2001, (the "2001 Treaty"), and the Protocol on the application of the Agreement on Extradition between the United States of America and the European Union to the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Lithuania, with Annex, signed 15 June 2005 (the "Protocol"). The Annex to the Protocol (the "Annex") reflects the integrated text of the provisions of the 2001 Treaty and the U.S.-EU Extradition Agreement. A copy of the Protocol with Annex is attached to this declaration.

3. In accordance with Article 8(1) of the Annex, the Embassy of the Republic of Lithuania has submitted Diplomatic Note No. SN45-32, dated 5 August 2016, formally requesting the extradition of Igor Poliakov. A copy of the diplomatic note is attached to this declaration.

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*



...tify That Elizabeth M. Kiingi, whose name is subscribed to the document hereunto annexed, ...he time of subscribing the same Attorney Adviser, Office of the Legal Adviser, Department of ...ited States of America, and that full faith and credit are due to her acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Rex W. Tillerson, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this fifteenth day of March, 2017.

*Rex W. Tillerson*
_____
Secretary of State

By *Matthews*
_____
Assistant Authentication Officer,
Department of State

*Issued ...ant to CH... ...te of Sept. ...89, 1 Stat. ...22 USC ...22USC 265... USC 301; 2... 1733 et. se... USC 1443(f)... E 44 Federa... ...n of Civil P... re.*

EX-POLIAKOV-00002

-2-

4.  In accordance with Article 19 of the Annex, the United States provides legal representation in the U.S. courts for Lithuania in its extradition requests, and Lithuania provides legal representation in its courts for extradition requests made by the United States.

5.  The offenses for which extradition is sought are covered by Article 2 of the Annex.

6.  In accordance with Article 9 of the Annex, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization.  Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in Vilnius.  Lithuania, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March __12__, 2017.



ELIZABETH M. KIINGI

Attachments:
    1.  Copy of Note.
    2.  Copy of Protocol with Annex.

**Protocol on the application of the Agreement on Extradition between the United States of America and the European Union to the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Lithuania**

1.      As contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"), the Governments of the United States of America and the Republic of Lithuania acknowledge that, in accordance with the provisions of this Protocol, the U.S.-EU Extradition Agreement is applied in relation to the bilateral Extradition Treaty between the Government of the United States of America and the Government of the Republic of Lithuania signed 23 October 2001 (hereafter "the 2001 Extradition Treaty") under the following terms:

(a)     Article 5(1) of the U.S.-EU Extradition Agreement as set forth in Article 8(1) of the Annex to this Protocol shall govern the mode of transmission of the extradition request and supporting documents;

(b)     Article 5(2) of the U.S.-EU Extradition Agreement as set forth in Article 9 of the Annex to this Protocol shall govern the requirements concerning certification, authentication or legalization of the extradition request and supporting documents;

(c)     Article 7(1) of the U.S.-EU Extradition Agreement as set forth in Article 11(4) of the Annex to this Protocol shall provide an alternative method for transmission of the request for extradition and supporting documents following provisional arrest;

(d)     Article 8 of the U.S.-EU Extradition Agreement as set forth in Article 8 *bis* of the Annex to this Protocol shall govern the channel to be used for submitting supplementary information;

(e)     Article 10 of the U.S.-EU Extradition Agreement as set forth in Article 14 of the Annex to this Protocol shall govern the decision on requests made by several States for the extradition or surrender of the same person;

(f)     Article 13 of the U.S.-EU Extradition Agreement as set forth in Article 7 of the Annex to this Protocol shall govern extradition with respect to conduct punishable by death in the Requesting State; and

(g)     Article 14 of the U.S.-EU Extradition Agreement as set forth in Article 8 *ter* of the Annex to this Protocol shall govern consultations where the Requesting State contemplates the submission of particularly sensitive information in support of a request for extradition.

2.      The Annex reflects the integrated text of the provisions of the 2001 Extradition Treaty and the U.S.-EU Extradition Agreement that shall apply upon entry into force of this Protocol.

3.      In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Protocol shall apply to offenses committed before as well as after it enters into force.

1

4.    This Protocol shall not apply to requests for extradition made prior to its entry into force.

5.    (a)    This Protocol shall be subject to the completion by the United States of America and the Republic of Lithuania of their respective applicable internal procedures for entry into force.  The Governments of the United States of America and the Republic of Lithuania shall thereupon exchange instruments indicating that such measures have been completed.  This Protocol shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

      (b)    In the event of termination of the U.S.-EU Extradition Agreement, this Protocol shall be terminated and the 2001 Extradition Treaty shall be applied.  The Governments of the United States of America and the Republic of Lithuania nevertheless may agree to continue to apply some or all of the provisions of this Protocol.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Protocol.

DONE at Brussels, in duplicate, this 15 day of June, 2005, in the English and Lithuanian languages, both texts being equally authentic.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
REPUBLIC OF LITHUANIA:

2

ANNEX

EXTRADITION TREATY
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE REPUBLIC OF LITHUANIA

TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political and Military Offenses |
| Article 5 | Prior Prosecution |
| Article 6 | Lapse of Time |
| Article 7 | Capital Punishment |
| Article 8 | Extradition Procedures and Required Documents |
| Article 8 *bis* | Supplemental Information |
| Article 8 *ter* | Sensitive Information in a Request |
| Article 9 | Admissibility of Documents |
| Article 10 | Translation |
| Article 11 | Provisional Arrest |
| Article 12 | Decision and Surrender |
| Article 13 | Temporary and Deferred Surrender |
| Article 14 | Requests for Extradition or Surrender Made by Several States |
| Article 15 | Seizure and Surrender of Property |
| Article 16 | Rule of Speciality |
| Article 17 | Consent to Waiver of Extradition Proceedings |
| Article 18 | Transit |
| Article 19 | Representation and Expenses |
| Article 20 | Consultation |
| Article 21 | Termination |

3

EX-POLIAKOV-00006

## Article 1
## Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State have charged with or convicted of an extraditable offense.

## Article 2
## Extraditable Offenses

1.    An offense shall be an extraditable offense if it is punishable under the laws in both States by deprivation of liberty for a period of more than one year or by a more severe penalty.

2.    An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of any offense described in paragraph 1.

3.    For the purposes of this Article, an offense shall be an extraditable offense:

  (a) whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

  (b) whether or not the offense in one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

4.   Extradition shall be granted for an extraditable offense regardless of where the act or acts constituting the offense were committed.

5.   If extradition has been granted for an extraditable offense it shall also be granted for any other offense specified in the request even if the latter offense in punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

## Article 3
## Nationality

Extradition shall not be refused based on the nationality of the person sought.

## Article 4
## Political and Military Offenses

1.   Extradition shall not be granted if the offense for which extradition is requested is a political offense.

4

2.   For the purposes of this Treaty, the following offenses shall not be considered political offenses:

    (a) a murder or other violent crime against a Head of State of the Requesting or Requested State, or of a member of the Head of State's family;

    (b) an offense for which both the Requesting and Requested States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

    (c) murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

    (d) an offense involving kidnaping, abduction, or any form of unlawful detention, including the taking of a hostage;

    (e) placing or using an explosive, incendiary or destructive device capable of endangering life, of causing substantial bodily harm, or of causing substantial property damage; and

    (f) a conspiracy or attempt to commit any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses.

3.   Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated.

4.   The executive authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law.

Article 5
Prior Prosecution

1.   Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested. Conviction or acquittal also means, under Lithuanian law, an agreed resolution approved by a court with final and binding effect.

2.   Extradition shall not be precluded by the fact that the competent authorities of the Requested State have decided either:

    (a) not to prosecute the person sought for the acts for which extradition is requested;

    (b) to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

    (c) to investigate the person sought for the same acts.

5

### Article 6
### Lapse of Time

The decision by the Requested State whether to grant the request for extradition shall be made without regard to the law of either the Requesting State or the Requested State concerning lapse of time.

### Article 7
### Capital Punishment

Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out.  If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions.  If the Requesting State does not accept the conditions, the request for extradition may be denied.

### Article 8
### Extradition Procedures and Required Documents

1.    Requests for extradition and supporting documents shall be transmitted through the diplomatic channel, which shall include transmission as provided for in Article 11(4).

2.    All requests shall include:

    (a) documents, statements, or other types of information which describe the identity and probable location of the person sought;

    (b) information describing the facts of the offense and the procedural history of the case;

    (c) a statement of the relevant text of the provisions of the laws describing the essential elements of the offense for which extradition is requested;

    (d) a statement of the relevant text of the provisions of law prescribing punishment for the offense;

    (e) a statement of the provisions of law describing any time limit on the prosecution; and

    (f) the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.

6

3.    A request for extradition of a person who is sought for prosecution also shall include:

      (a) a copy of the warrant or order of arrest issued by a judge, court, or other authority competent for this purpose;

      (b) a copy of the charging document; and

      (c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

4.   A request for extradition relating to a person who has been convicted of the offense for which extradition is sought also shall include:

      (a) a copy of the judgment of conviction, or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

      (b) information establishing that the person sought is the person to whom the finding of guilt refers;

      (c) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

      (d) in the case of a person who has been convicted in absentia, the documents required by paragraph 3.

Art. 8 *bis*
Supplemental Information

1.   The Requested State may require the Requesting State to furnish additional information within such reasonable length of time as it specifies, if it considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty.

2.   Such supplementary information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of the Republic of Lithuania.

Article 8 *ter*
Sensitive Information in a Request

      Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State.  If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

7

EX-POLIAKOV-00010

## Article 9
### Admissibility of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and, for the Republic of Lithuania, the Ministry of Justice of the Republic of Lithuania.

## Article 10
### Translation

All documents submitted by the Requesting State shall be translated into the language of the Requested State.

## Article 11
### Provisional Arrest

1.      In case of urgency, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition. A request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Office of the Public Prosecutor of the Republic of Lithuania. The facilities of the International Criminal Police Organization (Interpol) also may be used to transmit such a request.

2.    The application for provisional arrest shall contain:

   (a)   a description of the person sought;

   (b)   the location of the person sought, if known;

   (c)   a brief statement of the facts of the case, including, if possible, the time and location of the offense;

   (d)   a description of the law(s) violated;

   (e)   a statement of the existence of a warrant of arrest or a finding of guilt or judgment of conviction against the person sought; and

   (f)   a statement that the documents supporting the extradition request for the person sought will follow within the time specified in this treaty.

3.      The Requesting State shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

4.      A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the request for

8

extradition required in Article 8. For this purpose, receipt of the request for extradition by the Embassy of the Requested State in the Requesting State shall constitute receipt by the executive authority of the Requested State.

5.      The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.


### Article 12
### Decision and Surrender

1.      The Requested State shall promptly notify the Requesting State of its decision on the request for extradition.

2.      If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3.      If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.

4.      If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense.


### Article 13
### Temporary and Deferred Surrender

1.    If the extradition request is granted in the case of a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Requesting and Requested States.

2.    The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.


### Article 14
### Requests for Extradition or Surrender Made by Several States

1.      If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same

9

offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2.        If the Republic of Lithuania receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its executive authority shall determine to which State, if any, it will surrender the person.

3.        In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

(a)        whether the requests were made pursuant to a treaty;
(b)        the places where each of the offenses was committed;
(c)        the respective interests of the Requesting States;
(d)        the seriousness of the offenses;
(e)        the nationality of the victim;
(f)        the possibility of any subsequent extradition between the Requesting States; and
(g)        the chronological order in which the requests were received from the Requesting States.

Article 15
Seizure and Surrender of Property

1.        To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items, including articles, documents, and evidence, that are connected with the offense in respect of which extradition is granted.  The items mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.        The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable.  The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

3.        The rights of third parties in such items shall be duly respected in accordance with the laws of the Requested State.

Article 16
Rule of Speciality

1.        A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)  any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense for which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b)  any offense committed after the extradition of the person; or

10

(c)  any offense for which the executive authority of the Requested State consents to the person's detention, trial, or punishment.  For the purpose of this subparagraph:

(i)  the Requested State may require the submission of the documentation called for in Article 8; and

(ii)  the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request is being processed.

2.        A person extradited under this Treaty may not be extradited to a third State or extradited or surrendered to an international tribunal for any offense committed prior to extradition unless the Requested State consents.

3.        Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of that person to a third State, if:

(a)  that person leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b)  that person does not leave the territory of the Requesting State within 10 days of the day on which that person is free to leave.

Article 17
Consent to Waiver of Extradition Proceedings

If the person sought consents in writing to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

Article 18
Transit

1.        Either State may authorize transportation through its territory of a person surrendered to the other State by a third State.  A request for transit shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Republic of Lithuania.  The facilities of the International Criminal Police Organization (Interpol) may also be used to transmit such a request to the above-mentioned authorities.  The request for transit shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2.        Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State.  If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for

11

transit pursuant to paragraph 1, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 48 hours of the unscheduled landing.

## Article 19
### Representation and Expenses

1.   The Requested State shall advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition.

2.   The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered.  The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3.   Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

## Article 20
### Consultation

The United States Department of Justice and the Office of the Public Prosecutor and the Ministry of Justice of the Republic of Lithuania may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

## Article 21
### Termination

Either State may terminate this Treaty at any time by giving written notice to the other State, and the termination shall be effective six months after the date of such notice.

12



## LIETUVOS RESPUBLIKOS AMBASADA JUNGTINĖSE AMERIKOS VALSTIJOSE IR JUNGTINĖMS MEKSIKOS VALSTIJOMS
## EMBASSY OF THE REPUBLIC OF LITHUANIA TO THE UNITED STATES OF AMERICA AND TO THE UNITED MEXICAN STATES

No. SN45-32

The Embassy of the Republic of Lithuania presents its compliments to the Department of State of the United States of America and referring to the Extradition Treaty between the Republic of Lithuania and the United States of America has the honor to forward the documents regarding the extradition of the Lithuanian national **Mr. Igor POLIAKOV, born May 30, 1974.**

Please find enclosed the relevant documents (124pages) sent by the Ministry of Justice of the Republic of Lithuania.

The Embassy of the Republic of Lithuania avails itself of this opportunity to renew to the Department of State of the United States of America the assurances of its highest consideration.

August 5, 2016

UNITED STATES DEPARTMENT OF STATE
Office of the Legal Adviser
Washington, D.C. 20520

DEPARTMENT OF STATE   2016 AUG -9 P 3: 49   L/LEI



# LIETUVOS RESPUBLIKOS TEISINGUMO MINISTERIJA
# MINISTRY OF JUSTICE OF THE REPUBLIC OF LITHUANIA

State budgetary agency, Gedimino ave. 30/1, LT-01104 Vilnius, tel. + 370 5 266 2984,
fax + 370 5 262 5940, e-mail rastine@tm.lt
Data have been accumulated and stored in the Register of Legal Entities, code 188604955

United States Department of Justice     19 July 2016     Our ref. No. (855/16) 9R-2553
Office of International Affairs

950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

## RE: EXTRADITION OF IGOR POLIAKOV

The Ministry of Justice of the Republic of Lithuania presents its compliments to the United States Department of Justice and kindly asks to examine the enclosed request of the Prosecutor General's Office of the Republic of Lithuania for the extradition of the citizen of the Republic of Lithuania Mr. Igor Poliakov, born on 30 May 1974, for the purpose of prosecution, pursuant to the Agreement on Extradition between the Government of the Republic of Lithuania and the Government of the United States of America, which has been approved by the Protocol on the Application of the Agreement on Extradition between the United States of America and the European Union to the Extradition Treaty between the Government of the Republic of Lithuania and the Government of the United States of America.

ENCLOSURES. 123 pages.

Sincerely yours

Vice Minister of Justice             Julius Pagojus



Toma Milieškaitė, tel: (+370 5) 266 2915, e-mail: toma.milieskaite@tm.lt



# LIETUVOS RESPUBLIKOS
# GENERALINĖ PROKURATŪRA

Jungtinių Amerikos Valstijų
Teisingumo departamento
Tarptautinių ryšių skyriaus direktoriui
p. Vaughn A. Ary

2016-07-15 Nr.14.2.-3739 (14.3.-80/13)

Vašingtonas, D.C. 20530

## DĖL LIETUVOS RESPUBLIKOS PILIEČIO IGOR POLIAKOV EKSTRADICIJOS

Gerbiamasis Pone,

Lietuvos Respublikos generalinė prokuratūra reiškia Jums pagarbą ir, vadovaudamasi Lietuvos Respublikos Vyriausybės ir Jungtinių Amerikos Valstijų Vyriausybės ekstradicijos sutartimi, patvirtinta Protokolu dėl Europos Sąjungos ir Jungtinių Amerikos Valstijų susitarimo dėl ekstradicijos taikymo Lietuvos Respublikos Vyriausybės ir Jungtinių Amerikos Valstijų Vyriausybės ekstradicijos sutarčiai, prašo išduoti Lietuvos Respublikos pilietį Igor Poliakov.

**Igor Poliakov** (taip pat žinomas kaip **Igor Ramos bei Igor Adrian Ramos**), asmens kodas 37405300083, gimęs 1974 m. gegužės 30 d. Vilniaus mieste, Lietuvos Respublikoje, Lietuvoje pastovios gyvenamosios vietos neturi, naudojasi Lietuvos Respublikos piliečio pasu Nr. 21016785, galiojančiu iki 2016-11-28.
(Igor Poliakov tapatybę patvirtinantys įrodymai – **priedas Nr. 1**)

Lietuvos kriminalinės policijos biuro Nusikaltimų tyrimo 2-oje valdyboje 2009-06-26 pradėtas ikiteisminis tyrimas Nr. 38-1-00066-09 pagal požymius nusikalstamos veikos, numatytos Lietuvos Respublikos baudžiamojo kodekso 182 straipsnio 1 dalyje, gavus Alvydo Milkevičiaus pareiškimą dėl galimai nusikalstamų Igor Poliakov veiksmų.

Vilniaus apygardos prokuratūroje 2009-11-16 pradėtas ikiteisminis tyrimas Nr. 10-9-00203-09 pagal požymius nusikalstamos veikos, numatytos Lietuvos Respublikos baudžiamojo kodekso 182 straipsnio 2 dalyje, gavus Valdemaro Savickio pareiškimą dėl galimai nusikalstamų Igor Poliakov veiksmų. (Lietuvos Respublikos baudžiamojo kodekso straipsnių išrašas – **priedas Nr. 2**).

**1.** 2010-04-12 prokuroro nutarimu (**priedas Nr. 3**) baudžiamojoje byloje Nr. 38-1-00066-09 Igor Poliakov pripažintas įtariamuoju dėl to, jog jis, turėdamas tikslą apgaule savo naudai įgyti svetimą turtą, 2009-06-15 už pažadėtą įgyti automobilį „Subaru Outback", išviliojo iš nukentėjusiojo Alvydo Milkevičiaus 12 000 litų. Šiuos pinigus, tikėdamasis gauti automobilį, A.Milkevičius dalimis pervedė į Igor Judickij priklausančią sąskaitą Nr. LT19 7300 0100 1504 5675, t. y. 2009-05-15 pervedė 4500 litų, o 2009-05-16 pervedė 7500 litų. Nustatyta, kad Igor Judickij gautus 12 000 litų perdavė Igor Poliakov pagal 2009-08-17 pakvitavimą. Taip pat, A.Milkevičius per Česlav Pečul Igor Poliakov perdavė 4000 litų. Tokiu būdu I. Poliakov pasisavino A. Milkevičiui priklausančius 16 000 litų. Tyrimo metu gauti duomenys, kad, Igor Poliakov grąžino A.Milkevičiui dalį pasisavintos pinigų sumos, t. y. 6636,88 litų. Liko neatlyginta 9363,12 litų.

Biudžetinė įstaiga, Rinktinės g. 5A, LT-01515 Vilnius, tel. (8 5) 266 2305, faks. (8 5) 266 2317,
el. p. generaline.prokuratura@prokuraturos.lt. Duomenys kaupiami ir saugomi Juridinių asmenų registre, kodas 288603320

Kadangi įtariamasis Igor Poliakov pasislėpė nuo ikiteisminio tyrimo, 2010-04-15 priimti nutarimas paskelbti jo paiešką. 2010-04-16 Vilniaus miesto 3 apylinkės teismo nutartimi Igor Poliakov paskirta kardomoji priemonė – suėmimas (**priedas Nr. 4**).

**2.** 2011-09-29 prokuroro nutarimu (**priedas Nr. 5**) baudžiamojoje byloje Nr. 10-9-00203-09 Igor Poliakov pripažintas įtariamuoju dėl to, jog jis, turėdamas tikslą apgaule savo naudai įgyti svetimą – nukentėjusiojo Valdemaro Savickio – didelės vertės turtą, 2008 m. gegužės – rugpjūčio mėn., melagingai žadėjo Valdemarui Savickiui iš Jungtinių Amerikos Valstijų pristatyti „Mercedes Benz GL450" markės automobilį. Igor Poliakov, iš anksto žinodamas, kad automobilio nenupirks ir paimtų pinigų negrąžins, įgijęs V. Savickio pasitikėjimą ir piktnaudžiaudamas įgytu pasitikėjimu, įtikino pastarąjį per tris kartus pagal pakvitavimą perduoti jam 56 560 JAV dolerių (2008-08-06 – 30 000 JAV dolerių, 2008-08-20 – 14 800 JAV dolerių, 11 760 JAV dolerių) tariamam „Mercedes Benz GL450" markės automobilio pirkimui, tačiau automobilio nenupirko ir gautų automobilio pirkimui piniginių lėšų V. Savickiui negrąžino. Ikiteisminio tyrimo duomenimis, Igor Poliakov grąžino V. Savickiui 500 JAV dolerių.

Kadangi įtariamasis Igor Poliakov pasislėpė nuo ikiteisminio tyrimo, 2011-09-29 priimtas nutarimai paskelbti jo paiešką. 2011-11-09 Vilniaus miesto 3 apylinkės teismo nutartimi Igor Poliakov paskirta skardomoji priemonė – suėmimas (**priedas Nr. 6**).

2016-04-13 šie ikiteisminiai tyrimai sujungti į vieną procesą, suteikiant bylai Nr. 38-1-00066-09.

Baudžiamojoje byloje surinkta pakankamai duomenų, patvirtinančių, kad Igor Poliakov pagrįstai įtariamas padaręs nurodytas nusikalstamas veikas. Duomenys, kuriais remiantis grindžiami įtarimai Igor Poliakov, pateikiami prie šio prašymo pridedamame priede **Nr. 7**.

Apkaltinamojo nuosprendžio priėmimo senaties terminai baudžiamojoje byloje nesibaigė.

Prašome išduoti Igor Poliakov Respublikos teisėsaugos institucijoms baudžiamajam persekiojimui aukščiau nurodytoje baudžiamojoje byloje už nusikalstamas veikas, numatytas Lietuvos Respublikos baudžiamojo kodekso 182 straipsnio 1 dalyje, 182 straipsnio 2 dalyje.

Lietuvos Respublikos generalinė prokuratūra garantuoja, kad išduotinas Igor Poliakov be Jūsų sutikimo nebus traukiamas baudžiamojon atsakomybėn ar baudžiamas už kitas, nei kad yra prašomas išduoti, nusikalstamas veikas, taip pat nebus išduota trečiajai valstybei.

Tikimės, kad mūsų prašymas bus įvykdytas ir iš anksto dėkojame už bendradarbiavimą. Suteiksime Jums analogišką ar kitokią teisinę pagalbą.

PRIDEDAMA. Dokumentų paketas, 2 egz., kiekviename   *57*   l.

Pagarbiai

Baudžiamojo persekiojimo departamento
Vyriausiasis prokuroras

 Tomas Krušna

R. Požarskienė, 370 5 250 09 08, el. paštas rozita.pozarskiene@prokuraturos.lt

*/Translation from the Lithuanian language/*



## LIETUVOS RESPUBLIKOS GENERALINĖ PROKURATŪRA
### PROSECUTOR GENERAL'S OFFICE OF THE REPUBLIC OF LITHUANIA

Mr Vaughn A. Ary
Director
Office of International Affairs
U.S. Department of Justice

Washington, D. C. 20530

*25* July 2016, our ref. no.:14.2.-_**3739**_
(14.3.-80/13)
*please quote in all correspondence*

RE: **EXTRADITION OF THE CITIZEN OF THE REPUBLIC OF LITHUANIA
IGOR POLIAKOV**

Dear Sir,

The Prosecutor General's Office of the Republic of Lithuania presents its compliments to you and, in accordance with the Extradition Treaty between the Government of the Republic of Lithuania and the Government of the United States of America which has been approved by the Protocol on the Application of the Agreement on Extradition between the United States of America and the European Union to the Extradition Treaty between the Government of the Republic of Lithuania and the Government of the United States of America, hereby requests for the extradition of the citizen of the Republic of Lithuania Igor Poliakov.

> **Igor Poliakov** (aka **Igor Ramos** and **Igor Adrian Ramos**), ID No. 37405300083, born on 30 May 1974 in Vilnius City, Republic of Lithuania, without a permanent place of residence in Lithuania, uses the passport of the citizen of the Republic of Lithuania No. 21016785 valid until 28 November 2016.
> (data confirming the identity of Igor Poliakov have been provided under Annex **No. 1**).

On 26 June 2009, upon the receipt of report by Alvydas Milkevičius concerning criminal actions allegedly committed by Igor Poliakov, Crime Investigation Board No. 2 of the Lithuanian Criminal Police Bureau commenced pre-trial investigation No. 38-1-00066-09 on the grounds of criminal offence specified under Article 182 Paragraph 1 of the Criminal Code of the Republic of Lithuania.

On 16 November 2009 upon the receipt of report by Valdemar Savicki concerning criminal actions allegedly committed by Igor Poliakov, Vilnius Regional Prosecutor's Office commenced pre-trial investigation No. 10-9-00203-09 on the grounds of criminal offence specified under Article 182 Paragraph 2 of the Criminal Code of the Republic of Lithuania (printout of relevant articles of the Criminal Code of the Republic of Lithuania – **Annex No. 2**).

**1.** Further to the prosecutor's decision dd. 12 April 2010 (**Annex No. 3**) taken in the context of the criminal case No. 38-1-00066-09 Igor Poliakov has been recognised as the suspect because of the following facts: he, while intending to misappropriate property of another by fraud and for the benefit of himself, on 15 June 2009, having promised Alvydas Milkevičius to purchase the

Budgetary authority, 5A Rinktinės St., LT-01515 Vilnius, tel. no. (+370 5) 266 2305, fax no. (8 5) 266 2317,
e-mail: generaline.prokuratura@prokuraturos.lt. Data collected and stored at the Registry of Legal Entities (code 288603320)

EX-POLIAKOV-00020

2

car Subaru Outback for him, swindled LTL 12,000 out of the victim. Believing that I. Poliakov would purchase the car A. Milkevičius transferred this money on separate occasions to the account of Igor Judickij No. LT19 7300 0100 1504 5675, i.e. on 15 May 2009 he transferred the amount of LTL 4,500, and on 16 May 2009 – LTL 7,500. It has been established that Igor Judickij handed the thus received amount (LTL 12,000) over to Igor Poliakov on the grounds of the receipt dd. 17 August 2009. Moreover, A. Milkevičius handed LTL 4,000 over to Igor Poliakov via Česlav Pečul. In this manner I. Poliakov misappropriated the total amount of LTL 16,000 belonging to A. Milkevičius. The investigation also revealed that Igor Poliakov returned some part of the misappropriated money to A. Milkevičius, i.e. LTL 6,636.88. The remainder amounts to LTL 9,363.12.

Since the suspect Igor Poliakov has gone into hiding from pre-trial investigation, on 15 April 2010 it was decided to announce him wanted. Further to the ruling dd. 16 April 2010 of Vilnius City 3rd District Court (arrest warrant, **Annex No. 4**) the constraint measure of arrest has been imposed upon Igor Poliakov.

**2.** Further to the prosecutor's decision dd. 29 September 2011 **(Annex No. 5)** taken in the context of the criminal case No. 10-9-00203-9 Igor Poliakov has been recognised as the suspect because of the following facts: he, while intending to acquire high value property of another i.e. the victim Valdemar Savicki for his own benefit and by fraud, in May-August 2008 by way of deceitfully promising to bring from the United States of America the car MERCEDES BENZ GL450 while being aware on advance that he would not buy the car nor return the money taken for these purposes, gained the trust of Valdemar Savicki and, abusing the trust of the victim in him, persuaded V. Savicki to hand the amount of USD 56,560 (LTL 129,266) to him on three different occasions (i.e. on 6 August 2008 – the amount of USD 30,000; on 20 August 2008 – USD 14,800 and then USD 11,760) and on the basis of receipts so that he could allegedly purchase that car. However, I. Poliakov failed to purchase the said car and did not return the pecuniary funds which he obtained for the purposes of car purchase to Valdemar Savicki either. The pre-trial investigation revealed that Igor Poliakov returned USD 500 to V. Savicki.

Since the suspect Igor Poliakov has gone into hiding from pre-trial investigation, on 29 September 2011 it was decided to announce him wanted. Further to the ruling dd. 9 November 2011 of Vilnius City 3rd District Court (arrest warrant, **Annex No. 6**) the constraint measure of arrest has been imposed upon Igor Poliakov.

On 13 April 2016 these pre-trial investigations were united into one joint investigation, and the case No. 38-1-00066-09 has been allocated thereto.

In the context of the criminal case in question there is sufficient amount of data which corroborate the fact that Igor Poliakov is reasonably suspected of having committed the aforementioned criminal offences. The data based on which the suspicions have been raised against Igor Poliakov have been provided in the **Annex No. 7** enclosed herewith.

Statutory period of limitations for passing a judgement of conviction in respect of the said person in the context of the aforementioned criminal case has not expired yet.

With due consideration of the aforementioned facts, hereby we respectfully request for the extradition of Igor Poliakov to the law enforcement authorities of the Republic of Lithuania for his criminal prosecution for the criminal offences specified in the present request which are

3

punishable under Article 182 Paragraph 1 and Article 182 Paragraph 2 of the Criminal Code of the Republic of Lithuania.

The Prosecutor General's Office of the Republic of Lithuania guarantees that Igor Poliakov - the person to be extradited - shall not be prosecuted or sentenced for committing a crime other than that indicated above to be the basis for extradition nor shall be extradited to any third country without your consent.

The Prosecutor General's Office sincerely hopes that this request shall be executed. We would like to take a chance to thank you in advance for your co-operation and will be glad to provide analogous or any other legal assistance to you.

ENCLOSED: Package of documents, 2 copies, each containing _51_ p.

Yours faithfully,

Chief Prosecutor
Department for Criminal Prosecution                                    Mr Tomas Krušna

By: Ms R. Požarskienė, tel. +370 5 250 09 08, e-mail: rozita.pozarskiene@prokuraturos.lt

*Translation corresponds to the original text:*
*Ms A. Šimkonienė, translator at the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

EX-POLIAKOV-00022

**PRIEDAS Nr. 1**

**ANNEXE No. 1**

**Asmens nuotrauka**





KOPIJA TIKRA



*2.9-2084-3213d.*

# VILNIAUS APSKRITIES VYRIAUSIOJO POLICIJOS KOMISARIATO
## KRIMINALINĖS POLICIJOS SUNKIŲ NUSIKALTIMŲ TYRIMO VALDYBOS
### 1-ASIS SKYRIUS

Vilniaus apygardos prokuratūros
Vilniaus apylinkės prokuratūros
Trečiojo skyriaus prokurorei Valentinai Strokinienei
Rinktinės g. 5A, LT-01515 Vilnius

2015-10-16   Nr. 10-S-25978β
Į 2015-10-12  Nr. 2.S-(2084)-57310

## DĖL IGOR POLIAKOV, GIM. 1974-05-30, PAIEŠKOS

Vilniaus aps. vyriausiojo policijos komisariato Kriminalinės policijos sunkių nusikaltimų tyrimo valdybos 1-ojo skyriaus pareigūnai nuo 2010 metų ieško pasislėpusio nuo ikiteisminio tyrimo Nr. 38-1-00066-09, Lietuvos Respublikos piliečio Igor Poliakov, gim. 1974-05-30. Turimais duomenimis ieškomasis šiuo metu gyvena Jungtinėse Amerikos Valstijose (North Miami Beach). Igorio Poliakovo dukra Anastasija Poliakova (Romanenkova), gim. 1997-06-29, palaiko ryšį su tėvu ir dažnai lankosi Jungtinėse Amerikos Valstijose.

Viršininkas                                                    Artūras Maculevičius

KOPIJA TIKRA

*Prokurore Para šiñau*
*R. M.*

Andrej Pulko, tel. ( 8 5 ) 271 6097, el. p. andrej. pulko@policija.lt

Biudžetinė įstaiga          Tel.  (8 5) 271 6038       Duomenys kaupiami ir saugomi
Birželio 23-iosios g. 10     Faks.(8 5) 271 6093       Juridinių asmenų registre
LT-03602 Vilnius                                       Kodas 191688326          ePolicija.lt
                                                                               Policijos elektroninių paslaugų sistema

EX-POLIAKOV-00025

Vilniaus aps. VPK NTV
Autotransporto priemonių grobimų tyrimo
skyrius
Gauta
20 13-07-16 Nr.

Jelena Kolesnikova

Visa išdėstyta informacija skirta tik teisėsaugos institucijų naudojimui bei negali būti
naudojama kaip įrodymas baudžiamojo proceso metu. Esant būtinybei naudoti pateiktą informaciją
baudžiamajame persekiojime, būtina konsultuotis su LKPB TRV/JAV FTB.

Le.viršininko pareigas

Originalas siunčiamas nebus.

KOPIJA TIKRA

Tomas Baudzzevičius, (8 5) 2719647, 2719900, el.p. tomas.baudzzevicius@policija.lt

---

13-06-19   10-6-8269

EUROPOL

LIETUVOS KRIMINALINĖS POLICIJOS BIURO
TARPTAUTINIŲ RYŠIŲ VALDYBA

St+-5.-16ST
Nr. TR/284/44/LT/13
Nr. 10-5-7470

Vilniaus apskrities vyriausiojo policijos komisariato          2013-06-18
Nusikaltimų tyrimo valdybos                                    2013-05-10/13
Asmenų paieškos skyriaus
viršininkei Artūrui Maculevičiui

DĖL IGOR POLIAKOV, GIM. 1974-05-30, PAIEŠKOS

Informuojame, kad iš JAV Federalinių tyrimų biuro (FTB) buvo gauti žemiau pateikiami
duomenys apie Lietuvos pil. Igor Poliakov, gim. 1974-05-30.

Igor Poliakov, taip pat žinomas kaip Igor Ramos bei Igor Adrian Ramos, gim. 1974-05-30,
Lietuvos piliečio paso Nr. 21016785 (galioja iki 2016-11-28), buvo sulaikytas 2012-02-17 d.
Broward apygardos šerifo pareigūnų (Floridoje, JAV), už vagystę sunkinančiomis aplinkybėmis.
Dabartiniu Poliakov buvimo vieta JAV nėra žinoma. Turimais duomenimis, I.Poliakov buvo
įsiramsęs pinigų plovimu bei kitomis įtartinomis pinigų transakcijomis, laikotarpyje nuo 2004 iki
2010 metų, Niujorko ir Konektikuto valstijose. Pagal pateikiamą informaciją, I.Poliakov buvimo
vieta JAV buvo užfiksuota:

· 26 Kanui Drive, Ridge, New York, 11961; galimai su I.Poliakov susiję telefonai
631-821-0593 (taidinas), 631-830-3785 (mobilus) ir 631-871-5443 (mobilus); su
šiuo adresu I.Poliakov siejamas nuo 2003 m. lapkričio mėn. iki 2013 m. balandžio
mėn.;

· 1904 Ocean Drive South, Apartment S-305, Hallendale Beach, Florida; nuo 2012
m. birželio iki spalio mėn.;

· 831 Blue Ridge Drive, Medford, New York; 2012 m. gruodžio mėn.;

· 19390 Collins Avenue, Apartment 616, Sunny Isles Beach, Florida; 2012 m.
birželio mėn.;

· 400 Kings Point Drive, Apartment 1617, Sunny Isles Beach, Florida, 2011 m. nuo
spalio iki gruodžio mėn.;

· Post Office Box 65, Riverhead, New York; 2011 m. birželio mėn.;

· 296 Crockell Hill, Brentwood, New York; 2006 m. nuo gegužės iki spalio mėn.;

· 103 Bailey Court, Middle Island, New York; nuo 2004 m. rugpjūčio mėn. iki 2005
m. sausio mėn.;

· 16 Seauket Trail, Ridge, New York; 2001 m. rugsėjo mėn. iki gruodžio mėn.

Tel. (8 5) 271 9900
Fakas (8 5) 271 9924
El. p. erv@policija.lt

Policija.lt

Translated from Lithuanian

Person's photo – Inquiry result

**Person's photo**

37405300083 IGOR POLIAKOV

[photo]

Print   Back   Person

Round seal:/REPUBLIC OF LITHUANIA VILNIUS REGIONAL PROSECUTOR'S OFFICE/

TRUE COPY

Prosecutor  Rasa Šimonė  [signature]

18 December 2012

*Translation corresponds to the original text:*
*Mr. Arūnas Bagdonas, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability*
*under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

Translated from Lithuanian



**1-ST DIVISION OF SERIOUS CRIME INVESTIGATION BOARD OF CRIMINAL POLICE UNDER VILNIUS COUNTY POLICE HEADQUARTERS**

To: Valentina Strokinienė,
Prosecutor of Third Division of
Vilnius District Prosecutor's Office
under Vilnius Regional Prosecutor's
Office
Rinktinės St. 5A, LT-01515, Vilnius

Our ref.: No. 10-S-259736 dated 16 October
2015
Your ref.:No. 2.S-(2084)-57310 dated 12
October 2015

### Re: SEARCH OF IGOR POLIAKOV, D.O.B. 30 MAY 1974

Officers of the 1-St Division of Serious Crime Investigation Board of Criminal Police under Vilnius County Police Headquarters, as of the year 2010 have been searching for Igor Poliakov, a citizen of the Republic of Lithuania, born on 30 May 1974, who went into hiding from the pre-trial investigation No. 38-1-00066-09. As per information available, the wanted person currently resides in the United States of America (North Miami Beach). Anastasija Poliakova (Romanenkova), born on 29 June 1997, daughter of Igor Poliakov, communicates with her father and often visits the United States of America.

Chief                    [signature]                    Artūras Maculevičius

Round        seal:/VILNIUS        REGIONAL
PROSECUTOR'S OFFICE/

TRUE COPY
Prosecutor Rasa Šimonė [signature]

Andrej Pulko, tel. (8 5 ) 271 6097, e-mail andrej.pulko@policija.lt

*Translation corresponds to the original text:*
*Mr. Arūnas Bagdonas, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

Translated from Lithuanian

### INTERNATIONAL LIAISON OFFICE
### LITHUANIAN CRIMINAL POLICE BUREAU
### EUROPOL

To Artūras Maculevičius, Chief of
Persons Search Division
Crime Investigation Board under Vilnius County
Police Headquarters

Our ref.: No. TR/284/44/LT/13 dated 18 June 2013
Your ref.: No.10-S-7470 dated 10/13 May 2013

**RE: SEARCH OF IGOR POLIAKOV, D.O.B. 30 MAY 1974**

Please be advised that the following data was received from the Federal Bureau of Investigations, USA, about Igor Poliakov, a citizen of the Republic of Lithuania, born on 30 May 1974.

Igor Poliakov, also known as Igor Ramos and Igor Adrian Ramos, bon on 30 May 1974. Lithuanian citizen's passport No. 21016785 (valid until 28 November 2016) was arrested on 17 February 2012 by Broward County Sheriff officers (in Florida, USA) due to a large scale theft. By decision of the 17th Judicial Circuit Court in F.Lauderdale (Florida), the said person was released on 20 August 2012. Current whereabouts of I.Poliakov in the US are unknown. As per information available, I.Poliakov was suspected of money laundering and other suspicious pecuniary transactions during the period from 2004 to 2010 in the states of New York and Connecticut. According to information provided, whereabouts of I.Poliakov in the US have been recorded at the following locations:

-26 Kastal Drive, Ridge, New York, 11961; phones, possibly related to I.Poliakov : 631-821-0593 (landline), 631-830-3785 (mobile) and 631-871-5443 (mobile); I.Poliakov was linked to this address until April 2013.

-1904 Ocean Drive South, Apartment S-305, Hallandale Beach, Florida; from June 2012 to October 2012;

- 831 Blue Ridge Drive, Medford, New York; December; December 2012;

- 19390 Collins Avenue, Apartment 616, Sunny Isles Beach, Florida; June 2012;

- 400 Kings Point Drive, Apartment 1617, Sunny Isles Beach, Florida; from October to December 2011;

-  Post Office Box 65, Riverhead, New York, June 2011;

- 296 Crockell Hill, Brentwood, New York; from May to October 2006;

- 103 Bailey Court, Middle Island, New York, from August 2004 to January 2005;

- 16 Setauket Trail, Ridge, New York; from September to December 2001;

All the above information is for the use of law enforcement institutions only and may not be used as evidence during criminal proceedings. In the event of necessity to use the information provided, it is necessary to consult with International Liaison Office of Lithuanian Criminal Police Bureau/ FBI, USA.

Chief at interim                    [signature]                    Jelena Kolesnikova

Romas Bandzevičius, (8 5) 2719647, 2719900 e-mail tomas.bandzevicius

The original shall not be sent

TRUE COPY
Prosecutor  Rasa Šimonė[signature]

*Translation corresponds to the original text:*
*Mr. Arūnas Bagdonas, translator/interpreter of the Prosecutor's Office General of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*



## ASMENS PARODYMO ATPAŽINTI PAGAL JO NUOTRAUKĄ
## PROTOKOLAS

2009 m. birželio 30 d.

Vilnius

Pradėta: 14 val. 30 min., baigta: 14 val. 45 min.

LKPB NT 2-osios valdybos 1-ojo skyriaus Vyresnysis tyrėjas Kšištof Obolevič,
(įstaiga, pareigūnas, vardas, pavardė)

tarnybinėse patalpose, baudžiamojoje byloje Nr. 38-1-00066-09 dėl sukčiavimo

_____, dalyvaujant

vertėjui ____nedalyvavo_____,
(vardas, pavardė, adresas)

kuris įspėtas dėl baudžiamosios atsakomybės, numatytos Lietuvos Respublikos BK 235 str., už

melagingą ar žinomai neteisingą vertimą, _____
(vertėjo parašas, vardas, pavardė)

dalyvaujant _____

_____

_____

_____

_____,

vadovaudamasis Lietuvos Respublikos BPK 179, 191, 192, 195 str.,___liudytojui_____

___Alvydui Milkevičiui_____
(procesinė padėtis, vardas, pavardė)

paaiškino, kad jam bus pateiktos __4__ asmenų nuotraukos, iš kurių bus pasiūlyta atpažinti
asmenį (asmenis), apie kurį (kuriuos) jis yra davęs parodymus. Jis taip pat  įspėtas dėl
baudžiamosios atsakomybės, numatytos Lietuvos Respublikos BK 235 str., už melagingų
parodymų davimą.

_____
(parašas)

Atpažįstančiajam parodytos_____pridėtos prie protokolo_ sunumeruotos _1-4___
(šioje lentelėje įklijuotos ar prie protokolo pridėtos)                    (skaičius)
asmenų nuotraukos. Nuotrauka Nr. _4__ yra_____Igor Poliakov_____,
(atpažintino asmens vardas, pavardė)
kitos   nuotraukos   yra   asmenų,   nesusijusių   su   tiriama   baudžiamąja   byla.

KOPIJA TIKRA

EX-POLIAKOV-00030

Parodytos nuotraukos:



Atpažįstantysis <u>Alvydas Milkevičius</u>, pasiūlius jam pagal nuotraukas nurodyti asmenį,

apie kurį jis davė parodymus, pareiškė: _____

<u>nuotraukoje Nr. 4 atpažįstu asmenį prisistačiusį vardu Igor Ramos, kuris už automobilio</u>
(jeigu atpažįstantysis nurodė vieną iš jam parodytų atpažinti pagal fotografijas asmenų, būtina pagal galimybes pažodžiui užrašyti jo parodymus,

<u>pristatymą iš manęs paėmė 12 000 litų užstatą tačiau jo nepristatė, o pinigų negrąžino</u>
pagal kurias žymes ar ypatybes jis tą asmenį atpažįsta, jei neatpažįsta, jam pasiūloma paaiškinti, kuo skiriasi jo parodymuose minėtas asmuo

_____
nuo parodytųjų atpažinti)

_____

_____

_____

_____

_____

KOPIJA TIKRA

_____

_____2009-06-30_____ parodymo atpažinti  I.Poliakov _____ protokolo tęsinys:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Parodymas atpažinti atliktas _natūralus_____
                                            (apšvietimas)

Parodymų atpažinti metu    tech. priemonių nenaudota_____
                                (fotografavimas, vaizdo, garso įrašų darymas, techninių priemonių naudojimo sąlygos ir tvarka)

Dalyvavusių asmenų pareiškimai:___nėra_____

_____

_____

_____

_____

Protokolas perskaitytas, parašytas teisingai.

Atpažįstantysis        _____          ALVYDAS  OKILNEVIČIUS
                                (parašas)                                        (vardas, pavardė)

Vertėjas                _____          _____
                                (parašas)                                        (vardas, pavardė)

Dalyvavę asmenys:
                    1. _____          _____
                                (parašas)                                        (vardas, pavardė)
                    2. _____          _____
                                (parašas)                                        (vardas, pavardė)
                    3. _____          _____
                                (parašas)                                        (vardas, pavardė)

Vyresnysis tyrėjas        _____          Kšištof Obolevič
(pareigos)                        (parašas)                                    (vardas,  pavardė)


KOPIJA TIKRA

29



1

2

3

4

KOPIJA TIKRA

*Translated from the Lithuanian language*

**RECORD OF IDENTIFICATION**
**OF THE PERSON FROM PHOTOGRAPHS**

30 June 2009
Vilnius

The identification was commenced at 2:30 p.m., completed at 2:45 p.m.

Kšištof Obolevič, Senior Investigator of the Division No 1 of the Crime Investigation Board of the Lithuanian Criminal Police Bureau
<span style="font-size:smaller">(institution and division, position, name and surname)</span>

at the official premises, in the criminal case No 38-1-00066-09 regarding swindling

<u>without the participation</u> of the translator _____
<span style="font-size:smaller">(name, surname, residence address)</span>
who has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for producing a wrong or deliberately misleading translation. _____
<span style="font-size:smaller">(translator's name, surname, signature)</span>

with the participation of _____

_____

_____

_____

pursuant to Articles 179, 191, 192, 195 of the Code of Criminal Procedure of the Republic of Lithuania, notified

the witness Alvydas Milkevičius _____
<span style="font-size:smaller">(procedural status, name, surname)</span>

that the witness shall be provided with the photographs of <u>4</u> persons and the witness shall be offered to identify the person (persons) he has given evidence about. The witness was also warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for giving false evidence.

_____
<span style="font-size:smaller">(signature)</span>

The identifying person was provided with the <u>photographs attached to the Record and numbered 1-4.</u>
<span style="font-size:smaller">(included in or attached to the table)          (number)</span>
<u>Igor Poliakov is on photograph No 4,</u> other photographs display the persons not related with the criminal
<span style="font-size:smaller">(name and surname of the person to be identified)</span>
case under the investigation.

TURE COPY
*Prosecutor Rasa Šimonė /signature/*

Photographs shown:

| | | |
|---|---|---|
| (photograph)<br><br>No 1 | (photograph)<br><br>No 2 | (photograph)<br><br>No 3 |
| (photograph)<br><br>No 4 | (photograph)<br><br>No 5 | (photograph)<br><br>No 6 |

When the identifying person <u>Alvydas Milkevičius</u> was offered to identify from the photographs the person he gave evidence about, he stated the following:

*I have identified the person who is on photograph No 4 as the person who had introduced himself as being Igor Ramos, who had taken a deposit of 12 000 LTL from me for the delivery of the car, but he neither delivered the car, not repaid the money.*

TURE COPY
*Prosecutor Rasa Šimonė /signature/*

EX-POLIAKOV-00035

Continuation of the Record of Identification of <u>I. Poliakov</u> of <u>30 June 2009</u>:

_____

_____

_____

The identification procedure was conducted <u>under the conditions of natural light</u>
                                                            (light)

The inspection was conducted <u>without the use of any technical means</u>_____

_____
(by taking photographs, filming, making audio- and video-recording, taking prints, casts of traces, making outlines, etc.)

Statements of the persons who were present during the inspection: <u>not received.</u>

The Record of Inspection was read, everything recorded correctly.

| | | |
|---|---|---|
| Identifying person | _/signature/_ | _ALVYDAS MILKEVIČIUS_ |
| | (signature) | (name, surname) |
| Translator: | _____ | _____ |
| | (signature) | (name, surname) |
| Participating persons: | 1. _____ | |
| | (signature) | (name, surname) |
| | 2. _____ | _____ |
| | (signature) | (name, surname) |
| | 3. _____ | _____ |
| | (signature) | (name, surname) |

| | | |
|---|---|---|
| <u>Senior Investigator</u> | _/signature/_ | <u>Kšištof Obolevič</u> |
| (position) | (signature) | (name, surname) |

TURE COPY
*Prosecutor Rasa Šimonė /signature/*

Translated from the Lithuanian language by Viktorija Valionavičienė, a translator of the Prosecutor General's Office of the Republic of Lithuania, who has been warned about criminal liability for making a false translation or a translation known to be incorrect as provided for in Article 235 of the Criminal Code of the Republic of Lithuania.

*Translated from the Lithuanian language*

| | |
|---|---|
| /photograph/ | /photograph/ |
| **1** | **2** |
| /photograph/ | /photograph/ |
| **3** | **4** |

TURE COPY
*Prosecutor Rasa Šimonė /signature/*

Translated from the Lithuanian language by Viktorija Valantavičiūtė, a translator of the Prosecutor General's Office of the Republic of Lithuania, who has been warned about criminal liability for making a false translation or a translation known to be incorrect as provided for in Article 235 of the Criminal Code of the Republic of Lithuania.

# PRIEDAS Nr. 2

# ANNEXE No. 2

EX-POLIAKOV-00038

**Išrašas**

**Lietuvos Respublikos baudžiamojo kodekso**

### 182 straipsnis. Sukčiavimas

1. Tas, kas apgaule savo ar kitų naudai įgijo svetimą turtą ar turtinę teisę, išvengė turtinės prievolės arba ją panaikino, baudžiamas viešaisiais darbais arba bauda, arba laisvės apribojimu, arba areštu, arba laisvės atėmimu iki trejų metų.

2. Tas, kas apgaule savo ar kitų naudai įgijo didelės vertės svetimą turtą ar turtinę teisę arba didelės mokslinės, istorinės ar kultūrinės reikšmės turinčias vertybes arba išvengė didelės vertės turtinės prievolės, arba ją panaikino, arba sukčiavo dalyvaudamas organizuotoje grupėje, baudžiamas laisvės atėmimu iki aštuonerių metų.

3. Tas, kas apgaule savo ar kitų naudai įgijo nedidelės vertės svetimą turtą ar turtinę teisę, išvengė nedidelės vertės turtinės prievolės arba ją panaikino, padarė baudžiamąjį nusižengimą ir baudžiamas viešaisiais darbais arba bauda, arba laisvės apribojimu, arba areštu.

4. Už šio straipsnio 1 ir 3 dalyse numatytas veikas asmuo atsako tik tuo atveju, kai yra nukentėjusio asmens skundas ar jo teisėto atstovo pareiškimas, ar prokuroro reikalavimas.

5. Už šio straipsnio 1 ir 2 dalyse numatytas veikas atsako ir juridiniai asmenys.

### 95 straipsnis. Apkaltinamojo nuosprendžio priėmimo senatis

1. Asmeniui, padariusiam nusikalstamą veiką, negali būti priimtas apkaltinamasis nuosprendis, jeigu:

1) praėję:

a) treji metai, kai buvo padarytas baudžiamasis nusižengimas;

b) aštuoneri metai, kai buvo padarytas neatsargus arba nesunkus tyčinis nusikaltimas;

c) dvylika metų, kai buvo padarytas apysunkis tyčinis nusikaltimas;

d) penkiolika metų, kai buvo padarytas sunkus nusikaltimas;

e) dvidešimt penkeri metai, kai buvo padarytas labai sunkus nusikaltimas;

f) trisdešimt metų, kai buvo padarytas nusikaltimas, susijęs su tyčiniu kito žmogaus gyvybės atėmimu;

2) per šio straipsnio 1 dalies 1 punkte nustatytą laiką asmuo nesislėpė nuo ikiteisminio tyrimo ar teismo ir nepadarė naujos tyčinės nusikalstamos veikos.

2. Senaties terminas skaičiuojamas nuo nusikalstamos veikos padarymo iki nuosprendžio priėmimo dienos.

3. Jeigu nuo šio kodekso XVIII, XX, XXI, XXIII ir XLIV skyriuose numatytų nusikalstamų veikų nukentėjo nepilnametis, senaties terminas negali baigtis anksčiau, negu šiam asmeniui sueina dvidešimt penkeri metai.

4. Jeigu nusikalstamą veiką padaręs asmuo pasislėpė nuo ikiteisminio tyrimo ar teismo, senaties eiga sustoja. Senaties eiga atsinaujina nuo tos dienos, kurią asmuo sulaikomas arba kurią jis pats atvyksta pas ikiteisminio tyrimo pareigūną, prokurorą ar į teismą. Tačiau apkaltinamasis nuosprendis negali būti priimtas, jeigu nuo to laiko, kai asmuo padarė nusikalstamą veiką, praėjo dvidešimt penkeri metai, o nuo to

laiko, kai padarė nusikaltimą, susijusį su tyčiniu kito žmogaus gyvybės atėmimu, – trisdešimt metų ir senaties eiga nenutrūko dėl naujos tyčinės nusikalstamos veikos padarymo.

5. Bylos nagrinėjimo teisme metu senaties eiga sustoja laikotarpiui, kuriam:

1) teismas paskelbia nagrinėjimo teisme pertrauką ar bylos nagrinėjimą atideda dėl kaltinamojo ar jo gynėjo nedalyvavimo;

2) teismas paskelbia nagrinėjimo teisme pertrauką, kol bus atlikta teismo paskirta ekspertizė, specialisto tyrimas ar bus įvykdytas teisinės pagalbos prašymas užsienio valstybei;

3) teismas paskelbia nagrinėjimo teisme pertrauką ir paveda prokurorui ar ikiteisminio tyrimo teisėjui atlikti Lietuvos Respublikos baudžiamojo proceso kodekse numatytus procesinius veiksmus;

4) teismas paskelbia nagrinėjimo teisme pertrauką naujai pakviestam kaltinamojo gynėjui susipažinti su bylos medžiaga.

6. Šio straipsnio 5 dalyje numatytais atvejais apkaltinamasis nuosprendis negali būti priimtas, jeigu nuo senaties termino pradžios praėjo penkeriais metais ilgesnis terminas, negu numatyta šio straipsnio 1 dalyje.

7. Jeigu asmuo iki šiame straipsnyje nurodytų terminų pabaigos padaro naują tyčinę nusikalstamą veiką, senaties eiga nutrūksta. Šiuo atveju senaties eiga už pirmą nusikalstamą veiką pradedama skaičiuoti nuo tos dienos, kurią buvo padarytas naujas tyčinis nusikaltimas ar baudžiamasis nusižengimas.

8. Nėra senaties šiems nusikaltimams, numatytiems šiame kodekse:

1) genocidui (99 straipsnis);

2) tarptautinės teisės draudžiamam elgesiui su žmonėmis (100 straipsnis);

3) tarptautinės humanitarinės teisės saugomų asmenų žudymui (101 straipsnis);

4) civilių trėmimui ar perkėlimui (102 straipsnis);

5) tarptautinės humanitarinės teisės saugomų asmenų žalojimui, kankinimui ar kitokiam nežmoniškam elgesiui su jais ar jų turto apsaugos pažeidimui (103 straipsnis);

6) civilių ar karo belaisvių prievartiniam panaudojimui priešo ginkluotosiose pajėgose (105 straipsnis);

7) saugomų objektų naikinimui ar nacionalinių vertybių grobstymui (106 straipsnis);

8) agresijai (110 straipsnis);

9) draudžiamai karo atakai (111 straipsnis);

10) uždraustų karo priemonių naudojimui (112 straipsnis);

11) aplaidžiam vado pareigų vykdymui (113$^1$ straipsnis).


**10 straipsnis. Nusikalstamų veikų rūšys**

Nusikalstamos veikos skirstomos į nusikaltimus ir baudžiamuosius nusižengimus.


**11 straipsnis. Nusikaltimas**

1. Nusikaltimas yra pavojinga ir šiame kodekse uždrausta veika (veikimas ar neveikimas), už kurią numatyta laisvės atėmimo bausmė.

2. Nusikaltimai yra tyčiniai ir neatsargūs. Tyčiniai nusikaltimai skirstomi į nesunkius, apysunkius, sunkius ir labai sunkius.

3. Nesunkus nusikaltimas yra tyčinis nusikaltimas, už kurį baudžiamajame įstatyme numatyta didžiausia bausmė neviršija trejų metų laisvės atėmimo.

4. Apysunkis nusikaltimas yra tyčinis nusikaltimas, už kurį baudžiamajame įstatyme numatyta didžiausia bausmė viršija trejus metus laisvės atėmimo, bet neviršija šešerių metų laisvės atėmimo.

5. Sunkus nusikaltimas yra tyčinis nusikaltimas, už kurį baudžiamajame įstatyme numatyta didžiausia bausmė viršija šešerius metus laisvės atėmimo, bet neviršija dešimties metų laisvės atėmimo.

6. Labai sunkus nusikaltimas yra tyčinis nusikaltimas, už kurį baudžiamajame įstatyme numatyta didžiausia bausmė viršija dešimt metų laisvės atėmimo.

**12 straipsnis. Baudžiamasis nusižengimas**
Baudžiamasis nusižengimas yra pavojinga ir šiame kodekse uždrausta veika (veikimas ar neveikimas), už kurią numatyta bausmė, nesusijusi su laisvės atėmimu, išskyrus areštą.

Išrašas tikras
Prokurorė Rozita Požarskienė

*/Translation from the Lithuanian language/*

**Printout from the Criminal Code of the Republic of Lithuania**

**Article 182. Fraud**
1. Any person who, on false pretences and for his own benefit or for the benefit of other persons, appropriates or gains a right to someone else's property, evades or eliminates a pecuniary obligation,
shall be punished by community service or a fine, or restriction of liberty, or detention, or imprisonment for a term of up to 3 years.
2. Any person who, on false pretences and for his own benefit or for the benefit of other persons, acquires another's property or a property right of high value or valuables of a considerable scientific, historical or cultural significance or avoids a property obligation of high value or annuls it or commits fraud while acting within an organised group
shall be punished by imprisonment for a term of up to eight years.
3. Any person who, on falsepretences and for his own benefit or for the benefit of other persons, appropriates of gains a right to someone else's property of low value, evades or eliminates a pecuniary obligation of the same value, commits a misdemeanour, and
shall be punished by community service or a fine, or restriction of liberty, or detention.
4. The person shall be held liable for acts specified in Paragraphs 1 and 3 of this Article only in case a claim of the victim or a statement by his legal representative or a request by the prosecutor exists.
5. Any legal person shall also be held liable for the acts specified in Paragraphs 1 and 2 of this Article.

**Article 95. Statute of Limitations of Making a Judgement of Conviction**
   1. A judgement of conviction may not be passed with regard to a person who committed a criminal act after:
1) the lapse of:
a) 3 years from the commission of a misdemeanour;
b) 8 years from the commission of a crime of negligence or a minor intentional crime;
c) 12 years from the commission of a medium intentional crime;
d) 15 years from the commission of a serious crime;
e) 25 years from the commission of a grave (i.e. particularly serious) crime;
f) 30 years from the commission of a crime connected with manslaughter;
2) if, during the period specified in Point 1 of Paragraph 1 of this Article, the person did not attempt to escape pre-trial investigation or trial and did not commit any other criminal acts.
2. The statute of limitations shall be calculated from the day the offence was committed up to the day of the delivery of the judgement of conviction.
3. If a minor has suffered from the criminal offences specified under Chapter XVIII, XX, XXI, XXIII and XLIV of this Code, the term of statute of limitations may not expire sooner than this person attains the age of 25.
4. If a person, after committing a criminal act, goes into hiding from pre-trial investigation or trial, the calculation of the statutory time beyond which an action may not be brought shall be suspended. The calculation of the statutory period shall be resumed from the day the person is arrested or appears himself/herself before a pre-trial investigation officer, prosecutor or the court. However, the judgement of conviction may not be delivered if 25 years have passed after he/she committed the crime, while in case of a crime connected with manslaughter the statutory period is 30 years, provided the calculation of the limitations term was not terminated by commission of a new intentional crime.

5. During case hearing in the court, the term of limitations shall be suspended in the following cases:

1) when the court announces an adjournment in case hearing or postpones case hearing due to the absence of defendant or his counsel for the defence;

2) when the court announces an adjournment in case hearing for the period until a forensic examination or an inquiry by a forensic specialist ordered by the court is carried out or legal assistance request to a foreign country is executed;

3) when the court announces an adjournment in case hearing and commits prosecutor or pre-trial judge to carry out procedural actions specified in the Code of Criminal Procedure of the Republic of Lithuania;

4) when the court announces an adjournment in case hearing so as a new counsel for the defence of defendant could get familiar with the case material.

6. In cases specified in Paragraph 5 of this Article a judgement of conviction may not be passed after the lapse of the term which is five years longer than specified in Paragraph 1 of this Article from commencement of the term of limitation.

7. If a person commits another intentional criminal act before the lapse of the time period specified in this Article, the calculation of the statutory period shall cease. In such case, the calculation of the statutory period for the first criminal act commences from the day of the commission of another intentional criminal act or misdemeanour.

8. The following crimes provided by this Code are not subject to the statute of limitations:

1) genocide (Article 99);

2) treatment of persons in a way prohibited by international law (Article 100);

3) killing of persons protected under international humanitarian law (Article 101);

4) exiling or transferring of civilians (Article 102);

5) injury, torture or any other inhuman treatment of persons protected under international humanitarian law or violation of protection of their property (Article 103);

6) forced engagement of civilians or prisoners of war in the armed forces of the enemy (Article 105);

7) destruction of protected objects or plunder of national treasures (Article 106);

8) aggression (Article 110);

9) prohibited military attack (Article 111);

10) use of prohibited warfare (Article 112);

11) negligent execution of duties of a commander (Article 113[1]).

## Article 10. Types of Criminal Offences

Criminal offences shall be divided into crimes and misdemeanours.

## Article 11. Crimes

1. A crime is a wrongful criminal act (or omission) forbidden under this Code which is punishable by imprisonment.

2. A crime is an intentional act or an act of negligence. Intentional crimes are divided into crimes of small gravity (minor crimes), crimes of medium gravity, serious and grave (particularly serious) crimes.

3. A crime of small gravity (minor crime) is an intentional crime for which the maximum sentence to a term of imprisonment not exceeding 3 years may be imposed under the criminal statute.

4. A crime of medium gravity is an intentional crime for which the maximum sentence to a term of imprisonment exceeding 3 years but not exceeding 6 years may be imposed under the criminal statute.

3

5. A serious crime is an intentional crime which is punishable by the maximum sentence to a term of imprisonment exceeding 6 years but not exceeding 10 years as provided for by the criminal statute.

6. A grave crime is a crime committed intentionally for which the maximum sentence to a term of imprisonment exceeding 10 years may be imposed under the criminal statute.

**Article 12. Misdemeanour**
A misdemeanour is a dangerous and wrongful criminal act (or omission) forbidden under this Code for which a non-custodial punishment, except for detention, may be imposed under the criminal statute.

True copy
Prosecutor
Ms Rozita Požarskienė

*Translation corresponds to the original text. Ms. A. Šimkonienė, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

**PRIEDAS Nr. 3**

**ANNEXE No. 3**

EX-POLIAKOV-00045



## VILNIAUS MIESTO APYLINKĖS PROKURATŪRA

### NUTARIMAS
### PRIPAŽINTI ĮTARIAMUOJU
### 2010-04-12
Vilnius

Vilniaus miesto apylinkės prokuratūros skyriaus prokurorė Valentina Strokinienė, susipažinusi su ikiteisminio tyrimo Nr. 38-1-00066-09 medžiaga,-

n u s t a t ė:

2009-06-26 Lietuvos kriminalinės policijos biuro Nusikaltimų tyrimo 2-oje valdyboje pradėtas ikiteisminis tyrimas Nr. 38-1-00066-09 pagal LR BK 182 str. 1 d., dėl sukčiavimo. plėšimo. 2009-07-24 ikiteisminio tyrimo medžiaga perduotą į Vilniaus aps. VPK Vilniaus m. 3PK.

Ikiteisminio tyrimo metu surinkta pakankamai duomenų patvirtinančių, kad IGOR POLIAKOV, a.k. 37405300083, jis, apgaule savo naudai įgijo svetimą turtą, o būtent:

jis, turėdamas tikslą apgaule savo naudai įgyti svetimą turtą, 2009-05-15 už pažadėtą įgyti automobilį „Subaru Outback" išviliojus iš nukentėjusiojo Alvydo Milkevičiaus 12 000 Lt, kuriuos Alvydas Milkevičius dalimis pervedė į Igor Judickij priklausančią sąskaitą Nr. LT19 7300 0100 1504 5675, t.y. 2009-05-15 pervedė 4500 Lt, o 2009-05-16 pervedė 7500 Lt, tokiu būdu apgaule savo naudai įgijo Alvydui Milkevičiui priklausančius 12 000 Lt,

tai yra padarė nusikalstamą veiką, numatytą Lietuvos Respublikos Baudžiamojo kodekso 182 str. 1 d.

2009-09-30 Igor Poliakov paskelbtas konkretus patikrinimas nacionaliniu lygiu vieneriems metams, jos buvimo vieta nežinoma.

Iš surinktos medžiagos matyti, kad tikslinga pripažinti Igor Poliakov įtariamuoju pagal LR BK 182 str. 1 d..

Remdamasi ir vadovaudamasi LR BPK 21 str. 3 d.

N u t a r ė:

1.  Pripažinti Igor Poliakov įtariamuoju pagal LR BK 182 str. 1 d., dėl sukčiavimo.

Skyriaus prokurorė                                                    Valentina Strokinienė

KOPIJA TIKRA

Prokurorė Para Strokiene

Translated from Lithuanian



**VILNIUS CITY DISTRICT PROSECUTOR'S OFFICE**
**DECISION**
**ON RECOGNIZING PERSON AS A SUSPECT**

**12 April 2010**
Vilnius

Valentina Strokinienė, a prosecutor of Vilnius City District Prosecutor's Office, having familiarized herself with the material of the pre-trial investigation No.38-1-00066-09,

has established the following:

On 26 June 2009, 2-nd Crime Investigation Board of the Lithuanian Criminal Police Bureau launched the pre-trial investigation No. 38-1-00066-09 in accordance with Paragraph 1 of Article 182 due to fraud. On 27 July 2009 the pre-trial investigation material has been transferred to Vilnius City 3rd Police Commissariat under Vilnius County Police Headquarters.

During the pre-trial investigation sufficient data was collected which confirms that IGOR POLIAKOV, personal number 37405300083, by fraud obtained for his own benefit property belonging to another person, namely:
he, while having the purpose of obtaining property of another person by fraud for his own benefit, on 15 May 2009, promised to obtain a car "Subaru Outback" and defrauded from Alvydas Milkevičius, a victim 12,000.00 LTL; Alvydas Milkevičius transferred this money in parts to the account No. LT19 7300 0100 1504 5675 belonging to Igor Judickij i.e. on 15 May 2009 he transferred LTL 4,500.00, on 16 May 2009 transferred LTL 7,500.00, thereby, by fraud he obtained for his own benefit LTL 12,000.00 belonging to Alvydas Milkevičius,
i.e. he committed a criminal act provided in Paragraph 1 of Article 182 of the Criminal Code of the Republic of Lithuania.
On 30 September 2009, a specific check-up was announced in respect of Igor Poliakov for the period of one year; his whereabouts are unknown.
The collected material allows to make a presumption that Igor Poliakov is to be recognized as a suspect in accordance with Paragraph 1 of Article 182 of the Criminal Code of the Republic of Lithuania.
On the grounds and following Paragraph 3 of Article 21 of the Code of Criminal Procedure of the Republic of Lithuania,

Decided:

To recognize Igor Poliakov as a suspect pursuant to Paragraph 1 of Article 182 of the Criminal Code of the Republic of Lithuania due to fraud.

Prosecutor                    [signature]            Valentina Strokinienė
Round seal:/ REPUBLIC OF LITHUANIA VILNIUS DISTRICT PROSECUTOR'S OFFICE/
TRUE COPY
Prosecutor Rasa Šimonė [signature]

*Translation corresponds to the original text:*
*Mr. Arūnas Bagdonas, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

**PRIEDAS Nr. 4**

**ANNEXE No. 4**

EX-POLIAKOV-00048



VILNIAUS MIESTO 3 APYLINKĖS TEISMAS
**N U T A R T I S**

2010  m. balandžio 16  d.
Vilnius

Vilniaus miesto 3 apylinkės teismo ikiteisminio tyrimo teisėja Alberta Bal tušytė, sekretoriaujant Ramintai Martinkaitei,
dalyvaujant prokurorei Valentinai Strokinienei,
gynėjui advokatui Kristupui Ašmiui, nedalyvaujant įtariamajam Igor Poliakov,
teismo posėdyje išnagrinėjo Vilniaus miesto apylinkės prokuratūros skyriaus prokurorė s Valentinos Strokinienė pareiškimą dėl kardomosios priemonės suėmimo skyrimo įtariamajam Igor Poliakov, a.k. 37405300083, gim.1974-05-30, Vilniuje, įtrauktam į gyvenamosios vietos neturinčių asmenų apskaitą, deklaruota gyvenamoji vieta Taikos g. 129-5, Vilnius, nuo 2009-01-01 vykdančiam individualią veiklą, nevedusiam, tapatybę patvirtinantis dokumentas - prašymo išduoti pasą Nr. 22418935 kopija, neteistam,, ir susipažinusi su ikiteisminio tyrimo Nr. 38-1-00066-09 medžiaga dėl sukčiavimo,

n u s t a t ė :

Ikiteisminio tyrimo metu surinkti duomenys leidžia teigti, kad įtariamasis Igor Poliakov padarė nusikalstamą veiką, numatytą LR BK 182 str. 1 d., o būtent, turėdamas tikslą apgaule savo naudai įgyti svetimą turtą, 2009-05-15 už pažadėtą įgyti automobilį „Subaru Outback" išviliojo iš nukentėjusiojo Alvydo Milkevičiaus 12 000 Lt, kuriuos Alvydas Milkevičius dalimis pervedė į Igor Judickij priklausančią sąskaitą Nr. LT19 7300 0100 1504 5675, t.y. 2009-05-15 pervedė 4500 Lt, o 2009-05-16 pervedė 7500 Lt, bei 4000 Lt, kuriuos nukentėjusysis A. Milkevičius perdavė per Česlav Pečul, tokiu būdu apgaule savo naudai įgijo Alvydui Milkevičiui priklausančius 16 000 Lt, tai yra padarė nusikalstamą veiką, numatytą Lietuvos Respublikos Baudžiamojo kodekso   182  str.  1  d.

Duomenys, leidžiantys manyti, kad įtariamasis Igor Poliakov padarė jam inkriminuojamą nusikalstamą veiką, yra šie: nukentėjusiojo Alvydo Milkevičiaus, liudytojų Česlav Pečul, Aleksandr Ivanenko, Larisos Korickaja, Svetlanos Romanenkovos, Elenos Voverienės parodymai ir kita ikiteisminio tyrimo medžiaga.

Kardomoji priemonė (suėmimas) skirtina, kadangi švelnesnėmis kardomosiomis priemonėmis negalima pasiekti LR BPK 119 str. numatytų tikslų, t.y. užtikrinti įtariamojo dalyvavimą procese, netrukdomą ikiteisminį tyrimą, bylos nagrinėjimą teisme, nuosprendžio įvykdymą. Atsižvelgiant į įtariamojo asmenybę, pagrįstai manoma, kad įtariamasis Igor Poliakov bėgs (slėpsis) nuo ikiteisminio tyrimo pareigūnų, prokuroro ar teismo, nes pagal deklaruotą gyvenamąją vietą Taikos g. 129-5, negyvena, pagal šaukimus apklausai neatvyksta, 2009-09-30 Igor Poliakov paskelbtas konkretus patikrinimas nacionaliniu lygiu vieneriems metams, jos buvimo vieta nežinoma. Prašo paskirti įtariamajam Igor Poliakov, gim. 1974-05-30, kardomąją priemonę – suėmimą nuo 2010-04-16

Įtariamojo gynėjas prokuroro prašymą prašo atmesti.

Prokuroro prašymas tenkintinas. Įtariamajam švelnesnėmis kardomosiomis priemonėmis nei suėmimas negalima pasiekti LR BPK 119 str. numatytų tikslų bei užtikrinti

**KOPIJA TIKRA**

įtariamojo dalyvavimą procese, netrukdomą ikiteisminį tyrimą bei bylos nagrinėjimą teisme, taip pat užkirsti kelią naujoms nusikalstamoms veikoms.

Tokia išvada daroma įvertinus tai, kad nukentėjusiojo Alvydo Milkevičiaus, liudytojų Česlav Pečul, Aleksandr Ivanenko, Larisos Korickajos, Svetlanos Romanenkovos, Elenos Voverienės parodymai ir kita ikiteisminio tyrimo medžiaga yra pakankamas pagrindas įtarti, kad Igor Poliakov galėjo padaryti jam inkriminuojamą veiką. Nors įtariamasis Igor Poliakov formaliai vykdo individualią veiklą, tačiau nėra duomenų apie jo darbo vietą ir gyvenamąją vietą, nevedęs, todėl nėra susaistytas tvirtais socialiniais ryšiais, pagal deklaruotą gyvenamąją vietą Taikos g. 129-5 negyvena, pagal šaukimus apklausai neatvyksta, 2009-09-30 Igor Poliakov paskelbtas konkretus patikrinimas nacionaliniu lygiu vieneriems metams, už inkriminuojamą veiką pripažinus kaltu, jam gali būti paskirta didesnė nei vienerių metų laisvės atėmimo bausmė, todėl pagrįstai manytina, kad įtariamasis gali pabėgti ir slėptis nuo ikiteisminio tyrimo pareigūnų, prokuroro ir teismo (LR BPK 122 str. 2 d.). Siekiant užtikrinti įtariamojo dalyvavimą procese, netrukdomą ikiteisminį tyrimą bei bylos nagrinėjimą teisme, tikslinga skirti jam kardomąją priemonę suėmimą.

Vadovaudamasi Lietuvos Respublikos BPK 119, 121 - 123, 125 ir 130 str.,

n u t a r ė :

Paskirti įtariamajam Igor Poliakov, a.k. 37405300083, kardomąją priemonę suėmimą. Suėmimo terminą skaičiuoti nuo įtariamojo Igor Poliakov sulaikymo dienos.

Įpareigoti Vilniaus miesto apylinkės prokuratūrą ne vėliau kaip per 48 valandas po įtariamojo Igor Poliakov sulaikymo pristatyti jį nutartį priėmusiam teismui apklausai dėl suėmimo pagrįstumo.

Nutartis per 20 dienų nuo jos priėmimo gali būti skundžiama įtariamojo ir jo gynėjo Vilniaus apygardos teismui per Vilniaus miesto 3 apylinkės teismą.

Teisėja (parašas)
Nuorašas tikras.
Teisėja                                    Alberta Baltušytė

KOPIJA TIKRA

EX-POLIAKOV-00050

Translated from Lithuanian



### VILNIUS CITY 3-RD DISTRICT COURT
### RULING
16 April 2010
Vilnius

Alberta Baltušytė, Pre-trial Investigation Judge of Vilnius City 3-rd District Court,
in presence of Raminta Martinkaitė, a Secretary,
Valentina Strokinienė, a prosecutor
Kristupas Ašmis, defence counsel, Igor Poliakov being in absentia,
in the court hearing have considered the application of Valentina Strokinienė, a division prosecutor of Vilnius City District Prosecutor's Office concerning imposing of a measure of constraint – arrest upon the suspect Igor Poliakov, personal number 37405300083, born on 30 May 1974 in Vilnius, who is included into the Registry of Persons Without Place of Residence, whose declared place of residence is at Taikos St. 129-5, Vilnius, who from 1 January 2009 engages into sole proprietorship, who is single, whose identification document – a copy of a request to issue passport No. 22418935, who has no record of previous convictions,
having familiarized with the material of the pre-trial investigation No. 38-1-00066-09 concerning fraud,

has established the following:

Data collected during the pre-trial investigation allows to predicate, that the suspect Igor Poliakov committed a criminal act provided in Paragraph 1 of Article 182 of the Criminal Code of the Republic of Lithuania, namely, while having the purpose of obtaining property of another person for his own benefit, on 15 May 2009, in exchange for the car "Subaru Outback" he promised to obtain, he defrauded from Alvydas Milkevičius, a victim 12,000.00 LTL, which Alvydas Milkevičius transferred in parts to the account No. LT19 7300 0100 1504 5675 belonging to Igor Judickij i.e. on 15 May 2009 he transferred LTL 4,500.00, on 16 May 2009 transferred LTL 7,500.00, and LTL 4,000.00, which the victim A.Milkevičius transferred through Česlav Pečul, thereby, by fraud he obtained for his own benefit LTL 16,000.00 belonging to Alvydas Milkevičius, i.e. he committed a criminal act provided in Paragraph 1 of Article 182 of the Criminal Code of the Republic of Lithuania.

The following data allows to assume that the suspect Igor Poliakov committed the criminal act which is incriminated upon him: evidence provided by Alvydas Milkevičius, a victim, by the witnesses Česlav Pečul, Aleksandr Ivanenko, Larisa Korickaja, Svetlana Romanenkova, Elena Voverienė and other pre-trial investigation material.

A measure of constraint (arrest) is to be imposed upon him, as by applying more lenient measures of constraint it is impossible to achieve the goals provided in Article 119 of the Code of Criminal Procedure of the Republic of Lithuania, i.e. to ensure participation of the suspect in the procedure, unimpeded pre-trial investigation, hearing of the case at court, execution of the court decision. Considering the suspect's personality, there are reasonable grounds to believe that the suspect Igor Poliakov will escape (will go into hiding from) the pre-trial investigation officers, prosecutor or court, as he does not reside at the declared place of residence at Taikos St. 129-5, he does not appear for questioning when summoned, on 30 September 2009 a concrete check-up was announced in respect of Igor Poliakov on the national level for the period of one

EX-POLIAKOV-00051

year, his whereabouts are unknown.[Prosecutor] requests to impose upon the suspect Igor Poliakov, born on 30 May 1974 a measure of constraint – arrest from 16 April 2010.

The defence counsel of the suspect requests to reject the prosecutor's request.

The prosecutor's request is to be satisfied. By applying more lenient measures of constraint than arrest it is impossible to achieve the goals provided in Article 119 of the Code of Criminal Procedure of the Republic of Lithuania and to ensure participation of the suspect in the procedure, unimpeded pre-trial investigation, hearing of the case at court, as well as to prevent new criminal acts.

Such conclusion is made after evaluation of the fact that the evidence given by Alvydas Milkevičius, a victim, the witnesses Česlav Pečul, Aleksandr Ivanenko, Larisa Korickaja, Svetlana Romanenkova and Elena Voverienė and other pre-trial investigation material provide sufficient grounds to suspect that Igor Poliakov could commit the act which is incriminated upon him. Even though the suspect Igor Poliakov formally engages into sole proprietorship, however there is no information about his business place and place of residence, he is not married, therefore he is not bound by strong social ties, he does not reside at the declared place of residence at Taikos St. 129-5, he does not appear for questioning when summoned, on 30 September a concrete check-up was announced in respect of Igor Poliakov on the national level for the period of one year, in the event he is found guilty of the act which is incriminated upon him, he may be imposed an imprisonment penalty the duration whereof is longer than one year, therefore, there are reasonable grounds to believe that the suspect may escape or go into hiding from the pre-trial investigation officers, the prosecutor or the court (Paragraph 2 of Article 122 of the Code of Criminal Procedure of the Republic of Lithuania).

In order to ensure the suspect's participation in the proceedings, unimpeded pre-trial investigation, and hearing of the case in court, it is purposeful to impose upon him a measure of constraint – arrest.

Following Article 119,121-123,125 and 130 of the Code of Criminal Procedure of the Republic of Lithuania,

decided:

To impose upon the suspected person Igor Poliakov, personal number 37405300083, a measure of constraint – arrest. The term of arrest shall be calculated from the date of arrest of the suspect Igor Poliakov.

To impose an obligation upon Vilnius District Prosecutor's Office, within 48 hours after arrest of Igor Poliakov, to bring him before the Court, which issued the ruling, for questioning concerning grounds of his arrest.

The ruling may be appealed against by the suspect and his defence counsel at Vilnius Regional Court through Vilnius City 3rd District Court within 20 days after the ruling was issued.

Judge (signature)
The copy is true          [signature]     Alberta Baltušytė
Judge

Round seal:/ REPUBLIC OF LITHUANIA * VILNIUS CITY 3RD DISTRICT COURT/

Round seal: /REPUBLIC OF LITHUANIA VILNIUS REGIONAL PROSECUTOR'S OFFICE/
                                        TRUE COPY
                                        Prosecutor Rasa Šimonė [signature]

*Translation corresponds to the original text:*
*Mr. Arūnas Bagdonas, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

EX-POLIAKOV-00052

**PRIEDAS Nr. 5**

**ANNEXE No. 5**



# VILNIAUS MIESTO APYLINKĖS PROKURATŪRA

## N U T A R I M A S
### DĖL IGOR POLIAKOV PRIPAŽINIMO ĮTARIAMUOJU
2011-09-29
Vilnius

Vilniaus miesto apylinkės prokuratūros Antrojo nusikalstamų veikų tyrimo skyriaus prokurorė Rasa Lukaševič, susipažinusi su ikiteisminio tyrimo Nr. 10-9-00203-09 medžiaga,

**nustatė:**

Vilniaus apskrities vyriausiojo policijos komisariato Nusikaltimų tyrimo valdybos Autotransporto priemonių grobimų tyrimo skyriuje atliekamas ikiteisminis tyrimas byloje Nr. 10-9-00203-09 pagal Valdemaro Savickio pareiškimą dėl ,nusikalstamos veikos, numatytos Lietuvos Respublikos baudžiamojo kodekso 182 str. 2 d., padarymo.

Ikiteisminio tyrimo metu nustatyta, jog Igor Poliakov, turėdamas tikslą apgaule savo naudai įgyti svetimą – nukentėjusiojo Valdemaro Savickio - didelės vertės turtą, 2008 metų gegužės - rugpjūčio mėnesį, melagingai žadėdamas iš Jungtinių Amerikos Valstijų pristatyti ,,MERCEDES BENZ GL450" markės automobilį, iš anksto žinodamas, kad automobilio nenupirks ir paimtų pinigų negrąžins, įgijęs Valdemaro Savickio pasitikėjimą ir piktnaudžiaudamas įgytu pasitikėjimu, įtikino pastarąjį per tris kartus pagal pakvitavimą perduoti jam 56 560 JAV dolerių (129 266 Lt) (2008-08-06 – 30 000 JAV dolerių, 2008-08-20 – 14 800 JAV dolerių, 11 760 JAV dolerių), tariamam ,,MERCEDES BENZ GL450" markės automobilio pirkimui, tačiau automobilio nenupirko ir gautų automobilio pirkimui piniginių lėšų Valdemarui Savickiui negrąžino bei pasislėpė, tokiu būdu apgaule savo naudai įgijo 56 560 JAV dolerių ( 129 266 Lt).

Ikiteisminio tyrimo byloje yra pakankamai duomenų, leidžiančių teigti, kad Igor Poliakov, a. k. 37405300083, padarė nusikalstamą veiką, numatytą LR BK 182 str. 2 d.

Ikiteisminio tyrimo metu nustatyta, kad Igorio Poliakov buvimo vieta nežinoma, yra įtrauktas į gyvenamosios vietos neturinčių asmenų apskaitą, niekur nedirba.

Remdamasi išdėstytu ir vadovaudamasi LR BPK 21 str. 3 d.,

**nutarė:**

Ikiteisminio tyrimo byloje Nr. 10-9-00203-09 Igorį Poliakov, a. k. 37405300083, pripažinti įtariamuoju, padarius nusikalstamą veiką, numatytą LR BK 182 str. 2 d.

Skyriaus prokurorė

Rasa Lukaševič

KOPIJA TIKRA

Prokurore   Rasa Lukaševič

Translated from Lithuanian



**VILNIUS CITY DISTRICT PROSECUTOR'S OFFICE**
**DECISION**
**ON RECOGNIZING IGOR POLIAKOV AS A SUSPECT**
29 September 2011
Vilnius

Rasa Lukaševič, a prosecutor of The Second Criminal Acts Investigation Division of Vilnius City District Prosecutor's Office, having familiarized herself with the material of the pre-trial investigation No.10-9-00203-09,

**has established the following:**

Motor Vehicle Theft Investigation Division of the Crime Investigation Board under Vilnius County Police Headquarters conducts a pre-trial investigation No. 10-9-00203-09 on the grounds of a statement by Valdemar Savicki concerning commission of a criminal act provided in Paragraph 2 of Article 182 of the Criminal Code of the Republic of Lithuania. During the pre-trial investigation it was established that Igor Poliakov, having the purpose of obtaining by fraud property of high value belonging to another person – Valdemar Savicki, a victim,  in May-August of 2008, while giving a false promise to deliver a car MERCEDES BENZ GL450 from the United States of America, while *a priori* being aware that he would not buy the car and would not return the money taken, having gained trust of Valdemar Savicki and while misusing the trust gained, he convinced the latter person in three instances on the grounds of receipts to transfer him 56,560.00 USD ( 129,266.00 LTL) (on 6 August 2008 -30,000.00 USD, on 20 August 2008 -14,800.00 USD, 11,760.00 USD) for the assumed purchase of MERCEDES BENZ GL450 car, however he did not buy the car and did not return the pecuniary funds to Valdemar Savicki, which he received for the purpose of buying the car, and he went into hiding and thereby, by fraud, he obtained for his own benefit 56,560.00 USD  (129,266.00 LTL).

The pre-trial investigation case contains sufficient information which allows to assert, that Igor Poliakov, personal number 37405300083 committed a criminal act provided in Paragraph 2 of Article 182 of the Criminal Code of the Republic of Lithuania.

During the pre-trial investigation it was established that the whereabouts of Igor Poliakov are unknown, that he has been included into the registry of persons without place of residence, he does not have a job.

On the grounds of the above said and following Paragraph 3 of Article 21 of the Code of Criminal Procedure of the Republic of Lithuania,

**decided:**

To recognize Igor Poliakov as a suspect in commission of a criminal act provided in Paragraph 2 of Article 182 of the Criminal Code of the Republic of Lithuania.

Prosecutor                    [signature]          Rasa Lukaševič
of the Division                              Round  seal:/REPUBLIC  OF  LITHUANIA  VILNIUS
                                             REGIONAL PROSECUTOR'S OFFICE/
                                             TRUE COPY
                                             Prosecutor Rasa Šimonė [signature]

*Translation corresponds to the original text:*
*Mr. Arūnas Bagdonas, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

**PRIEDAS Nr. 6**

**ANNEXE No. 6**

Nr. KP-3032-498/11



**VILNIAUS MIESTO 3 APYLINKĖS TEISMAS**

# NUTARTIS

2011 m. lapkričio 09 d.
Vilnius

Vilniaus m. 3 apylinkės teismo teisėjas O.Šibkovas, sekretoriaujant G.Vasilevskai, dalyvaujant prokurorei R.Lukaševič, gynėjai advokatei I.Karvelienei, nagrinėjant Vilniaus m. apylinkės prokuratūros pareiškimą dėl kardomosios priemonės - suėmimo skyrimo

Įtariamajam Igor Poliakov, a/k 37405300083, įtariamam pagal LR BK 182 str. 2 d. (įtariamajam nedalyvaujant),

n u s t a t ė :

I.Poliakov įtariamas tuo, kad apgaule savo naudai įgijo didelės vertės svetimą turtą, o būtent:

jis, turėdamas tikslą apgaule savo naudai įgyti svetimą – nukentėjusiojo Valdemaro Savickio - didelės vertės turtą, 2008 metų gegužės - rugpjūčio mėnesį, melagingai žadėdamas iš Jungtinių Amerikos Valstijų pristatyti „MERCEDES BENZ GL450" markės automobilį, iš anksto žinodamas, kad automobilio nenupirks ir paimtų pinigų negrąžins, įgijęs Valdemaro Savickio pasitikėjimą ir piktnaudžiaudamas įgytu pasitikėjimu, įtikino pastarąjį per tris kartus pagal pakvitavimą perduoti jam 56 560 JAV dolerių (129 266 Lt) (2008-08-06 – 30 000 JAV dolerių, 2008-08-20 – 14 800 JAV dolerių, 11 760 JAV dolerių), tariamam „MERCEDES BENZ GL450" markės automobilio pirkimui, tačiau automobilio nenupirko ir gautų automobilio pirkimui piniginių lėšų Valdemarui Savickiui negrąžino bei pasislėpė, tokiu būdu apgaule savo naudai įgijo 56 560 JAV dolerių ( 129 266 Lt).

Duomenys leidžiantys daryti išvadą, kad įtariamasis galėjo padaryti jam inkriminuojamą veiką yra nukentėjusiojo, liudytojų parodymai.

Prokurorė prašo skirti įtariamajam kardomąją priemonę – suėmimą. Įtariamojo gynėjas prašo prokurorės prašymą netenkinti.

Prokurorės prašymas tenkintinas. Įtariamasis yra įtariamas sunkaus nusikaltimo padarymu, nuo ikiteisminio tyrimo pasislėpė, byloje paskelbta jo paieška. Sprendžiant klausimą dėl kardomosios priemonės teismas taip pat atsižvelgia į tai, kad I.Poliakov kitame ikiteisminiame tyrime taip pat yra paskelbta paieška ir paskirta kardomoji priemonė suėmimas. Tokio aplinkybės leidžia teismui daryti išvadą, kad būdamas laisvėje I.Poliakov gali slėptis nuo ikiteisminio tyrimo ir teismo bei daryti naujus nusikaltimus.

Siekiant užtikrinti I.Poliakov dalyvavimą ikiteisminiame tyrime ir užkirsti galimybę daryti kitas nusikalstamas veikas tikslinga paskirti jam kardomąją priemonę suėmimą.

Vadovaudamasis BPK  119-121, 123, 125, 130 str.str.

n u t a r ė :

įtariamajam Igor Poliakov  skirti kardomąją priemonę suėmimą.

Šią nutartį įtariamasis  ir jo gynėja per 20 dienų nuo šios nutarties priėmimo gali skųsti apeliacine tvarka  Vilniaus apygardos teismui per Vilniaus m. 3 apylinkės teismą.

Teisėjas

O.Šibkovas

KOPIJA TIKRA

1

*/Translation from the Lithuanian language/*

**No. KP-3032-498/11**



## VILNIUS CITY 3ʳᵈ DISTRICT COURT

# RULING

9 November 2011
Vilnius

Vilnius City 3ʳᵈ District Court Judge Mr O. Šibkovas, in the presence of the court clerk G. Vasilevska, prosecutor R. Lukaševič, defence counsel – lawyer I. Karvelienė, while considering the application submitted by Vilnius City District Prosecutor's Office for imposing a constraint measure of arrest upon

the suspect Igor Poliakov, ID No. 37405300083 who is being suspected on the grounds of Article 182 Paragraph 2 of the Criminal Code of the Republic of Lithuania (in the absence of the suspect),

has established the following:

I. Poliakov is suspected of having acquired high value property of another for his own benefit and by fraud, namely:
He, while intending to acquire high value property of another i.e. the victim Valdemar Savicki for his own benefit and by fraud, in May-August 2008 by way of deceitfully promising to bring from the United States of America the car MERCEDES BENZ GL450 while being aware on advance that he would not buy the car nor return the money taken for these purposes, gained the trust of Valdemar Savicki and, abusing the trust of the victim in him, persuaded V. Savicki to hand the amount of USD 56,560 (LTL 129,266) to him on three different occasions (i.e. on 6 August 2008 – the amount of USD 30,000; on 20 August 2008 – USD 14,800 and then USD 11,760) and on the basis of receipts so that he could allegedly purchase that car. However, I. Poliakov failed to purchase the said car, did not return the pecuniary funds which he obtained for the purposes of car purchase to Valdemar Savicki and has gone into hiding, thus fraudulently acquiring the amount of USD 56,560 (LTL 129,266) for his own benefit.

The data which allow assuming that the suspect could commit the criminal offence incriminated against him are the evidence given by the victim and witnesses.

The prosecutor requests to impose a constraint measure of arrest upon the suspect. The defence counsel of the suspect requests not to grant the prosecutor's request.

The request by the prosecutor is to be granted. The suspect is suspected of having committed a serious crime, he has been absconding pre-trial investigation against him, and he has been declared wanted within the context of the case. When considering the issue of constraint measure the court also pays attention to the fact that in the context of another pre-trial investigation I. Poliakov has also been announced wanted and he has also been made subject to the constraint measure of arrest. Such circumstances allow the court to conclude that while at large I. Poliakov may attempt to hide from pre-trial investigation and trial against him and commit new crimes.

EX-POLIAKOV-00058

2

For the purposes of ensuring the participation of I. Poliakov in the pre-trial investigation and preventing the commission of other criminal offences it is necessary to impose a constraint measure of arrest upon the said person.

In accordance with the provisions of Article 119-121, 123, 125 and 130 of the Code of Criminal Procedure, the Court

d e c i d e d:

To impose a constraint measure of arrest upon the suspect Igor Poliakov.

The said ruling may be appealed against, in accordance with the appellate procedure, by the suspect and his defence counsel within 20 days from the date of issuance thereof to Vilnius Regional Court through Vilnius City 3rd District Court.

Judge                                    /signature/                                    Mr O. Šibkovas

/round stamp/ /illegible/ <...> COURT <...>


/round stamp/ Republic of Lithuania
Vilnius Regional Prosecutor's Office

/stamp/ TRUE COPY
/hand-written/ Prosecutor Ms Rasa Šimonė
/signature/

Translation corresponds to the original text: _O. /illegible/_
Ms. Aistė Šimkonienė, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.

**PRIEDAS Nr. 7**

**ANNEXE No. 7**

EX-POLIAKOV-00060

Elektroninio dokumento nuorašas

 

## VILNIAUS APYGARDOS PROKURATŪROS VILNIAUS APYLINKĖS PROKURATŪROS 2-ASIS SKYRIUS

Jungtinių Valstijų teisingumo                                     2016-05-26 Nr.
departamentui

**DUOMENŲ, KURIAIS GRINDŽIAMAS ĮTARIMAS IGOR POLIAKOV PADARIUS NUSIKALSTAMAS VEIKAS, NUMATYTAS LR BK 182 STRAIPSNIO 1 DALYJE IR 182 STRAIPSNIO 2 DALYJE, SANTRAUKA**

Nukentėjusysis ir civilinis ieškovas Alvydas Milkevičius 2009-06-29 parodė, kad 2009 m. gegužės mėn. per savo sodo kaimyną Česlav Pečul, gyv. Kolektyvo g. 39, Vilnius, susipažino su Igoriu Ramos. Č. Pečul jam sakė, kad pažįsta Igorį Ramos ilgą laiką, kaip asmenį, kuris verčiasi automobilių gabenimu iš JAV. Kadangi jis buvo suinteresuotas automobilio iš JAV pirkiniu, jis susidomėjo ir paprašė Č. Pečul supažindinti jį su Igoriumi. Iš pradžių automobilio paieška internetu vyko per Č. Pečiul, kuris jam ir pateikė automobilio „Subaru Outback" nuotrakas. Vėliau Č. Pečul susitarė su Igoriu dėl jo su juo susitikimo ir davė jam jo mobilaus telefono Nr. 8-603-62639. Jam susisiekus telefono su Igoriu jie susitarė dėl susitikimo 2009 m. gegužės 15 d. Į susitikimą Igor atvyko automobiliu „BMW X5", valstybinis Nr. EBD 599, prie LR Seimo kanceliarijos, Tumėno g. , Vilniuje, kur yra jo darbovietė, ir jie aptarė automobilio pargabenimo sąlygas. Igor jam parodė tapatybės kortelę ID504218057 Igor Ramos vardu, tačiau kokios šalies šis dokumentas buvo išduotas, jis neįsidėmėjo. Igor pareikalavo, kad į jo sąskaitą pervestų 12 000 litų avansą už automobilio pristatymą. Vėliau Igor jam atsiuntė SMS žinutę su AB „Swedbank" sąskaitos Nr.17730001001504567, nurodęs vardą Igor Judickij. Gavęs banko sąskaitos duomenis, 2009-05-15, jis pervedė 4500 litų ir 2009-05-15 pervedė dar 7500 litų. Padaręs pavedimą jis paskambino Igoriui ir paprašė susitikti tikslu gauti jo parašą, patvirtinantį pinigų gavimą. Tą pačią dieną jie susitiko degalinėje „Onex", Geležinio Vilko g., Vilniuje, ir Igor pasirašė ant internetinio pavedimo kopijų ir paaiškino, kad 2009-05-17 jis skris į JAV, kur sutvarkys visus automobilio dokumentus ir po 30-40 dienų automobilis bus pristatytas į Lietuvą. Susitikime taip pat dalyvavo ir Č. Pečul. 2009-06-09 Č. Pečul jį informavo, kad tą pačią dieną jie su Igoriu važiuos į Klaipėdos uostą ir 2009-06-10 automobilis bus pristatytas į Vilnių, tačiau, pasak Č. Pečul, jiems trūko kažkokių dokumentų, nepavyko atsiimti automobilio ir jie grįžo į Vilnių. Pasak Č. Pečul, Igor jam pažadėjo po grįžimo į Vilnių už kelių valandų paskambinti, tačiau nuo to laiko jis nepaskambino ir susitikti su juo nepavyko. Jam paskambinus kelis kartus į Igorio duotą telefono numerį buvo informuotas baltarusiškai, kad abonentas yra nepasiekiamas, o vėliau ir iki šiol telefonas yra išjungtas. Igor Ramos yra apie 30 m. amžiaus, neaukšto ūgio, vidutinio kūno sudėjimo, trumpai kirptų, tamsių plaukų, tamsaus veido. Beveik nekalba lietuviškai, tačiau supranta lietuvių kalbą, gali būti JAV pilietis, nes suprato iš kalbos, kad JAV gyvena jo motina.

A.Milkevičius 2009-09-30 papildomai parodė, kad iš viso jam padaryta 16 000 litų turtinė žala. Kadangi AB „Swedbank" negalėjo vienu kartu pervesti pinigų, pinigus pervedinėjo du kartus, vienu kartu pervedė 4500 litų, o kitos dienos rytą pervedė 7500 litų. 2009 m. birželio mėn. dienos dabar tiksliai nepamena, savo kaimynui Č. Pečul padavė 2500 litų, o dar po kelių dienų, jam padavė 1500 litų. Kaimynas Č.Pečul jam pažadėjo, kad kitą dieną automobilis jam bus pristatytas, pinigų neva reikėjo automobilio išmuitinimui. Dar kitą dieną kaimynas jį informavo, jog kartu su I

Biudžetinės įstaigos filialas, Rinktinės g. 5A, LT-01515 Vilnius.
Duomenys kaupiami ir saugomi Juridinių asmenų registre, filialo kodas 191884691.
Apylinkės prokuratūros duomenys: Rinktinės g. 7, LT-09201 Vilnius,
tel. (8 5) 273 4536, faks. (8 5) 273 4253, el. p. vilnius@prokuraturos.lt

2

Poliakov buvo nuvažiavęs į Klaipėdą, tačiau, pasak Č. Pečul, pritrūkus dokumentų, automobilio neatvarė. Apie tai, kad Č. Pečul davė 2500 litų ir 1500 litų, pirminės apklausos metu jis nepaminėjo, nes pasitikėjo kaimynu. Jis jam sakė, kad tuos pinigus I.Poliakov perduos savo vardu. Apie tai, kad kaimynui Č. Pečul jis davė minėtą pinigų sumą, tai patvirtinančio dokumento jis neturi, taip pat neturi įrodymų, kad kaimynas jam duotus pinigus perdavė I. Poliakov.

    2009-06-30 asmens parodymo atpažinti pagal jo nuotrauką metu, A.Milkevičius atpažino I. Poliakov kaip asmenį, prisistačiusį Igor Ramos vardu, kuris iš jo paėmė 12 000 litų užstatą už automobilio pristatymą, tačiau automobilio nepristatė, pinigų negrąžino.

    2009-12-03 byloje gautas A.Milkevičiaus pareiškimas, jog 2009-11-25 I. Poliakov per Eleną Voverienę grąžino dalį skolos - 3000 litų.

    2010-01-21 byloje gautas A.Milkevičiaus pareiškimas, jog 2010-01-15 I. Poliakov į jo sąskaitą AB „Swedbank" pervedė dalį skolos - 1136,88 litų ir dabar lieka skolingas 11863,12 litų.

    2010-04-12 byloje gautas A.Milkevičiaus pareiškimas, jog 2010-04-09 E. Voverienė į jo sąskaitą AB „Swedbank" pervedė dalį I.Poliakov skolos – 2500 litų. Atlikus šį pavedimą I.Poliakov lieka skolingas 9363,12 litų.

    Liudytojas Česlav Pečul 2009-06-30 parodė, kad su vyriškiu, vardu Igor, jis yra pažįstamas apie 4 metus. Susipažino su juo atsitiktinai, kadangi užsiima automobilių prekyba ir jis jam pasiūlė pirkti iš jo automobilius, pargabentus iš JAV, perpardavimui, tačiau jis pats iš jo nė vieno automobilio nepirko. Jis jam sakė, kad užsiima automobilių iš JAV atgabenimu ir prekyba. Per visą tą laikotarpį jis jo pavardės nežinojo. Igor yra neaukšto ūgio, vidutinio kūno sudėjimo, trumpų, tamsių plaukų. Jei pamatytų, tai tikrai jį atpažintų. Paskutiniu metu jis naudojosi automobiliu „BMW X5", pilkos spalvos, valstybinis Nr. EBD 599. 2009 m. gegužės mėn., jo kaimynas, kuris statosi namą jo kaimynystėje, adresu Kolektyvo g. 39, Vilnius, vardu Alvydas, paprašė jo pagalbos surandant jam automobilį, būtent, „Subaru Outback", mėlynos spalvos, kadangi jis, mano, žinojo, kad jis užsiima automobilių prekyba. Jis jam asmeniškai negalėjo padėti, kadangi tuo metu nežinojo, kas pardavinėtų būtent tokį automobilį. Jis, žinodamas, kad Igor gali turėti tokį automobilį, paklausė jo, ar jis turi. Jis atsakė jam, kad paieškos internete JAV ir po kiek laiko perskambino jam ir informavo, kad surado būtent tokį automobilį. Jis paprašė parodyti nuotraukas ir jis, atvažiavęs į benzino kolonėlę „Onix", Geležinio Vilko g., Vilniuje, perdavė jam atspausdintas automobilio nuotraukas, kurias jis perdavė Alvydui. Alvydas, apžiūrėjęs nuotraukas, paprašė Igorio telefono numerį. Jis jam padiktavo turimą Igor mobilaus telefono Nr. 8-603- 62639. Toliau Alvydas bendravo su Igoriu tiesiogiai. Kita dieną Alvydas jam pasakė, kad Igor reikalauja 5 000 JAV dolerių užstato ir tarėsi su juo ar jam sumokėti, ar ne. Jis Alvydui pasakė, kad jis gali sumokėti, kadangi, kaip pats galvojo, jis užsiima automobilių verslu ir yra doras žmogus. Igor jam sakė, kad ruošiasi skristi į JAV tvarkyti verslo reikalų. Ar jis buvo išskridęs, ar ne, jis pasakyti negali, nes nežino. Tai buvo tik jo žodžiai. Po to, kai Igor neva grįžo iš JAV, praėjus maždaug poros savaičių laikotarpiui, jie su juo buvo nuvykę į Klaipėdą su jo automobiliu „BMW X5", valstybinis Nr. EBD 599. Prieš kelionę į Klaipėdą Igor paskambino jam ir pasakė, kad automobilis jau yra Klaipėdoje ir reikia sumokėti už konteinerį 1200 JAV dolerių. Apie tai jis informavo Alvydą ir jis jam davė 2500 litų. 2009-06-16 atvažiavus į Klaipėdą Igor atvažiavo prie UAB „Baltspeda", adreso nežino, užėjo į minėtos bendrovės patalpas tikslu sumokėti už konteinerį. Jis Igoriui davė tuos 2500 litų, o pats liko rūkyti lauke. Vėliau jis užėjo į kabinetą ir girdėjo, kaip jis šneka su UAB „Baltspeda" jam nepažįstamu darbuotoju apie automobilio išmuitinimą. Tas darbuotojas jam parodė išmuitinimo įkainius, kad išmuitinimas kainuos 11000 litų. Igor labai susinervino, pradėjo rėkti. Darbuotojas pasakė, kad sumažinti muito mokesčio nėra galimybės, nebent jis turi registruoti savo vardu. Igor pasakė, kad jam reikia grįžti į Vilnių, paimti lėktuvo į JAV bilietus, kaip įrodymą, kad jis tikrai buvo JAV ir vėliau galėtų užregistruoti automobilį savo vardu. Po to, kai jie išvažiavo iš „Baltspeda", jie nuvažiavo papietauti, kavinės adresu nežino. Kol pietavo pas juos atvažiavo Igorio



3



pažįstamas, kaip Igor vėliau pasakė, kad tai muitininkas. Pokalbio metu Igor teiravosi kaip jam pigiau išmuitinti automobilį. Tas vyriškis taip pat pasakė, kad vienintelis variantas pigiau išmuitinti automobilį, tai tik įregistruoti savo vardu, įrodžius, kad buvo išvykęs asmeniškai į JAV. Pakeliui atgal į Vilnių Igor jo klausė, ar Alvydas jam sumokės papildomai 11000 litų, į ką jis jam atsakė, kad kaina buvo sutarta iš anksto ir Alvydas jam daugiau nesumokės. Po grįžimo į Vilnių Igor pasakė, kad kitą dieną jie vėl važiuos į Klaipėdą ir susitarė, kad Igor jam paskambins. Jis tą pačią dieną susitiko su Alvydu ir paaiškino jam apie susidariusią situaciją, kad išmuitinti automobilį kainuos 11000 litų, į ką Alvydas atsakė, kad kaina buvo sutarta ir jis nesiruošia mokėti daugiau. 2009-06-17 kadangi jis nesulaukė Igorio skambučio, parašė jam žinutę, į ką jis atsakė, kad jis yra Baltarusijoje, bus už poros valandų ir paskambins. Tačiau jokio skambučio jis nesulaukė iki šiol.

Č.Pečul 2009-11-24 papildomai parodė, kad nori papildyti ir patikslinti savo anksčiau duotus parodymus, t.y. jo kaimynas vardu Alvydas, pavardės nežino, davė jam per du kartus 2009 m. birželio mėn., kada tiksliai, neprisimena, bet tai buvo prieš 2009-06-16 kelionę į Klaipėdą, 1500 litų ir 2500 litų, bendrai 4000 litų, kadangi Igor reikėjo 1500 litų sutvarkyti dokumentus, o 2500 litų išmuitinti automobilį. Jokio raštelio su Alvydu jis dėl pinigų paėmimo nepasirašė, tai buvo paremta pasitikėjimo pagrindu. Porą dienų iki 2009-06-16, jis kolonėlėje „Onix", Kazlausko – Geležinio Vilko g. sankryžoje, susitikęs su Igor, jam perdavė Alvydo jam duotus 1500 litų. Buvo tik dviese, jokio dokumento nepasirašė. Igor jam pasakė, kad reikės dar 2500 litų automobilio išmuitinimui, po ko, jis antrą kartą paėmė iš Alvydo 2500 litų, kuriuos 2009-06-16, prie UAB „Baltspeda", Klaipėdoje, lauke, perdavė Igor. Jokio raštelio apie tai, kad perdavė Igor 2500 litų, jis neturi, nei jie vėl nieko nepasirašė. Ankstesnės apklausos metu nepaminėjo apie Alvydo jam duotus 1500 litų, nes niekas jo neklausė.

2009-06-30 asmens parodymo atpažinti pagal jo nuotrauką metu, Č.Pečul atpažino I.Poliakov kaip asmenį, prisistačiusį Igor vardu, kuris už automobilio pristatymą iš A. Milkevičiaus paėmė 12 000 litų užstatą, tačiau automobilio nepristatė, pinigų negrąžino.

Liudytoja Elena Voverienė 2009-10-06 parodė, kad Igor Poliakov ji pažįsta, su juo bendrauja artimai, jį pažįsta apie 2 metus. I. Poliakov, kai grįžta iš užsienio, gyvena pas ją, Žemaitės g. 11-37. Kiek žino iš jo pasakojimų, jis į Ameriką važinėjo apie 5 metus. Tuo metu, kai jis važinėjo į Ameriką, užsiiminėjo automobilių prekyba. I. Poliakov jai nepasakoja visko.

E.Voverienė 2010-04-09 papildomai parodė, kad I. Poliakov šiuo metu yra Amerikoje, kada jis grįš, ji nežino, nekalbėjo apie tai. Jo telefono numerio ji neturi, jeigu jis jai skambina iš Amerikos, jo telefono numerio nerodo. Su juo bendrauja „Skype" ir elektroniniu paštu. Šiuo metu nepamena jo elektroninio pašto adreso. Kiek jai žinoma, I. Poliakov anksčiau turėjo sąskaitą SEB banke, ar dabar jis ją turi, nežino, nežino, ar kituose bankuose turi sąskaitų, gali būti, kad jo sąskaitos yra areštuotos. Žino, jog I. Poliakov yra pasiėmęs išsimokėtinai automobilį „BMW X5" SEB lizingu. Šių metų pradžioje, sausio mėn., į jos deklaruotos gyvenamosios vietos adresą, t.y. Gedvydžių g. 12-24, Vilniuje, atėjo laiškas iš SEB lizingo, jog už automobilį yra susidariusi skola. Anksčiau yra keletą kartų iš jo atsiųstų jai pinigų sumokėjusi įmokas, tačiau dabar nemoka, nes šių metų sausio mėnesį su I. Poliakov buvo apsipykę, jis tada iš jos paėmė minėto automobilio raktelius, nors jie ir susitaikė, automobilio ji pas jį neima ir juo visiškai nesinaudoja. Kur šiuo metu yra automobilis, ji nežino, mano, kad jis turėtų būti kokioje nors aikštelėje. Negali paaiškinti, kodėl I. Poliakov siunčia pinigus jai į banko sąskaitą, o ne A. Milkevičiui. Pagal I. Poliakov prašymą ji perveda pinigus A. Milkevičiui. Mano, kad I. Poliakov yra patogiau vienu kartu atsiųsti jai sumą pinigų, iš kurios I. Poliakov jai pasako, kokią sumą pervesti A. Milkevičiui į sąskaitą.

2010-04-13 E.Voverienė el.paštu pranešė, jog Igorio el.paštas - poliakov4@aol.com

Liudytojas Aleksandr Ivanenko 2009-10-01 parodė, kad maždaug prieš 4-5 metus, tikslai nepamena, automobilių stovėjimo aikštelėje, Subačiaus g., susitiko I. Poliakov, kurio jau nematęs apie 10 metų. Pokalbio metu I.Poliakov minėjo, kad Amerikoje perka automobilius, juos...



4

Lietuvoje parduoda. Su juo apsikeitė telefono numeriais. Maždaug po pusės metų, minėtoje automobilių aikštelėje, kurią Igor Judickij nuomojasi ir dirba, pasiteiravo jo, kas gali iš užsienio parvežti motociklo detalių. Tada jis davė I.Judickiui I. Poliakov telefono numerį, pasakęs, kad gal būtent jis gali padėti.

    Igor Judickij, 2009-10-01 apklaustas kaip įtariamasis pagal LR BK 182 straipsnio 1 dalį, savo kaltės nepripažino ir parodė, kad pažįsta Igor Poliakov, jis yra jo pažįstamas, jį pažįsta apie 3 metus. Su juo susipažino per bendrą pažįstamą Aleksandrą, jo pavardės dabar nepamena, nes su juo gal pusę metų nebendravo, jo telefono Nr. 865067067. Jis ieškojo žmogaus, kuris iš Amerikos jam galėtų atvežti detales motociklui „Kawasaki". Aleksandras jam pasakė, kad yra žmogus, kuris užsiima automobilių, parvarytų iš Amerikos, prekyba. Aleksandras jam pasakė, kad gal jis gali jam padėti ir davė I.Poliakov telefono Nr. 867875171, 860362639. Dabar turi šiuos minėtus telefono numerius, todėl negali pasakyti, kokį būtent numerį jam tada pasakė Aleksandras. Visa tai buvo maždaug prieš tris metus, t.y. 2006 m. Jis tą pačią dieną paskambino I. Poliakov, dabar nepamena, koks tai buvo mėnuo ir diena, gali būti, kad buvo rugsėjis. Paskambinus jam, susitarė susitikti automobilių stovėjimo aikštelėje, Subačiaus g. 58. Vilniuje. Būtent tada jis nuomojosi šią aikštelę ir užsiiminėjo automobilių parkavimu. Jei neklysta, I. Poliakov į aikštelę atvažiavo po kelių dienų ir aptarė galimybę gauti minėto motociklo detales. I.Poliakov tada jam paaiškino, kad greitu metu jis išvažiuoja į Ameriką, pasakė, kad detalės kainuos apie 2500 litų ir paprašė minėtų pinigų. Minėtus pinigus jis davė į rankas, nepasirašė jokio dokumento, taip jau yra, kad automobilių prekybos versle dauguma sandorių vyksta tokiu būdu, tai yra rankos paspaudimu, tuo labiau, kad jis pasakė, kad laikotarpyje, kada jis bus Amerikoje, savo automobilį „BMW X5", valstybinių numerių nepamena, automobilis žalios spalvos, laikys pas jį automobilių stovėjimo aikštelėje. Savaitės bėgyje jis išvažiavo ir kaip buvo sutarta, savo automobilį jis paliko aikštelėje. Minėtų dalių jis negavo, jis vis žadėdavo jas atvežti, bet taip ir neatveždavo, pasak jo, jam nuolat būdavo kažkokių kliūčių, maždaug po metų pareikalavo grąžinti pinigus arba duoti detales. Pinigų ir detalių jis jam negrąžino, bet pasiūlė pirkti vandens motociklą. Nuskaičiavus jam skolingus pinigus, už 8000 litų jis nupirko vandens motociklą, tokiu būdu jie atsiskaitė. Būtent tokiomis aplinkybėmis jie susipažino. Daugiau bendrų pažįstamų jie neturi, išskyrus Aleksandrą, kuris gyvena Naujoje Vilnioje. 2009 m. gegužės mėnesi, dienos tiksliai nepamena, jam paskambino I. Poliakov, paprašė SMS žinute jam į telefoną atsiųsti jo banko sąskaitos numerį. Jis paklausė, kam jam reikalinga jo sąskaita, jis jam paaiškino, kad sąskaita jam reikalinga, nes žmogus turi atsiskaitvti už parvarytą automobilį. Į klausimą, kodėl jis pats negali atidaryti sąskaitos banke, jis paaiškino, kad šiuo metu neturi lietuviškų dokumentų, nes kaip jis minėjo, jo pasas buvo areštuotas. Jis pasitikėjo I. Poliakov, jam pasirodė viskas logiška, nes kaip tik tuo laiku jis jam parvarė automobilį „Dodge Grand Caravan", su kuriuo dabar jis dirba taksi vairuotoju, todėl pamanė, kad ir kitam žmogui yra parvarytas automobilis, už kurį turi sumokėti. Savo sąskaitos numerį iš savo telefono Nr. 860614989 SMS žinute nusiuntė I. Poliakov į anksčiau minėtą telefono numerį, tačiau dabar tiksliai negali pasakyti, į kokį būtent numerį. Jo sąskaita, kurios numerio dabar neprisimena, yra banke „Swedbank". Kitą dieną jam paskambino I. Poliakov ir pasakė, kad į jo sąskaitą bus pervesta 12 000 litų už automobilį ir paprašė, kad jis tuos pinigus nuimtų. Jis pasakė, kad už tokios pinigų sumos nuėmimą bankas paims procentus, jis su tuo sutiko ir pasakė, kad būtent iš tų pinigų jis ir sumokętų tuos procentus. Jis paklausė, kodėl tas žmogus jam negali atsiskaityti grynais pinigais, jis atsakė, kad tas žmogus dabar negali nuimti pinigų iš savo sąskaitos, bet gali juos pervesti. Internete pažiūrėjo, yra pervesti pinigai ar ne ir kitą dieną jis nuėjo į banką, kuris yra Baltupių mikrorajone ir nuėmė 12000 litų, bankas nuskaičiavo apie 100 litų nuėmimo mokestį. Tuo metu jam priklausančių pinigų sąskaitoje nebuvo daug, gal porą šimtų litų. Išėjęs iš banko jis paskambino I. Poliakov ir susitarė susitikti mieste. Dabar pasakyti tiksliai negali, kur būtent susitiko, nes nepamena. Jis jam padavė visus pinigus, kuriuos nuėmė nuo sąskaitos. Maždaug po mėnesio, jis jam parašė raštelį, kuriuo patvirtino, kad jis atidarė banko



nuimtus pinigus. Šį raštelį jis turi išsaugojęs. I.Poliakov nėra patikimas žmogus, tai įrodo, kaip jis ilgai laukė motociklo detalių. I.Poliakov kartais prisistatinėja Ramos pavarde, tai yra todėl, kad jis Amerikoje yra vedęs ir paėmęs savo žmonos Ramos pavardę, jis turi vairuotojo pažymėjimą, išduotą Amerikoje, kur nurodyta būtent ši pavardė. Jokio nusikaltimo jis nedarė, tik norėjo padėti žmogui.

I.Judickij pateikė 2009-08-17 patvirtinimą, jog perdavė I. Poliakov 12 000 litų, kuriuos į jo sąskaitą pervedė A.Milkevičius.

2010-06-07, vadovaujantis LR baudžiamojo proceso kodekso (toliau – BPK) 212 straipsnio 2 punktu, ikiteisminis tyrimas dalyje I. Judickio atžvilgiu nutrauktas, nesurinkus pakankamai duomenų, pagrindžiančių jo kaltę dėl nusikalstomos veikos, numatytos LR BK 182 straipsnio 1 dalyje, padarymo.

2010-06-03 byloje gautas UAB „Baltspeda Auto" 2010-06-02 pranešimas Nr. 10B1/125, jog Igor Poliakov (Ramos) nesikreipė į įmonę dėl paslaugų, susijusių su automobilių gabenimu konteineriais iš JAV.

Nukentėjusysis ir civilinis ieškovas Valdemar Savicki 2009-11-27 parodė, kad 2008 m. gegužės mėn., planavo įsigyti automobilį, kuriuo su sutuoktine Jelena Savicki ketino važiuoti į kelionę po Italiją. Internetiniame puslapyje www.autoplius.lt rado automobilį „BMW X5", kuris jį sudomino. Paskambinus nurodytu telefonu atsiliepė vyras, prisistatęs Igor Poliakov vardu. Susitikimo metu I.Poliakov atvažiavo su kitu automobiliu, negu kuris nurodytas interneto puslapyje. I.Poliakov pasakė, kad gabena automobilius iš JAV ir skelbime nurodytas automobilis yra Amerikoje ir bus tik kitą mėnesį. Kartu dalyvavo ir I.Poliakov sugyventinė Elena. Susitikimo metu I.Poliakov nurodė, kad iki norimo išvykimo datos jam norimo automobilio pristatyti negalės, tačiau pasiūlė jam į kelionę vykti su I.Povliakov priklausančiu automobiliu „BMW X5". Jam toks nepažįstamo žmogaus pasiūlymas pasirodė įtartinas. 2008 m. birželio mėn., J.Savicki pradėjo skambinti I.Poliakov sugyventinė Elena, klausinėdama, ar jis ketina pirkti automobilį, siūlydama susitikti ir visaip mėgindama užmegzti su jo žmona artimesnį kontaktą. I. Poliakov taip pat ėmė skambinti jam siūlydamas pirkti vandens motociklą, vėliau automobilį. Jis, jo žmona ir I.Poliakov bei jo sugyventinė Elena pradėjo susitikinėti ir artimiau bendrauti, I.Poliakov ir Elena užeidavo į svečius į jo namus, bendraudavo su jo vaikais. I.Poliakov jam davė savo prisijungimo prie JAV aukcionų kodą, kuriuo pasinaudodamas internete rado skelbimą, kuriame buvo nurodyta, kad Amerikoje už 55 000 JAV dolerių yra parduodamas automobilis „Mercedes Benz GL 450". Automobilį pardavinėjo „Rallye Motors Mercedes-Benz", 1600 Northern Blvd, Roslyn, Niujorkas, JAV. I.Poliakov pasisiūlė nupirkti ir atgabenti šį automobilį. I.Poliakov pagal 2008-08-06 paskolos raštelį iš jo gavo 30 000 JAV dolerių avansinį mokėjimą (pagal 2008-08-06 LB kursą 66 654 litų) ir išvyko į JAV pirkti automobilio. Buvimo JAV metu tarp I.Poliakov ir jo vyko bendravimas telefonu. Su juo ir jo žmona taip pat nuolat bendravo Elena, I. Poliakov 2008-08-11 elektroniniu paštu atsiuntė jo išsirinkto „Mercedes Benz GL 450" nuotraukas. Po nuotraukų atsiuntimo jam, automobilio skelbimas ir nuotraukos buvo išimtos iš pardavėjo interneto svetainės. Grįžęs į Lietuvą I. Poliakov nurodė, kad automobilis „Mercedes Benz GL 450" yra nupirktas ir pakrautas į konteinerį, o taip pat patvirtino, kad pats kontroliavo automobilio pakrovimą į jūrų konteinerį. I.Poliakov nurodė, kad automobilis yra labai gražus ir, kad jis bus labai laimingas, kai jis bus atgabentas į Lietuvą. I.Poliakov susitikime nurodė, kad turi finansinių sunkumų ir paprašė už automobilį sumokėti visą pinigų sumą. Nurodė, kad jam reikia skubiai sumokėti UAB „Languva" už sugyventinės butą, kurį jie pirko dalimis. Kadangi jis, jo žmona ir I.Poliakov bei Elena artimai bendravo ir anksčiau nebuvo kilę jokių nesklandumų, jis 2008-08-20 paskolos rašteliu I. Poliakov perdavė 14 800 JAV dolerių ir 11 760 JAV dolerių (pagal 2008-08-20 LB kursą 62 613 Lt), taip pilnai atsiskaitydamas už automobilį ir jo pristatymą į Klaipėdos uostą. Sutartu laiku 2008-09-10 automobilis į Klaipėdos uostą nebuvo atgabentas, I. Poliakov susitikimo metu aiškino, kad

6



automobilis yra pakrautas konteineryje, tačiau negali išplaukti iš JAV, kadangi nėra kito automobilio pakrauto į konteinerį dokumentų. Pareikalavus pateikti automobilio įsigijimo ir nuosavybės dokumentus, I. Poliakov nurodė, kad juos užmiršo JAV bei jo pažįstama pas atsiųs. Po kiek laiko dokumentus jis tikrai atsiuntė. I. Poliakov jam, neįvykdžius sutarties sąlygų - pristatyti automobilį, pinigus turėjo grąžinti iki 2008-09-20. 2008 m. spalio mėn. pradžioje, I. Poliakov pareiškė, kad automobilis išplaukė iš JAV ir davė jam konteinerio numerį 4JCBS71E87A122518. Jis pagal I.Poliakov nurodytą konteinerio numerį susisiekęs su UAB „Balstpeda" (įmonė, tarpininkaujanti atliekant automobilių muitinės procedūras Klaipėdos uoste) išsiaiškino, kad nurodytame jūrų konteineryje nebuvo gabenamas „Mercedes Benz GL 450", o gabenami buvo visai kiti automobiliai. Jam susisiekus su automobilio pardavėju JAV paaiškėjo, kad automobilis „Mercedes Benz GL 450" egzistuoja, kad I. Poliakov, 2008 m. rugpjūčio mėn. pradžioje, sumokėjo už jį nedidelį avansą, tačiau sutartu laiku pas pardavėją neatvyko ir automobilio nenupirko. I.Poliakov, 2008 m. spalio mėnesį, jam pasakė, kad jį apgavo kažkoks tarpininkas JAV, nors užstatą už automobilį mokėjo pats ir pažadėjo artimiausiu metu grąžinti 56 560 JAV dolerių ir sumokėti palūkanas, tačiau šių pinigų jam negrąžino. 2008 m. lapkričio mėn., I. Poliakov atsiuntė SMS žinutę ir nurodė, kad per mėnesį grąžins pinigus ir sumokės palūkanas, tačiau pažadė neįvykdė. 2009 m. balandžio mėnesį, susitikimo Vilniuje metu, I. Poliakov pakartotinai paprašė jo nurodyti banko sąskaitos numerį ir patikino, kad nedelsdamas perves pinigus, tačiau pinigų iki šiol nesumokėjo. Vėliau su I. Poliakov susisiekti nepavyko. Telefonas yra atjungtas, o į elektroninius laiškus neatsako. Visus šiuos veiksmus I.Poliakov vykdė vilkindamas laiką ir suteikdamas apgadintus pažadus, o pats tuo metu perrašė automobilį „BMW X5", valstybinis Nr. EBD599, sugyventinės vardu ir, matyt, atliko kitus veiksmus, susijusius su asmeninio turto slėpimu (buto pirkimo sugyventinės vardu slėpimu, kadangi jis už butą buvo padaręs savo vardu pinigų pervedimus - apie 120.000 litų). I. Poliakov kartu su sugyventine Elena 2008 m. gegužės mėn., sužinoję apie jo ketinimus pirkti prabangų automobilį „Mercedes Benz GL 450", sąmoningai siekė su juo užmegzti artimus, draugiškus ryšius ir įgyti jo bei jo žmonos pasitikėjimą. Pažymėtina, kad nuo 2008 m. gegužės iki 2008 m. rugpjūčio mėn., I. Poliakov ir jo sugyventinė buvo labai paslaugūs (siūlė pasinaudoti kelionei savo automobiliu), nuolat skambindavo, klausinėdavo, bendraudavo ir kviesdavo į susitikimus, I. Poliakov siekė įgyti jo pasitikėjimą tam, kad apgaulės būdu iš jo įgytų didelės vertės turtą - 56 560 JAV dolerių. Jo ir I.Poliakov bendravimo laikotarpiu I. Poliakov sukūrė įvaizdį, kad jis verčiasi automobilių pirkimu JAV aukcionuose, jų atgabenimu ir pardavimu Lietuvoje. Automobilio paieškai I. Poliakov jam buvo davęs savo prisijungimo kodus prie JAV skelbiamų aukcionų duomenų. I.Poliakov žodžiu melagingai įtikino jį apie savo galimybes nupirkti automobilį „Mercedes Benz GL 450" ir atgabenti jį į Lietuvą. Jis taip pat nuslėpė tikruosius savo ketinimus, nepirkti automobilio ir pasisavinti jo perduotus pinigus. I.Poliakov suklaidino jį dėl automobilio „Mercedes Benz GL 450" pirkimo ir apgaulės būdu iš jo įgijo 30 000 JAV dolerių sumą automobiliui „Mercedes Benz GL 450" pirkti. 2008-08-20 I. Poliakov melagingai įtikino jį, kad automobilį nupirko, pakrovė į jūrų konteinerį ir, kad šis, 2008-09-10, turi būti atgabentas į Klaipėdos jūrų uostą. Piktnaudžiaudamas jo pasitikėjimu ir remdamasis melaginga informacija I. Poliakov papildomai iš jo įgijo 26 560 JAV dolerių. Pažymėtina, kad I. Poliakov veikė tiesiogine tyčia. Jis suvokė, kad jam pateikia melaginga informacija, suvokė, kad jis juo pasitiki ir suklaidindamas jį siekė gauti 56 560 JAV dolerių sumą. I. Poliakov nuo 2008 m. gegužės mėnesio aktyviais veiksmais siekė, kad jis pasinaudotų jo kaip tarpininko paslaugomis automobiliui pirkti ir priimdamas iš jo 30 000 JAV dolerių automobilio pirkimui suvokė, kad susitarimo neketina vykdyti, o priimdamas 26 560 JAV dolerių sumą kaip galutinį atsiskaitymą už automobilį suvokė, kad automobilis jam nebus pristatytas, nors teigė, kad automobilis yra nupirktas ir pakrautas į jūrinį konteinerį, nors automobilis stovėjo pardavimo aikštelėje. Apibendrinant konstatuotina, kad I. Poliakov aktyviais veiksmais įgijęs jo pasitikėjimą, juo piktnaudžiavo ir žodžiu patvirtinamais



7

melagingą informaciją, suklaidindamas jį, apgaule iš jo įgijo 56 560 JAV dolerių. Pasitikėjimo įgijimas ir melaginga informacija turėjo esminės reikšmės jo apsisprendimui dėl 56 560 JAV dolerių perdavimo I. Poliakov.

V.Savicki 2010-09-09 papildomai parodė, kad š. m. sausio 5-ą dieną, jam į mobilaus ryšio telefoną Nr. 8-652-50222 iš nežinomo abonento paskambino I. Poliakov, paklausė jo sąskaitos numerio, į kurią jis galėtų pervesti jam pinigų, kuriuos paėmė iš jo „Mercedes Benz" markės automobilio pirkimui. Jis žadėjo pervesti 15000 JAV dolerių. Š. m. sausio 13-ą dieną, į jo banko sąskaitą, esančią AB „SEB bankas", buvo pervesta 500 JAV dolerių. Minėtą sumą jam pervedė Igor Ramos. Jis suprato, kad pinigus jam pervedė I. Poliakov. Š. m. kovo mėnesio viduryje, kada, tiksliai pasakyti negali, jam vėl į tą patį numerį iš nežinomo numerio paskambino I.Poliakov ir vėl paklausė jo banko sąskaitos numerio, jis žadėjo jam pervesti 30000 JAV dolerių. Į jo klausimą, kodėl jis vietoj žadėtų 15000 JAV dolerių pervedė tik 500 JAV dolerių, I.Poliakov pradėjo aiškinti, kad jį patį kažkas apgavo, todėl jis negalėjo jam pervesti žadėtos pinigų sumos. Į jo klausimą, kada grąžins visą sumą, I.Poliakov atsakė, kad tikrai grąžins dalimis iki š. m. vasaros.

V.Savicki 2011-05-19 papildomai parodė, kad 2011-05-10, apie 09.47 val., jam būnant Ukrainoje, į jo asmeninį kompiuterį el. paštu iš el. pašto adreso poliakov4@aol.com atėjo žinutė, kurioje buvo parašyta „privet Valdemar! napishi kak ja mogu s toboj svezatsa, ja zarabotal dengi xociu otdat polnostju dolg". Jis suprato, kad žinutę jam parašė I. Poliakov. Nurodytu el. adresu jis parašė jam žinutę, kurioje nurodė jam savo ukrainietiško mobilaus telefono Nr. +380994892280 ir parašė, kad pinigus jis pervestų į jo sąskaitą SEB banke. 2011-05-11, apie 16.00 val., iš nežinomo numerio į jo nurodytą telefono numerį paskambino I.Poliakov, pakartojo, kad uždirbo pinigų ir nori sumokėti visą skolą, t.y. visus pinigus, kuriuos paėmė iš jo, žadėdamas pateikti jam „Mercedes Benz" markės automobilį. Jis sutiko. Tada I.Poliakov pradėjo jam sakyti, kad jam pažįstami sakė, kad Lietuvoje yra paskelbta jo paieška ir jis bijo grįžti į Lietuvą, kad nebūtų suimtas. Jis pasakė I.Poliakov, kad jis pervestų pinigus į jo sąskaitą SEB banke. I.Poliakov pasakė, kad skolą jis nori grąžinti jam asmeniškai, kad jis gali jį apgauti, kokiu būdu, jis nepaaiškino. 2011-05-17, 18.48 val., jam iš mobilaus telefono Nr. 8-6-653-36490 į jo telefono Nr. 8-655-93395 paskambino I.Poliakov ir pradėjo aiškinti, kad jis grąžins jam skolą, jeigu jis pasirūpins, kad būtų nutraukta jo paieška. Jis jam atsakė, kad tegul jis jam pirmiau grąžina skolą, tada jis pagalvos. I.Poliakov pasakė, kad pagalvos iki šios savaitės išeiginių ir jam praneš, ką jis ketina daryti. Kitą dieną jis iš savo mobilaus telefono numerio paskambino I.Poliakov telefono numeriu, buvo geras signalas, bet niekas neatsiliepė.

V.Savicki 2012-04-06 papildomai parodė, kad paskutinį kartą su I.Poliakov dėl jam negrąžintų pinigų už žadėtą iš JAV pargabenti automobilį „Mercedes Benz" bendravo 2011 m. gegužės mėn., apie ką yra davęs parodymus. Naujų aplinkybių nurodyti negali, nes jų nėra. Pareiškė 128.096 Lt civilinį ieškinį (tai pinigų suma, kurią šiai dienai I.Poliakov turi jam grąžinti).

Liudytoja Elena Voverienė 2009-12-08 parodė, kad maždaug nuo 2006 m. pažįsta I.Poliakovą. I.Poliakov prekiaudavo mašinomis iš Jungtinių Amerikos Valstijų arba Kanados. 2008 m., maždaug kovo mėn., I.Poliakov paprašė jos paskolinti pinigų, o ji paprašė, kad jos sesuo V.Turčilienė paskolintų I.Poliakov prašomą pinigų sumą. V.Turčilienė sutiko ir paskolino I.Poliakov pinigus. 2008 m. kovo mėn., ji su seserim nusprendė nusipirkti butą ir 2008-03-31 buvo pasirašyta buto pirkimo - pardavimo sutartis jos sesers vardu. Jai su sese pritrūko pinigų susimokėti už butą ir paprašė I.Poliakov grąžinti paskolintus pinigus. I.Poliakov grąžino paskolintus pinigus dalimis, yra tai patvirtinantys dokumentai. I.Poliakov yra visiškai atsiskaitęs su savo įsiskolinimu jos sesei. 2008 m., maždaug gegužės mėn., su I.Poliakov nuvažiavo į susitikimą su jam priklausančiu automobiliu „BMW X5", kurį jis norėjo parduoti, kurio metu jo automobilį apžiūrėjo vyras, ir moteris Vyasistate Valdemar ir Alionos vardais (pavardės nežino). Moteris jai buvo matyta ir jie su ja susitendavo, ir keletą kartų buvo susitikę. Apie ką šnekėdavo I.Poliakov ir Valdemar, nežino, nes I.Poliakov

8



verslo santykius nesikišdavo. Valdemaras ir Aliona yra jai rašę SMS žinutes, kodėl I.Poliakov nekelia telefono ragelio ir kodėl neatrašo į žinutes. Bandė per ją susisiekti su I.Poliakov ir primygtinai prašė, kad kai I.Poliakov atsiras, susisiektų su jais. Ji jiems pasakydavo, kad jis dažnai būna išvykęs ir kai grįš būtinai perduos. Kokiu klausimu nori susisiekti su I.Poliakov, ji nežino.

E.Voverienė 2009-12-1 papildomai parodė, kad 2008-04-05, jai dalyvaujant, I.Poliakov pasiskolino iš jos sesers Valentinos Turčilienės 88 000 litų. Šiai sumai išrašytas paprastasis neprotestuotinas vekselis. Pinigus I.Poliakov skolinosi verslo plėtrai, t.y. ketino pirkti mašinas ir gabenti iš JAV ar Kanados. I.Poliakov pinigus grąžindavo dalimis, įvairiomis sumomis. I.Poliakov paskolintus pinigus įnešdavo į UAB „Languva Plastikas" už jos ir jos sesers perkamą butą. Patikrinus, kad įnašai yra sumokėti, I.Poliakov buvo išrašyti pakvitavimai dėl įskaitymo.

Liudytoja Valentina Turčilienė 2010-02-22 parodė, kad 2008 m. kovo mėn., jos sesers draugas I.Poliakov paprašė paskolinti apie 118 000 litų verslo plėtrai. Kam konkrečiai reikėjo pinigų ir kuom verčiasi I.Poliakov, nežino. Pinigus paskolino dviem kartais: 2009 m. kovo mėn., maždaug 28 d., 30 000 litų pasirašant ant paprastojo neprotestuotino vekselio, ir 2008-04-05 – 88 000 litų taip pat pasirašant ant paprastojo neprotestuotino vekselio. Pagal minėtus vekselius pinigus I.Poliakov sumokėjo grynais, nes jis taip pageidavo. I.Poliakov 2009-05-22 grąžino 30 000 litų, 2009-10-16 – 88 000 litų. Su I.Poliakov nebendrauja.

2010-01-12 el. paštu iš Victor Cosme (el.p. vcosme@rallyemotors.com), kuris pardavinėjo automobilį „Mercedes-Benz GL 450", buvo gauti atsakymai į jam pateiktus Vilniaus apskrities vyriausiojo policijos komisariato Nusikaltimų tyrimo valdybos Ekonominių nusikaltimų tyrimo skyriaus pareigūno klausimus: Igor atvyko verslo reikalais 2008 m. rugpjūčio mėn. pradžioje. Jis pirko automobilį už 52 500 USD ar panašiai, nėra tikras šimtu procentų. Igor sumokėjo 5000 USD užstatą, kurį jis jam grąžino, pasaugojęs automobilį mėnesį laiko. Suplėšė visus dokumentus, patvirtinančius užstato sumokėjimą. Jokia pirkimo-pardavimo sutartis nebuvo pasirašyta. Visą automobilio kainą turėjo sumokėti kaip įmanoma greičiau. Igor jam pasakė, kad jis vyks likusių pinigų į Rusiją ir sugrįš per savaitę, tačiau užtruko trimis savaitėmis ilgiau nei jam sakė. Jis jam pasakė, kad labai sirgo, kad jo tėtis labai sirgo. Tada jis laukė, kol jis sugrįš į JAV. Kai sugrįžo sudaryti sandorį, jis labai nervinosi ir pasakė, kad turi atgauti užstatą arba skambins policijai, taigi jie grąžino jam jo pinigus. I.Poliakov atsisakė pirkti automobilį praėjus maždaug mėnesiui po užstato palikimo, maždaug rugsėjo mėn. I.Poliakov atsisakė pirkti automobilį pasakęs, kad jo klientas nebenori sunkvežimio. Užstatą I.Poliakov grąžino, kai tik jis atšaukė sandorį. Nustojo bendrauti su I.Poliakov, nebuvo jokios priežasties su juo bendrauti, jis yra melagis. Jis nepažinojo I.Poliakov. Jam pasirodė įtartina, kai tik I.Poliakov pradėjo sakyti, kad serga, kad jo tėtis serga, jis žinojo, kad jis nepirks automobilio.

Prokurorė

Rasa Šimonė, 8 52 527 067, Rasa.Simone@prokuraturos.lt



KOPIJA TIKRA

## DETALŪS METADUOMENYS

| | |
|---|---|
| **Dokumento sudarytojas (-ai)** | Vilniaus apygardos prokuratūros Vilniaus apylinkės prokuratūros 2-asis skyrius 191884691, Rinktinės g. 7, LT-09201 Vilnius |
| **Dokumento pavadinimas (antraštė)** | Firminis blankas |
| **Dokumento registracijos data ir numeris** | 2016-05-26 Nr. 1.33-45129 |
| **Dokumento specifikacijos identifikavimo žymuo** | ADOC-V1.0 |
| **Informacija apie būdus, naudotus metaduomenų vientisumui užtikrinti** | "Registravimas" paskirties metaduomenų vientisumas užtikrintas naudojant "VI Registru Centras RCSC (IssuingCA-A), VI Registru Centras - I.k. 124110246 LT" išduotą sertifikatą "Integruotos baudžiamojo proceso informacinės sistemos, Lietuvos Respublikos vidaus reikalų ministerija,į. k.188601464\ LT", sertifikatas galioja nuo 2016-03-09 iki 2017-03-09. Veiksmą atliko 2016-05-26 09:49:28 Rasa Šimonė, Prokurorė, Vilniaus apygardos prokuratūros Vilniaus apylinkės prokuratūros 2-asis skyrius "Registravimas" paskirties metaduomenų vientisumas užtikrintas naudojant "VI Registru Centras RCSC (IssuingCA-A), VI Registru Centras - I.k. 124110246 LT" išduotą sertifikatą "Integruotos baudžiamojo proceso informacinės sistemos, Lietuvos Respublikos vidaus reikalų ministerija,į. k.188601464\ LT", sertifikatas galioja nuo 2016-03-09 iki 2017-03-09. Veiksmą atliko 2016-05-26 09:49:29 Integruotos baudžiamojo proceso informacinės sistemos |
| **Pagrindinio dokumento priedų skaičius** | - |
| **Pagrindinio dokumento pridedamų dokumentų skaičius** | - |
| **Programinės įrangos, kuria naudojantis sudarytas elektroninis dokumentas, pavadinimas** | IBPS sistema, versija 1.0.3-SNAPSHOT |
| **Informacija apie elektroninio dokumento ir elektroninio (-ių) parašo (-ų) tikrinimą (tikrinimo data)** | Atitinka specifikacijos keliamus reikalavimus. Visi dokumente esantys elektroniniai parašai galioja |
| **Elektroninio dokumento nuorašo atspausdinimo data ir ją atspausdinęs darbuotojas** | Nuorašą suformavo IBPS sistema 2016-05-26 09:49:48 Prokurorė Rasa Šimonė |



*Translation from the Lithuanian language*
Copy of electronic document



## VILNIUS REGIONAL PROSECUTOR'S OFFICE
## VILNIUS DISTRICT PROSECUTOR'S OFFICE
## UNIT No. II

U.S. Department of Justice                    26 May 2016
                                              Ref. No.

### RE: SUMMARY OF DATA BASED ON WHICH IGOR POLIAKOV IS SUSPECTED OF HAVING COMMITTED CRIMES UNDER ARTICLE 182 PARAGRAPH 1 AND ARTICLE 182 PARAGRAPH 2 OF THE CRIMINAL CODE OF THE REPUBLIC OF LITHUANIA

On 29 June 2009 the aggrieved person and civil claimant Alvydas Milkevičius gave evidence as follows: in May 2009 he got acquainted, via the neighbour of his garden Česlav Pečul residing at 39 Kolektyvo St., Vilnius, with Igor Ramos. Č. Pečul told him that he knew Igor Ramos for a long time as a person who was involved in delivering cars from the US. Since he was interested in purchasing the car from the US, he got interested into this and asked Č. Pečul to get him acquainted with that Igor. First the car search in the Internet was conducted via Č. Pečiul who submitted to him the pictures of the car Subaru Outback. Later on, Č. Pečul agreed with Igor to hold a meeting and gave him his cell phone No. 8-603-62639. When he phoned Igor, they agreed to meet on 15 May 2009. Igor arrived at the meeting by the car BMW X5 (number plates EBD 599) near the Office of the Seimas (Parliament) of the Republic of Lithuania in Tumėno St., Vilnius, where his workplace was located, and they discussed the conditions of bringing the cars back to Lithuania. Igor showed him ID card No. ID504218057 issued in the name of Igor Ramos, however, he did not take notice of the country which issued that document. Igor demanded that he transferred the advance payment of LTL 12,000 for the delivery of the car. Later on, Igor texted him and specified the number of AB Swedbank account 177300010015045675 indicating the name Igor Judickij. Upon the receipt of the bank account data, on 15 May 2009 he (A. Milkevičius) transferred the amount of LTL 4,500 and on 15 May 2009 he transferred another amount i.e. LTL 7,500. Upon transferring the money, he called Igor and asked him to meet in order to obtain his signature confirming the receipt of money. On the same day they met at the petrol station Onex in Geležinio Vilko St., Vilnius, and Igor signed the copies of online transfer and explained to him that on 17 May 2009 he would leave for the USA where he would arrange all the relevant car documents and the car would be brought to Lithuania in 30-40 days. Č. Pečul was also present during this meeting. On 9 June 2009 Č. Pečul informed him that on the same day they (together with Igor) would go to Klaipėda Port and on 10 June 2009 the car would be delivered to Vilnius, however, according to Č. Pečul, some documents were missing, they couldn`t take the car and so they returned to Vilnius. According to Č. Pečul, Igor promised him to give him a call after a few hours from their return to Vilnius, however, he failed to call him since and he could not meet him. When he dialled the telephone number given to him by Igor, he was informed in Belorussian language that the telephone`s subscriber is beyond reach and later on this phone number was also turned off. Igor Ramos is approx. 30 years of age, not very tall, medium build, his hair is black and cut short and he has a dark complexion. He hardly speaks Lithuanian but understands Lithuanian, and he may be the citizen of the United States because he understood from what he had told him that his mother was living in the U.S.

On 30 September 2009 A. Milkevičius gave additional evidence and stated that he suffered material damage amounting to LTL 16,000 in total. Since he could not transfer the entire amount of money via the bank AB Swedbank on one occasion, he transferred the money on two different occasions, that is, he transferred the sum of LTL 4,500 on one occasion and then LTL 7,500 – in the morning on the next day. In June 2009 (he does not remember the day now) he handed the sum of LTL 2,500 over to his neighbour Č. Pečul and a few days after he handed another LTL 1,500 over to him. His neighbour Č. Pečul promised him that on the following day the car would be delivered to him and that the money was allegedly needed for customs check-out procedures. After one more day the neighbour told him that together with I. <...>

Branch of budgetary institution, 5A Rinktinės St., LT-01515 Vilnius
Data collected and stored in the Register of Legal Entities, branch code 191884691
Data of District Prosecutor's Office: 7 Rinktinės St., LT-09201 Vilnius
Tel (8 5) 273 4536, fax (8 5) 273 4253, e-mail: vilnius@prokuraturos.lt

*/round stamp/* Republic of Lithuania
Vilnius Regional Prosecutor's Office

<...> Poliakov he had gone to Klaipėda, however, according to I. Poliakov, the car was not delivered because some documents were missing. He has not mentioned the fact that he gave LTL 2,500 and LTL 1,500 over to Č. Pečul during his primary interview because he trusted his neighbour. He told him that he would hand this money over to I. Poliakov on his own behalf. He does not have any document confirming the fact that he gave the said amount of money to his neighbour Č. Pečul and he has no evidence proving the fact that the neighbour gave his money (which he had handed over to his neighbour) to I. Poliakov either.

On 30 June 2009 when the procedure of identification of a person by means of his/her photographs was conducted A. Milkevičius recognised I. Poliakov as a person who had introduced himself as Igor Ramos and who took from him the amount of LTL 12,000 as a security for the delivery of the car, however, he failed to deliver the car and did not return the money either.

On 3 December 2009 A. Milkevičius submitted his statement confirming that on 25 November 2009 I. Poliakov returned a part of his debt to him i.e. LTL 3,000 via Elena Voverienė.

On 21 January 2010 A. Milkevičius submitted his statement confirming that on 15 January 2010 I. Poliakov transferred a part of his debt to his account in AB Swedbank i.e. LTL 1,136.88 and the remaining part of the debt now amounts to LTL 11,863.12.

On 12 April 2010 A. Milkevičius submitted his statement confirming the fact that on 9 April 2010 E. Voverienė transferred a part of the debt of I. Poliakov to his account in AB Swedbank i.e. LTL 2,500. Upon the completion of this transfer I. Poliakov now owns LTL 9,363.12 in total to A. Milkevičius.

On 30 June 2009 the witness Česlav Pečul stated that he has known the person called Igor for about 4 years. They got acquainted by accident since he is involved in car trade and he got a proposal from him to buy cars brought from the U.S. for him for re-sale purposes, however, he has not bought a single car from him. He told him that he was involved in delivery of cars from the U.S. and trade in them. He has not known his family during the entire period. Igor is not a tall person, of medium build, with short dark hair. He would recognise him definitely if he happened to see him. Recently he has been using the car BMW X5, colour: grey, number plate EBD 599. In May 2009 his neighbour who is building a house for himself in his neighbourhood at 39 Kolektyvo St. (Vilnius), his name is Alvydas, asked for help in finding a car for him, namely, a blue Subaru Outback, since he thought and was aware of the fact that he has been involved in car trade for some time. He could not help him personally since he was unaware of people who were selling this car in particular at that time. While being aware that Igor might have such a car, asked him about that. Igor told him that he would look for such a car in the US via online sites and after some time he called him and told him that he had found that specific car. He asked to show him the pictures and then he drove to the petrol station Onix in Geležinio vilko Street in Vilnius and then he handed the printed car pictures over to him which he gave to Alvydas. The latter inspected the pictures and asked him to give him the telephone number

of that Igor. He gave him the cell phone number of Igor which was known to him i.e. 8 603 62639. After that Alvydas contacted Igor directly. On the other day Alvydas told him that Igor had asked for USD 5,000 as a security for the car and that he was discussing with him whether he should pay this security to him or not. He told Alvydas that he could pay this money to him since, as he thought to himself, Igor has been involved into the car business and that he was a man of integrity. Igor told him that he was planning to fly to the US to handle some business affairs there. He couldn't say whether Igor had indeed left for the US or not because he didn't know that. This was only what he had said to him. When about several weeks have passed since the alleged trip of Igor to the US they both drove to Klaipėda with his car BMW X5 (number plate EBD 599). Before going to Klaipėda Igor phoned him and told him that the car was in Klaipėda already and that they needed to pay USD 1,200 for the container. He informed Alvydas about this and the latter gave him LTL 2,500. When they arrived in Klaipėda on 16 June 2009, Igor drove near the premises of UAB Baltspeda (he does not know the exact address of this company), and entered the premises of the said company in order to pay for the container. He gave LTL 2,500 to Igor and stayed outside to have a smoke. Later on he entered the room and heard how he was talking with some employee of UAB Baltspeda unknown to him about the customs check-out procedures. That employee showed him the prices of customs check-out according to which it would cost LTL 11,000. Igor got very nervous and started yelling. The employee then told him that there is no possibility to reduce the customs tax unless he registered the car under his own name. Igor told him that he needs to go back to Vilnius to get the place tickets to the US as a proof that he had actually been in the US so that he could register the car under his name later on. When they left UAB Baltspeda, they drove somewhere to have lunch, and he does not know the address of that café. While they were having lunch some acquaintance of Igor came there <...>

/round stamp/ Republic of Lithuania
Vilnius Regional Prosecutor's Office

<...> who, as Igor later told him, was a customs officer. During their conversation Igor asked him how he could arrange customs check-out procedures for that car at a lower price. That man replied that the only option to get the car customs check-out procedures done cheaper is to register the car under his name upon proving that he had been in the US before. When they were returning to Vilnius Igor asked him whether Alvydas would pay the additional amount of LTL 11,000 to him to which he answered that the price had been agreed in advance and that Alvydas would not pay any more money. When they returned to Vilnius Igor told him that they would go to Klaipėda the following day and they agreed that Igor would call him first. On the same day he met Alvydas and explained to him that situation that the car customs check-out procedures would cost LTL 11,000 to which Alvydas replied that the price had been agreed in advance and that he was not going to pay any more money. Since Igor did not call him on 17 June 2009 he texted him and Igor replied that he was now in Belarus and that he would call him back in a few hours when he returned. However, he has not received any call from him thus far.

On 24 November 2009 Č. Pečul gave additional evidence and stated that he wanted to update and clarify his previous evidence, namely: his neighbour called Alvydas (he does not know his family name) gave him money on two different occasions in June 2009 (he does not remember when exactly but this was before the trip to Klaipėda on 16 June 2009) i.e. LTL 1,500 and LTL 2,500 (LTL 4,000 in total) since Igor need LTL 1,500 to arrange all the documents and LTL 2,500 were needed for customs check-out procedures. He did not sign any note for accepting the money with Alvydas because this was done on the grounds of mutual trust. A few days before 16 June 2009 at the petrol station Onix on the crossroads between Kazlausko and Geležinio vilko Streets in Vilnius City he met Igor and handed LTL 1,500 received from Alvydas to him. There were only the two of them and they did not sign any documents. Igor told him that he needed LTL 2,500 for the customs check-out procedures of this car whereupon he took LTL 2,500 from Alvydas for the second time which he handed over to Igor on 26 June 2009 in Klaipėda, near the premises of UAB Baltspeda (outside). He does not have any note confirming the fact of him giving LTL 2,500 to Igor because they did not sign

anything this time either. He has not mentioned the amount of LTL 1,500 given to him by Alvydas during his previous interview because nobody asked him about that.

On 30 June 2009 when the procedure of identification of a person by means of his/her photographs was conducted Č. Pečul recognised I. Poliakov as a person who introduced himself as Igor and who took the amount of LTL 12,000 from A. Milkevičius as a security for the delivery of the car, however, he did not deliver the car nor returned the money.

On 6 October 2009 the witness Elena Voverienė stated that she knows I. Poliakov and is in a close relationship with him. She has known him for about 2 years. When I. Poliakov returns from abroad, he lives at her place (11-37 Žemaitės St.). As far as she knows from his stories, he has been travelling to the US and back for about 5 years. At those times he has been involved in car trade. I. Poliakov does not tell her everything.

On 9 April 2010 E. Voverienė gave additional evidence and stated that currently I. Poliakov is in the US and that she does not know when he will come back, they haven't talked about that. He does not have his phone number; in cases where he calls her while being in the US she cannot see his phone number (it is not shown). They communicate with each other via Skype and e-mail. Currently she does not remember his e-mail. As far as she knows, I. Poliakov used to have an account in SEB earlier on and she does not know whether he still has one; she does not know whether he has any accounts in other banks, and they might be frozen as well. She knows that I. Poliakov has acquired the car BMW X5 on the grounds of a car lease (signed a contract with SEB leasing company). In the beginning of that year (in January) a letter was sent at the address of her declared place of residence, namely, 12-24 Gedvydžių St., Vilnius, it was from SEB Leasing and it was related to some debt with regard to that leased car. She used to cover payments by the money he sent to her previously (she did so a few times), however, she does not do that anymore because in January of that year I. Poliakov and she had some arguments and he took from her the keys to the said car then. Even though they reconciled afterwards, she does not take that car from him and does not use it at all. She does not know where the car might be at the moment; she thinks that maybe it is parked somewhere. She cannot explain why I. Poliakov transfers money to her bank account and not to A. Milkevičius. Upon the request of I. Poliakov she transfers the money to A. Milkevičius. She thinks that maybe it is more suitable for I. Poliakov to transfer the amount of money to her on one occasion and then he tells her which sum of money needs to be transferred to the account of A. Milkevičius.

On 13 April 2010 E. Voverienė informed us by e-mail that the e-mail of I. Poliakov is poliakov4@aol.com .

On 1 October 2009 the witness Aleksandr Ivanenko stated that approximately 4-5 years ago (he does not remember when exactly) he met I. Poliakov at the car parking lot in Subačiaus St. He had not seen him for about 10 years. During their conversation I. Poliakov mentioned that he was purchasing cars in the US and <...>

*/round stamp/* Republic of Lithuania
Vilnius Regional Prosecutor's Office

<...> then he sells them in Lithuania. They exchange phone numbers. In about half a year at the same car parking lot which has been rented by Igor Judickij for work purposes the latter asked him whether he was aware of any person who could bring some motorbike parts from abroad. Then he gave the phone number of I. Poliakov to I. Judickij and said that this person could help you do that.

On 1 October 2009 Igor Judickij was interviewed as the suspect on the grounds of Article 182 Paragraph 1 of the Criminal Code of the Republic of Lithuania (hereinafter referred to as CC of RL). He did not plead guilty and stated that he knows Igor Poliakov, he is his acquaintance. They have known each other for about 3 years. They got acquainted through their common acquaintance Aleksandras (he does not remember his family name because he has not been in contact with him for about half a year), his phone number is 865067067. He was looking for a person who could bring him some Kawasaki motorbike parts from the US. Aleksandras told him that there is a guy who is involved in trade business regarding the cars brought from the US. Aleksandras told him that he might help

5

him and gave him the phone number of I. Poliakov – 867875171, 860362639. He has now these phone numbers and therefore he cannot specify which of them was indicated to him by Aleksandras. This happened about three years ago, i.e. in 2006. On the same day he called I. Poliakov; he does not remember the month and the day of this conversation; this could have been in September. When he called him they agreed to meet at the car parking lot (58 Subačiaus St., Vilnius City). At that time, he was renting that car parking lot and trading in cars there. If he is not mistaken, I. Poliakov arrived at that car parking lot in a few days and they discussed the possibility of obtaining the spare part of the said motorbike model. I. Poliakov explained to him that he would be leaving for the US soon, said that the spare parts would cost around LTL 2,500 and asked for this amount of money. He handed this money over to Igor, they did not sign any document because usually in car trading business most of transactions are conducted like this, that is hands are shaken and that's all, even more so that Igor had said that he would keep his car BMW X5 (he does not remember the number plates, and the car colour is green) at the car parking lot while he would be in the US. He left during that week and, as agreed, he left his car in the car parking lot. He did not receive the said motorbike parts, Igor used to promise to bring them from time to time but always failed to keep his promise, he used to say that there were always some kind of obstacles which prevented him to get these spare parts. About a year later he demanded Igor to return the money or to deliver the spare parts to him. He did not return neither the money nor the parts but suggested buying a water-powered motorbike instead. They deducted the debt from the price of the water-powered motorbike and he bought one for LTL 8,000, and in this way they settled their accounts. It is under these circumstances that they got acquainted. They do not have any more common acquaintances with the exception of Aleksandras who lives in Naujoji Vilnia district of Vilnius City. In May 2009 (he does not remember the exact date) he received a call from I. Poliakov. He asked to text him his bank account number. He asked what for and got an explanation that the account number is needed because some guy wants to pay for the delivered car. He then asked why he cannot open a bank account himself, and Igor explained that he does not have any Lithuanian documents currently since, as he has mentioned, his passport has been seized. He trusted I. Poliakov and everything seemed logical to him because at that time Igor brought him the car Dodge Grand Caravan which he now uses in his work as a taxi driver, therefore, he thought that maybe there is another car brought for another person who has to pay for it as well. He texted his account number by using his phone No. 860614989 and sent it to I. Poliakov, to the aforementioned phone number but he cannot remember exactly which number it was. His account whose number he cannot remember right now has been opened at the bank Swedbank. On the following day I. Poliakov phoned him and said that the amount of LTL 12,000 would be transferred to his account as a payment for the car and he asked him to withdraw this money. He told him that the bank would charge an extra fee for the withdrawal of such amount of money, he was OK with that and told him to cover that extra fee with the money which he had asked him to withdraw. He wondered why that person could not settle his accounts with him in cash and he replied that that guy was not able to withdraw the money from his account but could transfer them instead. So he checked via the Internet whether the money had been transferred or not and went to the bank on the following day (the bank branch was located in Baltupiai district of Vilnius City) and withdrew LTL12,000; the bank charged LTL 100 as an extra fee for the withdrawal of money. At that time, he did not have much of his own money in the account, only around a few hundreds of LTL. When he left the bank he phoned I. Poliakov and they agreed to meet in the city. He cannot tell exactly where they met because he does not remember this anymore. He gave him all the money which he had withdrawn from the account. In about a month he drew up a note for him whereby he confirmed that he gave the money <...>

/round stamp/ Republic of Lithuania
Vilnius Regional Prosecutor's Office

<...> which he had withdrawn from the bank. He has kept that note. I. Poliakov is not a reliable person; this can be proven with the delay in delivering motorbike parts for him. I. Poliakov sometimes introduces himself by using family name Ramos because he has married before in the US and took

the family name of his wife – Ramos, he's got the driver's licence issued in the US where this family name in particular has been specified. He has not committed any crime, he just wanted to help another person.

I. Judickij submitted the written confirmation dd. 17 August 2009 whereby it has been confirmed that he handed the amount of LTL 12,000 over to I. Poliakov which had been transferred to his (I. Judickij's) account by A. Milkevičius.

On 7 June 2010 in accordance with the provisions of Article 212 Paragraph 2 of the Code of Criminal Procedure of the Republic of Lithuania (hereinafter referred to CCP of RL) pre-trial investigation has been cancelled with regard to I. Judickij due to the lack of evidence proving his guilt in having committed the criminal offence specified under Article 182 Paragraph 1 of CC of RL.

On 3 June 2010 a notification No. 10BI/125 dd. 2 June 2010 has been received in the context of the case from UAB Baltspeda Auto saying that Igor Poliakov (Ramos) did not address this company with regard to its services related to the transportation of cars from the US in containers.

On 27 November 2009 the aggrieved person and civil claimant Valdemar Savicki gave the following evidence: in May 2008 he planned to acquire the car and arrange a trip with his wife Jelena Savicki to Italy. He found the car BMW X5 on the Internet website www.autoplius.lt and got interested in it. When he dialled the given number some man picked up the phone and introduced himself as Igor Poliakov. I. Poliakov arrived at their meeting by some other car, not the one which had been specified on that website. I. Poliakov told him that he transported cars from the US and the car shown on that ad was in the US and would be in Lithuania in the following month. The cohabiting partner of I. Poliakov, Elena, was also present during this meeting. During the meeting I. Poliakov said that he would not be able to deliver the requested car by the planned date of departure but suggested going to the trip with the car BMW X5 owned by I. Poliakov himself. Such a proposal from a stranger seemed rather suspicious to him. In June 2008 the cohabiting partner of I. Poliakov, Elena, started calling the wife of V. Savicki, i.e. J. Savicki, asking whether her husband intended to buy the car, suggesting meeting her and trying to have close contact with his wife by all possible means. I. Poliakov also started calling him offering to buy the water-powered motorbike, and later – a car. He, his wife, I. Poliakov and his cohabiting partner Elena started meeting and communicating more closely; I. Poliakov and Elena visited them as guests and communicated with their children. I. Poliakov gave him his code enabling him to login to US auctions and thus he found an ad on the Internet saying that the car Mercedes Benz GL 450 was on sale in the US for USD 55,000. The car was being sold by Rallye Motors Mercedes-Benz at 1600 Northern Blvd, Roslyn, New York, USA. I. Poliakov said that he could buy and deliver this car. Further to the loan note dd. 6 August 2008 I. Poliakov received from him the amount of USD 30,000 as an advance payment (which corresponds to LTL 66,654 in accordance with the currency rate as of 6 August 2008 fixed by the Bank of Lithuania) and left to the USA to buy the car. While I. Poliakov was in the USA they used to communicate by phone. Elena also contacted him and his wife on a constant basis. In his e-mail dd. 11 August 2008 I. Poliakov sent him the pictures of the Mercedes Benz GL 450 that he had selected beforehand. When these pictures were sent to him, the car ad and the pictures were taken out from the Internet website of the car seller. When I. Poliakov returned to Lithuania, he said that the car Mercedes Benz GL 450 has been purchased and loaded in a container, and he also confirmed that he personally looked after the loading of the car in the shipment container. I. Poliakov said to him that the car was very nice and that he would be very happy when the car would be delivered to Lithuania. During their meeting I. Poliakov said that he had some financial difficulties and he asked to pay the whole amount of money for the car. He told him that he had to make an urgent payment to UAB Languva for the apartment of his cohabiting partner since they purchased it as separate owners and had to pay in instalments for their own "part" of the apartment. Since he, his wife and I. Poliakov and his cohabiting partner Elena were close friends and there were no problems whatsoever before, further to the loan note dd. 20 August 2008 he handed the amount of USD 14,800 and USD 11,760 (which corresponds to LTL 62,612 in accordance with the currency rate as of 20 August 2008 fixed by the

Bank of Lithuania) over to I. Poliakov, thus settling his accounts for the car and its delivery to Klaipėda Seaport in full. However, the car was not delivered to Klaipėda Seaport at the agreed time i.e. on 10 September 2008 and during their meeting I. Poliakov explained that <...>

*/round stamp/* Republic of Lithuania
Vilnius Regional Prosecutor's Office

<...> the car has been loaded in the container, however, it cannot leave the US since the documents of another car loaded in the same container are missing. When he demanded I. Poliakov to provide the documents of car purchase and ownership, he told him that he left them in the USA and that his acquaintance would send them to him. He did send the requested documents after some time. In case of failing to comply with the conditions of their agreement i.e. to deliver the car I. Poliakov had to return the money to him by 20 September 2008. In the beginning of October 2008 I. Poliakov said to him that the car left the USA and gave him the following number of the container: 4JCBS71E87A122518. Using the container number given to him by I. Poliakov, he contacted UAB Baltspeda (company acting as an intermediary while conducting customs procedures for car in Klaip4da Seaport) and was informed that the said shipment container did not contain a Mercedes Benz GL 450 but other cars. When he contacted the car seller in the US the latter informed him that the car Mercedes Benz GL 450 actually existed and that in the beginning of August 2008 I. Poliakov paid a small advance payment for it, however, he failed to meet the car seller at an agreed time and buy the car. In October 2008 I. Poliakov told him that he had been deceived by some intermediary in the US and, even though he paid the advance payment for the car himself and promised to return the amount of USD 56,560 in the nearest future (including interest), he failed to return the money. In November 2008 I. Poliakov texted him that he would return the money and pay the interest within one month, however, he failed to keep his promise. In April 2009, during their meeting in Vilnius, I. Poliakov once again asked him to give him his bank account number and ensured him that he would transfer the money immediately, however, he has not paid the money thus far. Later on all the attempts to contact I. Poliakov were unsuccessful. The cell phone has been switched off and he fails to reply to the e-mails. I. Poliakov did all these actions while delaying his settlement of accounts for the car and giving false promises while registering the car BMW X5 (number plate EBD599) under the name of his cohabiting partner and, as it may seem, conducting other actions related to the concealment of personal property (concealment of the fact of having purchased the apartment under the name of his cohabiting partner since he had made money transfers (approx. LTL 120,000) for this apartment under his name). In May 2008 I. Poliakov and his cohabiting partner Elena, having found out his intentions to buy an expensive car Mercedes Benz GL 450, deliberately tried to come into close and friendly contact with him and to earn his and his wife's trust. It is to be noted that since May 2008 until August 2008 I. Poliakov and his cohabiting partner were very helpful (they used to offer their car for the trips), they used to phone them a lot, asked various questions, communicated and invited to meet them. I. Poliakov tried to earn his trust so that to acquire high value property from him by fraud, i.e. USD 56,560. During the time when he and I. Poliakov were in contact with each other, I. Poliakov created the image of himself as the one who was engaged in purchasing cars at US auctions as well as their delivery and subsequent sale in Lithuania. For the purposes of car search I. Poliakov has given him his login codes needed to connect to the databases of auctions announced in the USA. I. Poliakov has fraudulently persuaded him (verbally) that he was capable of purchasing the car recedes Benz GL 450 and delivering it to Lithuania. He also concealed his real intentions, namely, not to purchase the car and to misappropriate the money handed over to him for this purpose. I. Poliakov has misled him about his alleged purchase of the car Mercedes Benz GL 450 and acquired, by fraud, the amount of USD 30,000 for the purposes of purchasing the car Mercedes Benz GL 450. On 20 August 2008 I. Poliakov fraudulently persuaded him that he had purchased the car, loaded it in the shipment container and that the car was to be delivered to Klaipėda Seaport on 10 September 2008. By abuse of trust and pursuant to false information I. Poliakov acquired the additional amount of USD 26,560 from him. It is to be noted that I. Poliakov acts were driven by direct intent. He realized that he was providing him

8

(V. Savicki) with false information, he was aware of the fact that V. Savicki trusted him and tried to mislead him in order to acquire the amount of USD 56,560 for himself. By his active actions pursued since May 2008 I. Poliakov tried to make sure that V. Savicki used him as an intermediary to purchase the car and, at the moment when he accepted the amount of USD 30,000 for the purposes of car purchase, he was aware of the fact that he was not intending to comply with their agreement, and, while accepting the amount of USD 26,560 as the final payment for the car, he was aware of the fact that the car would not be delivered to him even though he stated that the car had been purchased and loaded in the shipment container while in fact that car was still parked together with other cars for sale. To sum it all up, it is to be concluded that I. Poliakov, having gained his trust by his active actions, abused that trust and, having provided him verbally <...>

*/round stamp/* Republic of Lithuania
Vilnius Regional Prosecutor's Office

<...> with false information, misled him and thus acquired the amount of USD 56,560 from him by fraud. The fact that I. Poliakov had earned his trust and provided him with false information have had crucial importance in his final decision to handing the amount of USD 56,560 over to I. Poliakov.
On 9 September 2010 V. Savicki gave the following additional evidence: on 5 January of this year he received a call to his cell phone No. + 652 50222 from an unidentified number. This was a call from I. Poliakov; the latter asked him to give him his account number to which he could transfer the money which was taken from him for the purposes of purchasing a Mercedes Benz. He promised to transfer USD 15,000. On 13 January of this year the amount of USD 500 was transferred to his bank account in AB SEB bankas. The said sum has been transferred by Igor Ramos. He understood that this money was actually transferred to him by I. Poliakov. In the middle of March of this year (he cannot tell exactly when) he got another phone call to the same number from unidentified phone number, it was I. Poliakov again, and he asked for the number of his bank account promising to transfer the amount of USD 30,000. When he asked I. Poliakov why he transferred only USD 500 instead of USD 15,000 as promised, I. Poliakov started explaining that he had been deceived himself by someone else and therefore could not transfer the promised amount of money. When he asked when he was going to return the whole amount of money, I. Poliakov replied that he would definitely return that debt by paying it in instalments until the summer of that year.
On 19 May 2011 V. Savicki gave the following additional evidence: on 10 May 2011 at approx. 9:47 am while he was in Ukraine he receive an e-mail message to his PC from poliakov4@aol.com saying „*privet Valdemar! napishi kak ja mogu s toboj svezatsa, ja zarabotal dengi xociu otdat polnostju dolg*" (Russian text meaning „hi Valdemar! Write me your contacts, I have earned some money and I want to pay my debt to you completely "). He understood that that note had been sent by I. Poliakov. So he sent him an e-mail note at the given e-mail address and gave him his Ukrainian cell phone No. +380994092280 and also wrote that he could transfer the money to his account in SEB bank. On 11 May 2011 at approx. 4:00 pm I. Poliakov phoned him to his phone number from unidentified phone number and told him once again that he had earned some money and that he wanted to pay the whole debt to him i.e. all the money which he had taken from him when promising to deliver a Mercedes Benz. He agreed. Then I. Poliakov started telling him that his acquaintances have told him that he was wanted by the police in Lithuania and that he was afraid to come back to Lithuania so as not to be arrested. He told I. Poliakov to transfer the money to his account in SEB bank. I. Poliakov told him that he wanted to return the debt to him personally, or else he might deceive him, and he did not clarify in what way he could do that. On 17 May 2011 at 6:48 pm he received a call to his cell phone number 8 655 93395 from the cell phone number 8-6-653-36490, it was I. Poliakov and he started telling him that he would pay the debt to him on condition that he would ask the police to cancel his search. He answered that he'd better returned the debt first and only then he would reconsider his suggestion. I. Poliakov replied that he would think about it until the weekend of that week and then he would inform him about his further intentions. The following day he dialled the cell phone number of I. Poliakov, the signal was OK but nobody picked up the phone.

On 6 April 2012 V. Savicki gave the following additional evidence: the last time he talked with I. Poliakov about the debt for the Mercedes Benz which had been promised to be delivered to him from the US was in May 2011, and he has given evidence about that. He could not provide any new circumstances because there are none. He then filed a civil claim for the amount of LTL 128,096 (this is the amount of money which I. Poliakov owes him at the present moment).

On 8 December 2009 the witness Elena Voverienė gave the following evidence: she has known I. Poliakov since about 2006. I. Poliakov used to trade in cars from the USA or Canada. In 2008 (in approx. March of that year) I. Poliakov asked her to lend him some money; she asked her sister V. Turčilienė to lend the amount of money requested by I. Poliakov. V. Turčilienė agreed and lent the money necessary for I. Poliakov. In March 2008 she decided to buy an apartment with her sister and on 31 March 2008 the contract for purchase-sale of the apartment was signed under the name of her sister. She and her sister did not have enough money to pay for the apartment and thus she asked I. Poliakov to return the money which had been lent to him. I. Poliakov returned the lent money in instalments, and there are documents confirming this fact. I. Poliakov has settled all his accounts with her sister. In 2008, in May or something around that time, she and I. Poliakov drove to the meeting by his car BMW X5 which he wanted to sell. During this meeting the car was inspected by some man and a woman who introduced themselves as Valdemar and Aliona (she does not know their family name). The woman seemed to her as the woman she had seen somewhere else before that and they got to know her well and they also met a few times. She does not know what I. Poliakov and Valdemar were talking about since she used not to interfere into <...>

/round stamp/ Republic of Lithuania
Vilnius Regional Prosecutor's Office

<...> business affairs of I. Poliakov. Valdemar and Aliona have ben texting her why I. Poliakov would not pick up the phone and he would not answer any text messages from them. They tried to contact I. Poliakov through her and they insisted that she contacted them as soon as I. Poliakov comes back. She replied that he is away quite frequently and that she would give their message to him as soon as he comes back. She does not know why they wanted to contact I. Poliakov.

On 1 December 2009 E. Voverienė gave the following additional evidence: on 5 April 2008 in her presence I. Poliakov borrowed the amount of LTL 88,000 from her sister Valentina Turčilienė. A normal unprotested bill has been drawn up in respect of this amount. I. Poliakov borrowed this money for the development of his business, i.e. he planned to buy cars and transport them from the USA or Canada. I. Poliakov used to pay his debt in instalments, in different amounts. I. Poliakov used to pay the lent money to UAB Languva Plastikas for the apartment which was being purchased by her and her sister. Upon checking that all the payments have been made, relevant receipts have been drawn up for I. Poliakov in respect of settlement of his accounts.

On 22 February 2010 the witness Valentina Turčilienė gave the following evidence: in March 2008 her sister`s (boy)friend I. Poliakov asked her to lend about LTL 118,000 for the development of his business. She does not know what he needed the money for and what his business was. She lent the money on two different occasions: in March 2009 (at around day 28), the amount of 30,000 (by way of signing a normal unprotested bill) and on 5 April 2008 – the amount of LTL 88,000, also by way of signing a normal unprotested bill. I. Poliakov paid the money in cash on the basis of these bills because that was his wish. On 22 May 2009 I. Poliakov returned LTL 30,000 and on 16 October 2009 – the amount of LTL 88,000. She does not maintain any contact with I. Poliakov.

On 12 January 2010 the following answers were received by e-mail from the seller of the Mercedes Benz GL 450 Victor Cosme (e-mail: vcosme@rallyemotors.com) to the questions posed to him by the officer of Economic Crime Investigation Unit of Crime Investigation Board of Vilnius County Police Headquarters:

Igor came to the country for his business in the beginning of August 2008. He bought the car for the amount of USD 52,500 or something like that, he is not 100% sure about that. Igor paid USD 5,000

as security for that car which he (the seller) returned to him after storing the car for one month. He tore up all the documents confirming the payment of the security fee. They have not signed any purchase-sale contract. He had to pay the entire price of the car as soon as possible. Igor told him that he would go to Russia to get the remaining money and that he would be back in a week, however, it took him more than three weeks (compared to what he had told him). He told him that he was very ill and that his dad was very ill, too. Then he waited until he was able to return to the USA. When he came back to conclude the transaction he was very nervous and told him that he needed to get his security fee back or else he would call the police, so he returned him his money. I. Poliakov refused to purchase the car after approximately one month from the day he paid the security fee. It was in approx. September. I. Poliakov refused to buy the car by saying that his client didn`t want to purchase the truck anymore. He returned the security fee to I. Poliakov as soon as he cancelled the transaction. He stopped contacting I. Poliakov, there was no reason in communicating with him because he is a liar. He did not know I. Poliakov before. It all became very suspicious to him as soon as I. Poliakov started telling him that he had been ill and that his dad had been ill. He knew right away then that he would not purchase that car.


Prosecutor                                                          Ms Rasa Šimonė

                                                    /round stamp/ Republic of Lithuania
                                                    Vilnius Regional Prosecutor's Office

By: Ms Rasa Šimonė, tel. 8 52 527 067, e-mail: Rasa.Simone@prokuraturos.lt


                                                    /stamp/ TRUE COPY
                                                    /hand-written/ Prosecutor Ms Rasa Šimonė
                                                    /signature/

*Translation corresponds to the original text.*
*Ms. Aistė Šimkonienė, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

*/Translation from the Lithuanian language/*

| DETAILED METADATA | |
|---|---|
| **Author of the document** | Unit II of Vilnius District Prosecutor's Office under Vilnius Regional Prosecutor's Office 191884691, 7 Rinktinės St., LT-09201 Vilnius |
| **Name (heading) of the document** | Official document template |
| **Date and number of registration of the document** | 26 May 2016, ref. no. 1.33-45129 |
| **Mark of document specification identification** | ADOC-V1.0 |
| **Information about means used to ensure the integrity of metadata** | The integrity of metadata having the objective of "Registravimas" (registration) has been ensured by using the certificate "Integruotos baudžiamojo proceso informacinės sistemos, Lietuvos Respublikos vidaus reikalų ministerija, į. k. 1886014 64\ LT" ("Integrated Information Systems of Criminal Proceedings, Ministry of the Interior of the Republic of Lithuania, company code 1886014 64\ LT") issued by "VI Registru Centras RCSC (Issuing CA-A), VI Registru Centras – i. k. 124110246 LT" ("public enterprise "Centre of Registers" RCSC (Issuing CA-A), public enterprise "Centre of Registers", company code 124110246 LT"); certificate valid from 9 March 2016 until 9 March 2017. The action has been carried out on 26 May 2016 at 9:49:28 am by Ms Rasa Šimonė, Prosecutor, Unit II of Vilnius District Prosecutor's Office under Vilnius Regional Prosecutor's Office

The integrity of metadata having the objective of "Registravimas" (registration) has been ensured by using the certificate "Integruotos baudžiamojo proceso informacinės sistemos, Lietuvos Respublikos vidaus reikalų ministerija, į. K. 188601464\ LT" ("Integrated Information Systems of Criminal Proceedings, Ministry of the Interior of the Republic of Lithuania, company code 188601464\ LT") issued by "VI Registru Centras RCSC (Issuing CA-A), VI Registru Centras – i. k. 124110246 LT" ("public enterprise "Centre of Registers" RCSC (Issuing CA-A), public enterprise "Centre of Registers", company code 124110246 LT"); certificate valid from 9 March 2016 until 9 March 2017. The action has been carried out on 26 May 2016 at 9:49:29 am by Integrated Information Systems of Criminal Proceedings <...> |
| **Number of annexes attached to the main document** | - |

EX-POLIAKOV-00080

| Number of documents enclosed to the main document | - |
|---|---|
| Name of software using which the electronic document was drawn up | IBPS[1] system, version 1.0.3-SNAPSHOT |
| Information about the verification of electronic document and electronic signature(s) (date of verification) | In line with the requirements set out in relevant specification.<br>All electronic signatures included in the document are valid. |
| Date of print-out of the copy of electronic document and employee who printed it | Copy created by IBPS system on 26 May 2016 at 9:49:48 am<br>Prosecutor Ms Rasa Šimonė |

/round stamp/ Republic of Lithuania
Vilnius Regional Prosecutor's Office

*Translation corresponds to the original text:* Θ · ⟨signature⟩
*Ms. Aistė Šimkonienė, translator/interpreter of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

---

[1] *Integrated Criminal Procedure System* (Transl. note)

*/Translation from the Lithuanian language/*



### LIETUVOS RESPUBLIKOS GENERALINĖ PROKURATŪRA
### PROSECUTOR GENERAL'S OFFICE OF THE REPUBLIC OF LITHUANIA

03.11.2016, our ref. no.:14.2.- 9228
(14.3.-80/13)
In reply to your inquiry of 3 October 2016

Mr D. Silverbrand
Office of International Affairs
U.S. Department of Justice
By e-mail: David.Silverbrand@usdoj.gov

RE: **EXTRADITION OF IGOR POLIAKOV (SUPPLEMENTARY INFORMATION)**

In response to your request referred to above, hereby we would like to provide the following answers in the context of the case regarding the extradition of the citizen of the Republic of Lithuania Igor Poliakov DOB 30 May 1974 from the United States of America:

1) Yes.
2) The document specified by you has not been drafted upon joining the pre-trial investigations.
3) We have enclosed herewith the documents provided by the prosecutor in charge of the pre-trial investigation.
4) In accordance with the information provided by the prosecutor in charge of the pre-trial investigation, the statutory term of limitations on delivering a judgement of conviction for the criminal offence specified under Article 182 (1) of the Criminal Code of the Republic of Lithuania (referred to in the extradition request regarding I. Poliakov) would have expired on 16 May 2014 and respective term in relation to the criminal offence specified under Article 182 (2) of the Criminal Code of the Republic of Lithuania expires on 20 August 2018.

However, since I. Poliakov has gone into hiding from pre-trial investigation upon the commission of the crime, the statutory term of limitations has been suspended. The calculation of the statutory period shall be resumed from the day the person is arrested or appears himself/herself before a pre-trial investigation officer, prosecutor or the court. A judgement of conviction may not be passed with regard to a person who committed a criminal act after fifteen years provided that the statutory period has not ceased as a result of the commission of a new criminal offence.

The resolution to announce I. Poliakov wanted in the pre-trial investigation case No 38-1-00066-09 was issued on 15 April 2010 and on 29 September 2011 – in the pre-trial investigation case No 10-9-00203-09. The statutory period has been suspended since then.

We hope that the given information would be sufficient to you. Please accept our sincere gratitude for your co-operation.

ENCLOSED:
1. Printout from the Criminal Code of the Republic of Lithuania, 2 p.;
2. Copy of official record of supplementary interview of the victim V. Savicki, 2 p.;
3. Copy of official record of photo-based identity parade and photo, 8 p.

Yours sincerely,

Prosecutor
Department for Criminal Prosecution                                    Ms Rozita Požarskienė

Ms I. Idzelytė, tel. +370 5 266 23 82, e-mail: irma.idzelyte@prokuraturos.lt

*Translation corresponds to the original text: _____*
*Ms A. Šimkonienė, translator at the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making a false or deliberately misleading translation.*

Budgetary authority, 5A Rinktinės St., LT-01515 Vilnius, tel. no. (+370 5) 266 2305, fax no. (8 5) 266 2317,
e-mail: generaline.prokuratura@prokuraturos.lt stored at the Registry of Legal Entities (code 288603320)

EX-POLIAKOV-00082



## LIETUVOS RESPUBLIKOS
## GENERALINĖ PROKURATŪRA

p. D. Silverbrand                                2016-1(~03 Nr. 14.2.-5228      (14.3-80/13)
Jungtinių Amerikos Valstijų                  Į 2016-10-03  paklausimą
Teisingumo departamento
Tarptautinių ryšių skyrius

El. paštu: David.Silverbrand@usdoj.gov


**DĖL IGOR POLIAKOV EKSTRADICIJOS (PAPILDOMA INFORMACIJA)**

   Atsakydami į Jūsų aukščiau nurodytą prašymą, teikiame atsakymus Lietuvos Respublikos piliečio Igor Poliakov, gim. 1974 m. gegužės 30 d., ekstradicijos iš Jungtinių Amerikos Valstijų byloje.
   1) Taip.
   2) Jūsų minimas dokumentas sujungus ikiteisminius tyrimus nebuvo parengtas.
   3) Siunčiame ikiteisminiam tyrimui vadovaujančio prokuroro pateiktus dokumentus.
   4) Remiantis ikiteisminiam tyrimui vadovaujančio prokuroro pateikta informacija, apkaltinamojo nuosprendžio senaties termino pabaiga dėl I. Poliakov ekstradicijos prašyme nurodytos nusikalstamos veikos, numatytos Lietuvos Respublikos baudžiamojo kodekso 182 str. 1 d. – 2014-05-16, o dėl nusikalstamos veikos, numatytos 182 str. 2 d. – 2018-08-20.
   Tačiau, kadangi I. Poliakov, padaręs nusikalstamą veiką, pasislėpė nuo ikiteisminio tyrimo, senaties eiga sustojo. Senaties eiga atsinaujina nuo tos dienos, kurią asmuo sulaikomas arba kurią jis pats atvyksta pas ikiteisminio tyrimo pareigūną, prokurorą ar į teismą. Apkaltinamasis nuosprendis negali būti priimtas, jeigu nuo to laiko, kai asmuo padarė nusikaltimą, praėjo penkiolika metų ir senaties eiga nenutrūko dėl naujo nusikaltimo padarymo.
   Nutarimas paskelbti I. Poliakov paiešką ikiteisminio tyrimo byloje Nr. 38-1-00066-09 priimtas 2010-04-15, o ikiteisminio tyrimo byloje Nr. 10-9-00203-09 – 2011-09-29. Nuo šių datų senaties terminų eiga sustojo.
   Tikimės, kad pateikta informacija bus pakankama ir reiškiame Jums nuoširdžią padėką už bendradarbiavimą.


      PRIDEDAMA:
      1. Lietuvos Respublikos baudžiamojo kodekso išrašas, 2 l.
      2. Nukentėjusiojo V. Savicki papildomos apklausos protokolo nuorašas, 2 l.
      3. Asmens parodymo atpažinti pagal jo nuotrauką protokolo ir nuotraukos nuorašas, 8 l.


      Pagarbiai

Baudžiamojo persekiojimo departamento
prokurorė                                                                         Rozita Požarskienė


I. Idzelytė, +370 5 266 23 82, el.p. irma.idzelyte@prokuraturos.lt

EX-POLIAKOV-00083

Elektroninio dokumento nuorašas



## VILNIAUS APSKRITIES VYRIAUSIOJO POLICIJOS KOMISARIATO KRIMINALINĖS POLICIJOS NUSIKALTIMŲ NUOSAVYBEI TYRIMO VALDYBOS 3-IASIS SKYRIUS

### LIUDYTOJO PAPILDOMOS APKLAUSOS PROTOKOLAS

| Data | 2016-10-11 |
|---|---|
| Surašymo vieta | Vilnius |
| Apklausa pradėta | 10:16 |
| Apklausa baigta | 10:28 |

| Apklausą atlieka | Vyresnysis tyrėjas Nadežda Michailovskienė |
|---|---|
| Liudytojas | Valdemar Savicki (gim. 1968) |
| Apklausoje dalyvauja | nedalyvauja |
| Apklausos atlikimo vieta | |
| Liudytojo pareiškimas apie lietuvių kalbos mokėjimą | moka |
| Kalba, kuria liudytojas pageidauja duoti parodymus | lietuvių |
| Apklausoje dalyvauja vertėjas | nedalyvauja |
| Liudytojo santykiai su įtariamuoju | klausimas neužduotas |
| Techninių priemonių naudojimas Lietuvos Respublikos baudžiamojo proceso kodekso (toliau – BPK) 179 straipsnio tvarka | nenaudotos |

Liudytojui priminta, kad jis įspėtas dėl atsakomybės pagal Lietuvos Respublikos baudžiamojo kodekso 235 straipsnį už melagingų parodymų davimą.

Apklausa atlikta vadovaujantis BPK 78–83, 178–179, 183 straipsniais

Pasiūlius liudytojui papildomai papasakoti, kas jam gali būti žinoma apie aplinkybes, turinčias reikšmės bylai išspręsti, liudytojas parodė:
kad prie anksčiau duotų parodymų aš norėčiau papildyti, kad su Igoriu Poliakovu iki įvykio aš jau buvau pažįstamas. Kartais bendraudavome maždaug apie porą metų iki įvykio. Jį aš galiu atpažinti. Tuo metu kai įvyko įvykis apie kurį aš daviau parodymus apklausos metu, Igoriui buvo apie 30-35 metai, jis yra apie 1,72 m. ūgio, vidutinio sportiško kūno sudėjimo, šviesiai rūdų (šiaudų spalvos) trumpai kirptų plaukų, šviesių akių, riestos nosies, putlių lupų. Smulkiau jo veido bruožų aš aprašyti nemoku, tačiau jį pamatęs tikrai atpažinsiu. Be to turiu jo nuotrauką, kurią pateikiau prie ikiteisminio tyrimo medžiagos. Šiuo metu daugiau nieko parodyti negaliu.

Protokolo priedai: Nėra

| Dalyvavo | |
|---|---|
| Vertėjas | |
| Apklausą atliko | Vyresnysis tyrėjas          Nadežda Michailovskienė |

EX-POLIAKOV-00084

KOPIJA TIKRA

Transcript of e-document

*Translation from Lithuanian*

## VILNIUS COUNTY POLICE HEADQUARTERS
## CRIMINAL POLICE
## BOARD OF INVESTIGATION OF CRIMES AGAINST PROPERTY
## DIVISION 3

### RECORD OF SUPPLEMENTARY QUESTIONING OF A WITNESS

| | |
|---|---|
| Date | 11 October 2016 |
| Location | Vilnius |
| Questioning started at | 10:16 |
| Questioning ended at | 10:28 |

| | |
|---|---|
| Questioning conducted by | Chief Investigator Nadežda Michailovskienė |
| Witness | Valdemar Savicki (born in 1968) |
| Present in the questioning | None |
| Location where questioning is conducted | |
| Witness's declaration on knowledge of the Lithuanian language | Knows |
| The language in which the witness wishes to give statement | Lithuanian |
| Interpreter present in the questioning | None |
| Witness's relation to the suspect | This question was not asked |
| Use of technical means as provided for in Article 179 of the Criminal Procedure Code of the Republic of Lithuania (hereinafter the Criminal Procedure Code) | None |

The witness is reminded of his warning regarding liability for giving a false testimony as provided for in Article 235 of the Criminal Code of the Republic of Lithuania.

The questioning is conducted following the provisions of Articles 78-83, Articles 178-179 and Article 183 of the Criminal Procedure Code of the Republic of Lithuania.

The witness was offered to tell what in addition is known to him in relation to the circumstances that are relevant in the case. The witness gave the following statement:

In addition to my statements given earlier, I would like to say that I have been familiar with Igor Poliakov prior to the incident. We used to contact sometimes for about two years before the incident took place. I would be able to recognize him. At the time when the incident took place (with regards to which I gave statements earlier), Igor was about 30-35 years of age, of about 1.72 m height, of medium athletic build, short straw-colour hair, bright eyes, upturned nose, plump lips. I cannot describe his face features in detail, but I would recognize him once I saw him. Besides, I have a photograph of him which I have provided to be attached to the material of pre-trial investigation. Meanwhile, this is all I wanted to add.

| | |
|---|---|
| Enclosures to the record: none | |
| Participants | |
| Interpreter | |
| Questioning conducted by | Chief Investigator Nadežda Michailovskienė |

COPY IS TRUE. *Prosecutor Rasa Šimonė /signature/*

*Translation corresponds to the original text.*
*Mrs Erika Jadovienė, translator of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making false or deliberately misleading translation.*

EX-POLIAKOV-00085

## VILNIAUS APSKRITIES VYRIAUSIOJO POLICIJOS KOMISARIATO KRIMINALINĖS POLICIJOS NUSIKALTIMŲ NUOSAVYBEI TYRIMO VALDYBOS 3-IASIS SKYRIUS

### ASMENS PARODYMO ATPAŽINTI
### PAGAL JO NUOTRAUKĄ PROTOKOLAS

| Data | 2016-10-11 |
| Surašymo vieta | Vilnius |
| Veiksmas pradėtas | 10.30 val. |
| Veiksmas baigtas | 11.00 |
| Ikiteisminio tyrimo Nr. | 38-1-00066-09 |

| Parodymą atpažinti atlieka | Vilniaus aps. VPK KPNNTV 3-ojo skyriaus Vyresnioji tyrėja Nadežda Michailovskienė (pareigos, vardas ir pavardė) |
| Atpažįstantysis | Valdemar Davosh, gim. 1968 m. (procesinė padėtis, vardas ir pavardė, gimimo metai) |
| Dalyvauja | nedalyvauja (pareigos, procesinė padėtis, vardas ir pavardė) |
| Parodyme atpažinti dalyvauja vertėjas | nedalyvauja (vardas ir pavardė, vertimo kalba) |
| Techninių priemonių naudojimas Lietuvos Respublikos baudžiamojo proceso kodekso (toliau – BPK) 179 straipsnio tvarka | fotografuota (fotografavimas, vaizdo, garso įrašų darymas, apšvietimas ir kitos naudojimo sąlygos) bei tvarka |

Parodymas atpažinti atliekamas vadovaujantis BPK 179, 191, 192 ir 195 straipsniais.
Atpažįstančiajam parodytos sunumeruotos 5 asmenų nuotraukos, iš kurių pasiūlyta atpažinti asmenį, apie kurį jis yra davęs parodymus.
Nuotrauka Nr. 5 yra Igor Poliakov
kitos nuotraukos yra asmenų, nesusijusių su atliekamu ikiteisminiu tyrimu.

EX-POLIAKOV-00086

*Translation from Lithuanian*

## VILNIUS COUNTY POLICE HEADQUARTERS
## CRIMINAL POLICE
## BOARD OF INVESTIGATION OF CRIMES AGAINST PROPERTY
## DIVISION 3

## PHOTO-BASED IDENTITY PARADE
## RECORD

| Date | *October 11, 2016* |
|---|---|
| Place where this document has been drawn up | *Vilnius* |
| Action started at | *10:30* |
| Action concluded at | *11:00* |
| Pre-trial investigation No. | *38-1-00066-09* |

| Officer conducting identity parade | *Nadežda Michailovskienė, Chief Investigator at Division 3 of Board of Investigation of Crimes against Property of Criminal Police of Vilnius County Police Headquarters* |
|---|---|
| | (position held, name, surname) |
| Identifying person | *Valdemar Savicki, born in 1968* |
| | (procedural status, name and surname, year of birth) |
| Persons present | *None* |
| | (position held, procedural status, name and surname) |
| Interpreter present during the identity parade | *None* |
| | (name and surname, language from/into which interpretation is conducted) |
| Use of technical means as provided for in Article 179 of the Criminal Procedure Code of the Republic of Lithuania (hereinafter the Criminal Procedure Code) | *Photographs taken* |
| | (picture taking, making of video or sound recordings, lighting and other conditions and procedure for using technical means) |

Identity parade conducted in accordance with Articles 179, 191, 192 and 195 of the Criminal Procedure Code.

The identifying person has been shown *5* numbered photographs of persons on the basis of which he has been invited to identify the one about whom he has given the statement.

Photograph No. *5* is of *Igor Poliakov*, other photographs show persons who are not related to the given pre-trial investigation.

COPY IS TRUE. *Prosecutor Rasa Šimonė /signature/*



KOPIJA TIKRA

Prokurore: Rare Kuuau
R. M.

| [photograph] | [photograph] | [photograph] |
|:---:|:---:|:---:|
| No. 1 | No. 2 | No. 3 |
| [photograph] | [photograph] | |
| No. 4 | No. 5 | No. 6 |

COPY IS TRUE. *Prosecutor Rasa Šimonė /signature/*



2016-10-11

4

parodymo atpažinti protokolo tęsinys

Atpažįstantysis, pasiūlius pagal nuotraukas nurodyti asmenį, apie kurį jis davė parodymus, pareiškė:

_kad iš man atkreiptinu požeikliu asmenu nuo_ (įsrašyti)

(Jeigu atpažįstantysis nurodė vieną iš jam parodytų atpažinti pagal nuotraukas asmenų, būtina pagal galimybes pažodžiui užrašyti

_roeiju aš atkoseu dve asmeni nuotraukose iš_

jo parodymus, pagal kurias žymes ar ypatybes jis tą asmenį atpažįsta, jei neatpažįsta, jam pasiūloma paaiškinti, kuo skiriasi jo

_Nr. 5 kaip Sanri Poliakova apie_

parodymuose minėtas asmuo nuo parodytųjų atpažinti)

_kuri pasakojau dęsniau apkloseros izatu._

_iš asmeni aš atkoseu pagal akiu_

_linkar, nosi, ir visu veidu bruožu eisnura_,

Dalyvavusių asmenų pareiškimai

_nera_

Protokolo priedai _fotokortele_

(planai, schemos, nuotraukos, negatyvai, skaitmeninės informacijos laikmenos, garso, vaizdo įrašai ir kt.)

Protokolas perskaitytas, surašytas teisingai.

| | |
|---|---|
| Atpažįstantysis | _Valdemar Sauch_ |
| | (parašas, vardas ir pavardė) |
| Dalyvavo | |
| | (parašas, vardas ir pavardė) |
| Vertėjas | |
| | (parašas, vardas ir pavardė) |
| Parodymą atpažinti atliko | Vilniaus aps. VPK KPNNTV |
| | 3-ojo skyriaus Vyresnioji tyrėja |
| | Nadežda Mič_____ (parašas, vardas ir pavardė) |

KOPIJA TIKRA

_Prokurore Raw Pinseg_
_R. My_

*11 October 2016*.          Continuation of Photo-based Identity Parade Record

The identifying person was invited to identify the person from the photograph about whom he had given statements and he declared the following:

*From the photographs that were presented to me, I do identify the person in the photograph No. 5 as Igor Poliakov, about whom I had previously given my statement. I can recognize this person from his eyes, lips, nose and the whole picture of his face.*

(If the identifying person points to one of persons shown to him for photo-based identification, the statement given by such person shall, if possible, be entered in the official record as much verbatim as possible, indicating features or characteristics according to which he identified that particular person; if the identifying person fails to identify the person concerned, he shall be invited to explain the difference between the person referred to in his evidence and those shown to him for identification)

Declarations of persons present at the identity parade:
*None*

Annexes to the Record: *table of photographs*
(plans, schemes, pictures, photographic negatives, digital files, sound/video recordings etc.)

I have read the record, everything is written correctly.

| Identifying person | *Valdemar Savicki /signature/* |
|---|---|
| | (signature, name and surname) |
| Persons present | |
| | (signature, name and surname) |
| Interpreter | |
| | (signature, name and surname) |
| Identity parade conducted by | *Nadežda Michailovskienė, Chief Investigator at Division 3 of Board of Investigation of Crimes against Property of Criminal Police of Vilnius County Police Headquarters* |
| | (position held, name, surname) |

COPY IS TRUE. *Prosecutor Rasa Šimonė /signature/*

*Translation corresponds to the original text.*
*Mrs Erika Jadovienė, translator of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making false or deliberately misleading translation.*

EX-POLIAKOV-00091

Elektroninio dokumento nuorašas



### VILNIAUS APSKRITIES VYRIAUSIOJO POLICIJOS KOMISARIATO KRIMINALINĖS POLICIJOS NUSIKALTIMŲ NUOSAVYBEI TYRIMO VALDYBOS 3-IASIS SKYRIUS

2016-10-11 asmens parodymo atpažinti pagal jo nuotrauką protokolo priedas

## FOTOLENTELĖ NR. 1

| Data | 2016-10-11 |
|---|---|
| Ikiteisminio tyrimo Nr. | 38-1-00066-09 |



Nr. 1 Nuotrauka, kurioje V. Savicki rodo asmenį nuotraukoje Nr. 5, kurį atpažino.

| Vyresnysis tyrėjas | | Nadežda Michailovskienė |
|---|---|---|

EX-POLIAKOV-00092

KOPIJA TIKRA

*Translation from Lithuanian*

## VILNIUS COUNTY POLICE HEADQUARTERS
## CRIMINAL POLICE
## BOARD OF INVESTIGATION OF CRIMES AGAINST PROPERTY
## DIVISION 3

### Annex to the Photo-based Identity Parade Record dated 11 October 2016

### TABLE OF PHOTOGRAPHS No. 1

Date      *11 October 2016*
Pre-trial investigation No.      *38-1-00066-09*

[photograph]

Photograph No. 1 in which V. Savicki shows the person in the photograph No. 5 whom he has recognized.

Chief Investigator      */signature/*      Nadežda Michailovskienė

COPY IS TRUE. *Prosecutor Rasa Šimonė /signature/*

*Translation corresponds to the original text.*
*Mrs Erika Jadovienė, translator of the Prosecutor General's Office of the Republic of Lithuania, has been warned about criminal liability under Article 235 of the Criminal Code of the Republic of Lithuania for making false or deliberately misleading translation*

EX-POLIAKOV-00093